1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF OHIO
2                  WESTERN DIVISION

3   UNITED STATES OF AMERICA,-     Docket No. 3:10-cr-251
                              -
4       Plaintiff,            -     Toledo, Ohio
                              -     July 26, 2010
5          v.                 -     Bond Hearing
                              -
6   Hor I. Akl, et al.,       -
                              -
7       Defendant.            -
    -------------------------------

8
                  TRANSCRIPT OF BOND HEARING
9           BEFORE THE HONORABLE JAMES G. CARR
                UNITED STATES DISTRICT JUDGE.
10
    APPEARANCES:
11
    For the Plaintiffs:   United States Attorneys' Office
12                        By:  Justin E. Herdman
                               Duncan T. Brown
13                        Suite 400
                          801 Superior Avenue, W
14                        Cleveland, OH 44113
                          (216) 622-3965
15
                          U.S. Department of Justice
16                        Counter Terrorism Section
                          By:  S. Elisabeth Poteat
17                        950 Pennsylvania Avenue, NW
                          Washington, DC 20530
18                        (202) 616-9822

19  For the Defendant:    Helmick & Hoolahan
                          By:  Jeffrey J. Helmick
20                        2nd Floor
                          1119 Adams Street
21                        Toledo, OH 43604
                          (419) 243-3800

22  Court Reporter:       Tracy L. Spore, RMR, CRR
23                        1716 Spielbusch Avenue
                          Toledo, Ohio 43624
24                        (419) 243-3607

25  Proceedings recorded by mechanical stenography,
    transcript produced by notereading.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | (Commenced at 1:04 p.m.)                                     |
| 13:04:29 | 2  | THE CLERK:  10-CR-251.  United States of                 |
| 13:04:32 | 3  | America v. Hor Akl.  Matter called for detention          |
| 13:04:39 | 4  | hearing.                                                     |
| 13:04:40 | 5  | THE COURT:  The government is represented                 |
| 13:04:42 | 6  | by?                                                          |
| 13:04:42 | 7  | MR. HERDMAN:  Justin Herdman.                             |
| 13:04:43 | 8  | MS. POTEAT:  Lisa Poteat.                                 |
| 13:04:46 | 9  | MR. BROWN:  And Duncan Brown.  Good                       |
| 13:04:48 | 10 | afternoon, Your Honor.                                       |
| 13:04:50 | 11 | THE COURT:  And defendant is present in                   |
| 13:04:51 | 12 | court with his attorney, Mr. Jeffrey Helmick; is that      |
| 13:04:54 | 13 | right?                                                       |
| 13:04:54 | 14 | MR. HELMICK:  That's correct, Judge.  Mr.                 |
| 13:04:56 | 15 | Schulman is here, Sanford Schulman is here who            |
| 13:04:58 | 16 | represents the co-defendant.  He happened to be in        |
| 13:05:00 | 17 | town.  I asked him if he'd join me at counsel table.      |
| 13:05:04 | 18 | MR. SCHULMAN:  Good afternoon.                            |
| 13:05:04 | 19 | THE COURT:  Mr. Schulman.                                 |
| 13:05:10 | 20 | Is the government prepared to proceed?                    |
| 13:05:12 | 21 | MR. HERDMAN:  Yes, Your Honor.                            |
| 13:05:14 | 22 | THE COURT:  And is the defendant prepared to             |
| 13:05:17 | 23 | proceed?                                                     |
| 13:05:17 | 24 | MR. HELMICK:  Yes, Your Honor.                            |
| 13:05:18 | 25 | THE COURT:  Have each of you had a chance to             |

```
13:05:21   1   look at the Pretrial Service Officer's report?
13:05:25   2                 MR. HERDMAN:  I have, Your Honor.
13:05:26   3                 MR. HELMICK:  Yes, Your Honor.
13:05:30   4                 THE COURT:  Okay.  If I understand
13:05:34   5   correctly, Mr. Helmick, you're proposing that the same
13:05:39   6   property be pledged to secure whatever bond; is that
13:05:52   7   correct?
13:05:52   8                 MR. HELMICK:  That's correct, Your Honor.
13:05:53   9                 THE COURT:  And one additional property?
13:05:55  10                 MR. HELMICK:  That's correct.   There's one
13:05:57  11   additional piece of property at the bottom.   Judge,
13:06:00  12   with regard to that piece, I know this is unusual, but
13:06:03  13   may we approach?
13:06:05  14                 THE COURT:  Sure.
13:17:08  15                 (Whereupon the following discussion was had
13:17:08  16   at the bench outside the hearing of the courtroom:)
13:17:08  17                 THE COURT:  There will be two things.
13:17:08  18   Let's take care of this first.
13:17:08  19                 (Portion of the record sealed by order of
13:17:09  20   the Court.)
13:17:09  21                 MR. HELMICK:  Judge, this is just not my
13:17:09  22   day.   With regard to the new piece of property, which
13:17:09  23   is at 8703 Garden Road in Montclova and owned by Nazem
13:17:09  24   Akl, which is my client's first cousin, Judge, I didn't
13:17:09  25   want to say this in open court, but his wife is -- she
```

13:17:09  1    has thyroid cancer, and she's undergoing very difficult

13:17:09  2    treatment, both chemotherapy and radiation.   She

13:17:09  3    completed a round of radiation, and she needs to have a

13:17:09  4    scan this morning and additional testing and the

13:17:09  5    follow-up with the doctor.   He took her.   I doubt if

13:17:09  6    he can be here, which is obviously a problem for me.   I

13:17:09  7    can get him in tomorrow, Friday, at some later date with

13:17:09  8    you or with the magistrate.

13:17:09  9            THE COURT:   I think the main thing, if I

13:17:09  10   accepted that, I will want to -- maybe the thing to do

13:17:09  11   is I will read the drill into the record, and then you

13:17:09  12   represent to me you will go over with him or her or

13:17:09  13   whatever.   The main thing is I go through one by one on

13:17:09  14   the property bond to make sure they understand I'll take

13:17:09  15   the house, end of discussion.   Talk to Butch Wilson

13:17:09  16   about this.

13:17:09  17           MR. HELMICK:   I know this has happened at

13:17:09  18   least a couple times on people you've released.

13:17:09  19           With regard to one other piece of property,

13:17:09  20   Abdul Akl, that is Hor's cousin and Amera's uncle, he

13:17:09  21   had to leave for Lebanon.   He posted for Amera.   He

13:17:09  22   said he would post it here.   He executed a

13:17:09  23   power-of-attorney.   I prepared it.   The

13:17:09  24   power-of-attorney appoints Amera's mother, which is his

13:17:09  25   niece -- I'm sorry, his sister, to have

13:17:09  1    power-of-attorney.

13:17:09  2              THE COURT:  Following the genealogical chain

13:17:09  3    of the kings of England.

13:17:09  4              MR. HELMICK:  But nevertheless, he is not

13:17:09  5    here because he went to Lebanon.   She has

13:17:09  6    power-of-attorney.  I have a copy of the

13:17:09  7    power-of-attorney.   I prepared it; I'll provide the

13:17:09  8    government and the Court with a copy.   It specifically

13:17:09  9    sets forth his acknowledgment.  He's already posted it

13:17:09  10   for Amera.   He understands it's at risk if she flees or

13:17:09  11   doesn't comply with the orders of the Court.   He's also

13:17:09  12   making it available for Hor as well, and he understands

13:17:09  13   likewise if Hor would flee or not obey the Court's

13:17:09  14   order, his property could be lost or taken.

13:17:09  15             THE COURT:  Not "could" be.

13:17:09  16             MR. HELMICK:  I think it does say "will,"

13:17:09  17   actually.

13:17:09  18             MR. HERDMAN:  Just briefly in response, Mr.

13:17:09  19   Nazem Akl is the only individual on the list who's not

13:17:09  20   previously been inquired of by government counsel or the

13:17:09  21   Court.   So I would ask for some latitude, probably very

13:17:09  22   limited, but some opportunity to inquire at least as to

13:17:09  23   the nature of the property, et cetera.

13:17:09  24             THE COURT:  Have you been able to do any

13:17:09  25   record checks on these people?

13:17:09  1          MR. HERDMAN:  Well, on everyone but --

13:17:09  2  actually, I think Nazem Akl had already been completed

13:17:09  3  by Pretrial at the request of Amera.  He had originally

13:17:09  4  proposed that piece of property on behalf of Amera Akl

13:17:09  5  as well.  I think most has been done.  I think the

13:17:09  6  magistrate said, I have enough.  We stopped at that

13:17:09  7  point.  So we never got to Nazem Akl, if I remember

13:17:09  8  correctly from the hearing.

13:17:09  9          MS. POTEAT:  Did you want to make

13:17:09  10  representations what you know that is based on, the

13:17:09  11  property assessment?

13:17:09  12          My understanding is the figures come from

13:17:09  13  the property assessment or tax assessment, which may not

13:17:09  14  be up to date with respect to the value of the property

13:17:09  15  and how it's encumbered.

13:17:09  16          MR. HELMICK:  That's possible.

13:17:09  17          THE COURT:  I got a notice of reduction a

13:17:09  18  year ago.

13:17:09  19          I'm willing to assume the value may be as

13:17:09  20  much as ten percent at today's -- given the current

13:17:09  21  market condition.  I'll pick a random number.

13:17:09  22          MR. HELMICK:  We can ask them about that,

13:17:09  23  obviously.  I will point out to the Court that the

13:17:09  24  numbers I got were from the agreement to forfeit

13:17:09  25  property, which was prepared by the Court's officers

13:17:09  1    with Pretrial Services in terms of listing the values of

13:17:09  2    the property and mortgage balances.

13:17:09  3               MR. HERDMAN:  Just as a general matter, too,

13:17:09  4    Jeff and I talked about this.  In some sense I feel

13:17:09  5    he's putting the cart before the horse.  I want some

13:17:09  6    guidance on how you would like to proceed here today.

13:17:09  7               THE COURT:  I'm going to ask you what your

13:17:09  8    position is.  I'm going to hear from him, then let you

13:17:09  9    respond, and play advocacy ping-pong back and forth, and

13:17:09  10   make my mind up.

13:17:09  11              MR. HELMICK:  So I gather you don't want me

13:17:09  12   to call anybody yet until you decided you're even

13:17:09  13   interested in hearing about the property?

13:17:09  14              (End of side-bar discussion.)

13:17:09  15              THE COURT:  Are we now ready to proceed, Mr.

13:17:09  16   Herdman?

13:17:09  17              MR. HERDMAN:  Yes, Your Honor.

13:17:09  18              THE COURT:  Mr. Helmick?

13:17:09  19              MR. HELMICK:  Yes, Your Honor.  Thank you.

13:17:09  20              THE COURT:  Mr. Herdman.

13:17:09  21              MR. HERDMAN:  Your Honor, obviously we're

13:17:09  22   here on the defendant's motion for bond in this case.

13:17:09  23   And the government's position, quite simply, is that Mr.

13:17:09  24   Akl poses a substantial risk of flight in this instant

13:17:09  25   case.  It's based on a number of factors.  I'll go

13:17:09 1    through them relatively quickly.

13:17:09 2            But first and foremost is the nature of the

13:17:09 3    charges against Mr. Akl.   One of the charges, in fact

13:17:09 4    the lead charge is a violation of conspiracy to provide

13:17:09 5    material support to a designated foreign terrorist

13:17:09 6    organization, a violation of 18 U.S.C. 2339(b).  And

13:17:09 7    that statute -- a charge with that statute obviously

13:17:09 8    carries with it a presumption that the defendant

13:17:09 9    possesses both a risk of flight and a danger to the

13:17:09 10   community.   I'll address my comments almost exclusively

13:17:09 11   to the risk of flight analysis here.

13:17:09 12           THE COURT:  I candidly don't see much in the

13:17:09 13   way of danger to the community in light of the

13:17:09 14   recurrence of a similar kind of conduct.   If I

13:17:09 15   understand from the complaint correctly, whatever funds

13:17:09 16   were anticipated -- was anticipated were going to be

13:17:09 17   sent overseas would have come ultimately from the

13:17:09 18   government.   If I am mistaken in that, tell me.

13:17:09 19   That's the impression I have.   And I can't imagine the

13:17:09 20   government's about to resume those kinds of

13:17:09 21   negotiations.

13:17:09 22           MR. HERDMAN:  And so I'll address these to

13:17:09 23   the fact that Hor Akl is himself as a standalone matter,

13:17:09 24   that's taken outside the fact he's being charged with a

13:17:09 25   conspiracy, as a standalone, Mr. Akl is a substantial

flight risk.

First, the severity of the charges in this case.  You're aware the money laundering charges carry a 20-year statutory max, and the government is persuaded that the terrorism enhancement is likely to apply or we would seek for it to apply, in which case the maximum sentence under Counts 2 and 3 would be 240 months and would be achievable under the Sentencing Guidelines with use of the terrorism enhancement.  And moreover, there are separate counts of arson which carries a ten-year mandatory minimum, and the government's position would be that that probably is --

THE COURT:  That's the mandatory minimum?

MR. HERDMAN:  Mandatory minimum, Your Honor. And the government's position is that probably would have to be served consecutively, as well as the bankruptcy fraud charges would also probably have to be served consecutively.

THE COURT:  What do they carry?

MR. HERDMAN:  They are a five-year maximum sentence, Your Honor, on each charge.  I think there's three.

THE COURT:  Why would they have to be served consecutively?

MR. HERDMAN:  They are part of -- it is a

13:17:09  1   set of circumstances in conduct that is, although it's

13:17:09  2   tied in with the money laundering, and the government's

13:17:09  3   position it's also tied in with the material support,

13:17:09  4   that that conduct may -- I should say may need to be

13:17:09  5   served consecutively.   I haven't done a very careful

13:17:09  6   analysis, but it's possible.

13:17:09  7           THE COURT:  It seems hard for me to imagine

13:17:09  8   that it would be a mandatory consecutive.

13:17:09  9           MR. HERDMAN:  I may have misspoken,

13:17:09  10  certainly not mandatory consecutive.   It would be --

13:17:09  11          THE COURT:  We can approach this from the

13:17:09  12  standpoint the government is going to prevail on all the

13:17:09  13  charges, can and will be seeking whatever the maximum

13:17:09  14  term is.

13:17:09  15          MR. HERDMAN:  Yes, Your Honor.

13:17:09  16          THE COURT:  -- terms are.

13:17:09  17          Go ahead.

13:17:09  18          MR. HERDMAN:  With respect to Mr. Akl

13:17:09  19  himself, this is an individual that has long-term and

13:17:09  20  sustained ties overseas, primarily to Lebanon.   His

13:17:09  21  immediate family resides in Lebanon.   He has business

13:17:09  22  interests in Lebanon, I think a piece of family property

13:17:09  23  and a water park.   I believe that water park is an

13:17:09  24  income-generating property.   As well as he retains some

13:17:09  25  notion of allegiance or affinity to Lebanon.   When he

13:17:09  1  was interviewed by agents, he stated he has an entire

13:17:09  2  life over in Lebanon that's separate and apart from that

13:17:09  3  life that he has in the United States.  He is a

13:17:09  4  Lebanese passport holder and a U.S. passport holder.

13:17:09  5  And he has through his -- through his brother apparently

13:17:09  6  he has some longstanding ties to the Lebanese

13:17:09  7  government.  And I believe at one point in time he was

13:17:09  8  even able to get a military service requirement absolved

13:17:09  9  or taken care of through his ties to the Lebanese

13:17:09  10  government.

13:17:09  11       THE COURT:  This is a little off subject,

13:17:10  12  but while it occurs to me, what did he do until a year

13:17:13  13  or so ago, cook at Spice Bar?

13:17:19  14       MR. HERDMAN:  Yes.  I'll let Mr. Helmick

13:17:21  15  speak to that.  He was an owner and operator of a

13:17:25  16  restaurant, I think maybe until December of 2007, the

13:17:28  17  fall of 2007.  And he's been primarily unemployed since

13:17:31  18  then.

13:17:31  19       But actually that's an important point,

13:17:34  20  which is that Mr. Akl, were he to flee the jurisdiction

13:17:39  21  and go overseas, is more than capable of -- he has a set

13:17:42  22  of skills that are fungible.  It doesn't matter where

13:17:46  23  he is in the world.  He can provide construction

13:17:48  24  services.  He is apparently a skilled carpenter,

13:17:52  25  construction worker, and would be capable of providing

13:17:55  1   not only for himself but his family by pursuing that

13:17:58  2   line of work, which I think would be available pretty

13:18:02  3   much anywhere in the world.

13:18:05  4             Mr. Akl has travelled many times over to

13:18:09  5   Lebanon.  Again, I think that's a demonstration of the

13:18:13  6   affection he still retains for that country and the ties

13:18:17  7   that he has to that country, his family that is in that

13:18:19  8   country, and his business interests that are in that

13:18:22  9   country.

13:18:23  10            And he's also demonstrated an ability to

13:18:25  11   obtain tickets to travel over to Lebanon on relatively

13:18:30  12   short notice and pay cash for them.   And those

13:18:32  13   allegations are laid out in both the complaint and the

13:18:35  14   indictment,  Your Honor.

13:18:38  15            And as you read the charges in the

13:18:41  16   indictment, it's very clear that the defendant saw this

13:18:45  17   opportunity to launder money and provide support to

13:18:49  18   Hezbollah.

13:18:51  19            THE COURT:  Well, and make 30 percent along

13:18:53  20   the way.

13:18:53  21            MR. HERDMAN:  Yes.  And he saw this as a

13:18:55  22   moneymaking opportunity.  And the purpose of that, Your

13:18:57  23   Honor, was to provide him with the ability to sustain

13:19:00  24   business interests in both Lebanon and the United

13:19:03  25   States, and to provide for a life for him and his family

13:19:06  1    in both Lebanon and in the United States.   I submit

13:19:09  2    that that is a very important factor in analyzing the

13:19:12  3    risk of flight that this defendant poses.   Because he

13:19:15  4    is somebody that would be more than willing to relocate

13:19:18  5    not just himself but his entire family back over to

13:19:20  6    Lebanon.

13:19:21  7            And I also would point out Lebanon is not

13:19:24  8    the only country with which this defendant is familiar.

13:19:26  9    He lived for a period of time in Brazil as a young man.

13:19:30  10   I don't know what his level of Portuguese speaking

13:19:32  11   ability is, but I think he lived there for at least four

13:19:35  12   years.   And he also has family in Brazil.   So this is

13:19:40  13   yet another option were he to elect to leave the

13:19:44  14   jurisdiction.

13:19:45  15           THE COURT:  Let met ask you this:  How, in

13:19:49  16   the government's view, could that be accomplished?  In

13:19:53  17   all candor, where could he go and how could he get

13:19:56  18   there, either by himself or with his wife and three

13:19:59  19   children?

13:20:00  20           MR. HERDMAN:  I'm somewhat reluctant to lay

13:20:04  21   out maybe a step-by-step, but I think as a general

13:20:07  22   matter, Your Honor, the fact that the defendant is a

13:20:10  23   Lebanese passport holder, as is his wife, I have perhaps

13:20:15  24   a reduced confidence in our ability to monitor whether

13:20:21  25   the Lebanese government would be willing to reissue

13:20:24  1  travel documents.  I'm not saying it's impossible, but

13:20:27  2  I'm not sure I have a comfort level that that government

13:20:30  3  either has a desire or an ability to restrict issuance

13:20:33  4  of travel documents were Mr. Akl to request them.

13:20:37  5  Whereas I maybe have a greater --

13:20:39  6        THE COURT:  I suppose also, given at least

13:20:42  7  the government's view of connections with Hezbollah, the

13:20:45  8  opportunity to obtain false U.S. Lebanese or other

13:20:50  9  passports would probably be something to take into

13:20:53  10  account?

13:20:55  11        MR. HERDMAN:  It's certainly a possibility.

13:20:57  12  And one other thing I wanted to point out, Your Honor,

13:21:00  13  was that -- and I think this is in line with your

13:21:03  14  question.  The fact that the defendant's wife is already

13:21:09  15  out on bond I think is another significant factor here.

13:21:13  16  And it substantially increases the likelihood that they

13:21:16  17  would both as a couple pose a risk of flight.  I'm

13:21:19  18  fairly comfortable as we sit here today knowing that

13:21:22  19  Amera Akl is out on bond and Hor Akl is in, that it's

13:21:27  20  less likely that she would elect to flee with him still

13:21:31  21  being detained.  However, were they both out on bond,

13:21:33  22  Your Honor, I think that significantly increases the

13:21:35  23  likelihood that they would flee.  And there's a couple

13:21:38  24  reasons why that is.  One is they could do it together.

13:21:40  25  They could stay united as a family unit with the

13:21:43    1    children.    Secondly, it also increases their ability to

13:21:48    2    coordinate a movement out of the country were they to

13:21:52    3    elect to do so.    And thirdly, Hor Akl does not have the

13:21:59    4    longstanding ties to the Toledo area that Amera Akl has.

13:22:04    5    His family in the area, to the extent he has any not

13:22:07    6    purely through his marriage to Amera Akl, is, I think,

13:22:10    7    of the nature of second cousins, perhaps an uncle or

13:22:14    8    two, although I'm not entirely certain about that.

13:22:17    9    What I'm saying is that Amera Akl is, of the two members

13:22:22   10    of the couple here, two married members of the couple

13:22:26   11    here, Amera Akl is the one who has the closest

13:22:29   12    relationships here in Toledo.    And I would submit she's

13:22:33   13    probably less likely to flee because she -- most of what

13:22:37   14    she knows is here in the United States.    Whereas Hor

13:22:40   15    Akl, he, as a single or family unit, does not have the

13:22:45   16    close -- I'm talking immediate family ties to Toledo

13:22:48   17    that Amera Akl does.

13:22:50   18              THE COURT:  Are his parents still living?

13:22:52   19              MR. HERDMAN:  I believe his mother is still

13:22:54   20    alive is what Mr. Helmick's motion said.    And he has a

13:22:58   21    number of siblings over in Lebanon as well.    So the

13:23:04   22    fact that the couple would both be out on bond is, I

13:23:08   23    think, a significant factor.

13:23:10   24              THE COURT:  In terms of where would they go

13:23:15   25    and how could they get there, what control, if any, does

13:23:19  1  the government have over whatever assets they have, cash

13:23:21  2  or whatever?  Do you have any at all?

13:23:25  3          MR. HERDMAN:  Well, that's actually another

13:23:27  4  issue entirely which is that --

13:23:29  5          THE COURT:  If you want to address that,

13:23:30  6  that's fine.

13:23:31  7          MR. HERDMAN:  There was seizure -- when

13:23:33  8  search warrants were executed, there was a seizure of

13:23:36  9  approximately $5,000 in U.S. currency.  Quite frankly,

13:23:42  10  Your Honor, we're not entirely sure where that money

13:23:44  11  came from.  As I said, Mr. Akl, he was not employed

13:23:49  12  regularly -- well, actually, he was employed on somewhat

13:23:52  13  of a part-time basis at a business owned by Amera Akl's

13:23:58  14  family.

13:23:59  15          THE COURT:  Mugshots?

13:24:00  16          MR. HERDMAN:  Mugshots bar.  That's a

13:24:02  17  fairly large amount of cash to keep around the house,

13:24:05  18  $5,000.  I suppose it's possible that that was derived

13:24:09  19  from the salary at Mugshots bar, although it seems like

13:24:12  20  kind of a high amount to have earned as either a bouncer

13:24:17  21  or bartender.

13:24:18  22          So what I think that that indicates is

13:24:21  23  that -- and that money, by the way, the government did

13:24:24  24  not know that that money, at least in that amount, was

13:24:26  25  going to be present in the house.  So that was a little

13:24:30    1    bit of a surprise.  And I think what that indicates is

13:24:32    2    we did not have a tremendous amount of visibility on the

13:24:35    3    cash proceeds that the Akls either had obtained or had

13:24:40    4    access to.  I think the access to is the part that the

13:24:44    5    Court should take particular notice of because of maybe

13:24:48    6    some of the more established ties with Amera Akl's

13:24:53    7    family in the community here.  Maybe it's possible they

13:24:56    8    would have short notice to cash.  For instance, I point

13:24:59    9    out in this indictment Amera Akl was able to obtain

13:25:02   10    $6,000 in cash on a relatively short notice in order to

13:25:05   11    pay off the Chevy Trail Blazer that was to be used to

13:25:10   12    smuggle the money over to Lebanon.  And that, I think,

13:25:13   13    in the reading of the indictment, that occurred in a

13:25:16   14    couple of days, she was able to raise that amount of

13:25:18   15    money.  So I guess as a general matter I don't have a

13:25:23   16    real comfort that we have an ability to seize or freeze

13:25:29   17    or even monitor all the assets that the Akls either have

13:25:33   18    or have access to.

13:25:39   19            Another point that should be clear from the

13:25:40   20    indictment is this defendant has taken numerous

13:25:43   21    opportunities to be less than forthright and honest with

13:25:46   22    members of the U.S. government.  The bankruptcy fraud

13:25:49   23    charge alone establishes that he's lied in the past to

13:25:53   24    the bankruptcy judge.  He lied in the past in the

13:25:56   25    petition that was filed with the Bankruptcy Court.  He

13:25:58  1  also lied to Customs officials when he came back into

13:26:01  2  the United States following his March trip to Lebanon.

13:26:04  3  And even the arson charge contains some misstatements.

13:26:09  4  There's a police report that was filed on the date of

13:26:11  5  the arson.   There were statements that were made to

13:26:13  6  insurance investigators that are, I guess,

13:26:16  7  quasi-governmental, even though I admit it's a private

13:26:20  8  company.  But there is a defendant who really, as you

13:26:22  9  read the indictment, it's very clear that he was more

13:26:25  10  than willing to engage in untruths, false statements to

13:26:29  11  government officials to advance his own interests.   And

13:26:33  12  really the conspiracy itself, that's in large measure

13:26:35  13  what the conspiracy was about, evading reporting

13:26:37  14  requirements for cash transactions that were going to go

13:26:41  15  overseas, smuggling items hidden away in vehicles that

13:26:47  16  were to be sent overseas, in essence hiding this

13:26:49  17  criminal activity as far under the radar of the

13:26:54  18  government as was possible.   And I think that that's

13:26:56  19  another factor that goes to --

13:26:59  20          THE COURT:  Can I jump ahead?  Something

13:27:02  21  else occurs to me.   And Mr. Helmick has probably not

13:27:07  22  thought about this, but you may have talked to people.

13:27:12  23  If I were to release him but not to the family residence

13:27:16  24  but to some third-party custodian's residence, but -- go

13:27:20  25  ahead.   I mean, that might address that concern of

13:27:23  1   yours.  At least they wouldn't be easily and readily in

13:27:29  2   contact with each other.

13:27:30  3              But go ahead.   I take note of what you're

13:27:32  4   saying.

13:27:33  5              MR. HERDMAN:   I think to address that point,

13:27:36  6   my understanding of the custodians that have been

13:27:38  7   proposed is that they're family members, and in some

13:27:41  8   cases joint family members.   I know Amera Akl's father

13:27:45  9   has been proposed as a possible custodian.   And yes, it

13:27:48  10  would limit the face-to-face interaction between the

13:27:50  11  defendants, but I don't know that it would entirely

13:27:52  12  eliminate that possibility of using a very close

13:27:55  13  relative as a go-between for certain communications.

13:27:59  14  I'm just thinking off the top of my head.   That's my

13:28:04  15  reaction to it.

13:28:06  16             I think in essence Mr. Akl in particular

13:28:09  17  poses a very substantial risk of flight.   And the

13:28:14  18  government did not stand up in court and make the same

13:28:17  19  argument with respect to Mrs. Akl, and for various

13:28:20  20  obvious reasons; I've gone through some of them.

13:28:24  21             We do acknowledge the fact the couple has

13:28:26  22  three -- one teenager and two younger children at home.

13:28:30  23  We're not immune to that fact.   However, were Mr. Akl

13:28:34  24  to be released, the government is quite fearful that he

13:28:38  25  would pose not only a substantial risk of flight for

13:28:41   1   himself, but it would also increase the risk that Amera

13:28:44   2   Akl would seek to flee as well.

13:29:02   3          THE COURT:  Mr. Helmick, would you like a

13:29:11   4   recess to determine if there might be a separate

13:29:13   5   third-party custodian?  I mean, I'm going to be very

13:29:17   6   forthright with you.  I think that there is a risk of

13:29:23   7   flight.  If nothing else, it begins with the potential

13:29:30   8   sentence.  And solely for the purpose of this hearing,

13:29:41   9   if one were to assume a conviction were to occur -- what

13:29:46   10  would the maximum potential term be if it were all to be

13:29:51   11  added up, there were convictions on all counts and

13:29:54   12  factoring in however the guidelines work and all of

13:29:57   13  that?

13:29:58   14         MR. HERDMAN:  I feel comfortable saying 30

13:30:00   15  years.  And that's not including the bankruptcy fraud

13:30:05   16  charges, Your Honor.

13:30:06   17         THE COURT:  Or the arson charges?

13:30:08   18         MR. HERDMAN:  That does include the arson.

13:30:09   19  It would be a 20-year maximum for the money laundering,

13:30:12   20  which I think would be concurrent with any conviction on

13:30:14   21  the material support charge, which is a 15-year

13:30:18   22  statutory maximum.  20 years, then I think that that

13:30:21   23  ten-year or so mandatory would have to be served,

13:30:26   24  mandatory minimum.

13:30:27   25         THE COURT:  The arson is -- the only, quote,

13:30:30   1    "mandatory," close quote, is the ten-year on the arson?

13:30:40   2          Can you perhaps, if you're able to do so,

13:30:43   3    give me a list of information about the government's

13:30:46   4    anticipated proof?  With regard to some of the other

13:30:48   5    charges, it's pretty clear from the complaint and

13:30:51   6    indictment what the government anticipates using by way

13:30:54   7    of evidence.  But what about in terms of the arson?

13:30:57   8    I'm not sure that that's as apparent, so I think that's

13:31:00   9    important for me to get some sense.

13:31:04  10          MR. HERDMAN:  At a certain point I may have

13:31:06  11    to defer to Mr. Brown on some of the particulars.

13:31:08  12          THE COURT:  If it's easier to simply pass

13:31:13  13    the baton --

13:31:13  14          MR. HERDMAN:  I hate to put him on the spot

13:31:15  15    like that, but that's his area of expertise.  But I'll

13:31:19  16    speak generally, which is there were several admissions

13:31:22  17    by Amera Akl, very particular admissions with respect to

13:31:25  18    the vehicle that the arson was committed on: make and

13:31:29  19    model, a year of the vehicle, and the approximate time

13:31:34  20    that the vehicle was set on fire.  And a very cursory

13:31:37  21    search of insurance records and police records indicated

13:31:41  22    that, in fact, there was a car that caught on fire.

13:31:45  23    Amera Akl even indicated the location where the

13:31:48  24    vehicle --

13:31:48  25          THE COURT:  Out in Henry County or Fulton

| | | |
|---|---|---|
| 13:31:51 | 1 | County? |
| 13:31:51 | 2 | MR. HERDMAN:  Fulton County. |
| 13:31:54 | 3 | And specified the road to take to get out to |
| 13:31:56 | 4 | where the car was set on fire.  Lo and behold, all of |
| 13:32:00 | 5 | those statements were corroborated by the records. |
| 13:32:03 | 6 | Hor Akl was the individual driving the car |
| 13:32:05 | 7 | and filed the police report.  I have to say he did not |
| 13:32:08 | 8 | make any specific admissions to that effect, although he |
| 13:32:11 | 9 | did make passing references throughout the case in |
| 13:32:14 | 10 | recorded conversations to the effect that he was good at |
| 13:32:16 | 11 | burning things, setting things on fire.  Most of this |
| 13:32:19 | 12 | was done in a joking fashion, I have to say.  But the |
| 13:32:24 | 13 | family spent a lot of time sitting around a fire -- |
| 13:32:27 | 14 | THE COURT:  It will be in the evidence? |
| 13:32:28 | 15 | MR. HERDMAN:  Yes, Your Honor.  And the |
| 13:32:29 | 16 | records -- there's also a phone call that Hor Akl made |
| 13:32:33 | 17 | to the insurance investigator where it's reported, he |
| 13:32:39 | 18 | kind of describes what happened.  My initial take on |
| 13:32:42 | 19 | it, it seems somewhat implausible that the car just |
| 13:32:45 | 20 | caught on fire as he was driving it, that he had no |
| 13:32:48 | 21 | prior issues with it.  But that's a summary of the |
| 13:32:50 | 22 | case. |
| 13:32:51 | 23 | THE COURT:  So the government would contend |
| 13:32:52 | 24 | at the very least that there's a fair to considerable |
| 13:32:57 | 25 | likelihood of conviction on that charge? |

| | | |
|---|---|---|
| 13:33:00 | 1 | MR. HERDMAN:  Yes. |
| 13:33:12 | 2 | THE COURT:  Mr. Helmick, let me start with |
| 13:33:26 | 3 | this.  You're offering about how much in equity by the |
| 13:33:40 | 4 | time you get done? |
| 13:33:41 | 5 | MR. HELMICK:  Well, Judge, my rough |
| 13:33:43 | 6 | calculation from what's listed here, this doesn't |
| 13:33:48 | 7 | incorporate the argument by the government, is a net of |
| 13:33:54 | 8 | about a million dollars in equity.  Most of the |
| 13:34:00 | 9 | properties, as the Court can see, are residences. |
| 13:34:02 | 10 | There is one business listed. |
| 13:34:04 | 11 | THE COURT:  Which one is the business? |
| 13:34:08 | 12 | MR. HELMICK:  The third property down. |
| 13:34:12 | 13 | THE COURT:  What business is that? |
| 13:34:14 | 14 | MR. HELMICK:  That's a business owned by |
| 13:34:15 | 15 | Amera's uncle and Hor's cousin.  It is now posted for |
| 13:34:27 | 16 | her as well. |
| 13:34:28 | 17 | Judge, is the Court still concerned about |
| 13:34:29 | 18 | location in terms of where he might be placed and away |
| 13:34:32 | 19 | from her? |
| 13:34:33 | 20 | THE COURT:  Yes.  Why don't you tell me |
| 13:34:35 | 21 | what the options are. |
| 13:34:36 | 22 | MR. HELMICK:  I had anticipated this might |
| 13:34:37 | 23 | be a problem, but maybe not so much with non-family |
| 13:34:40 | 24 | custodians but with location.  One possibility may be |
| 13:34:45 | 25 | for Amera to move in with her parents, who live here in |

13:34:48   1   town, one of whom is already her custodian.   And that

13:34:52   2   would mean leaving the marital household where Hor lived

13:34:56   3   and she lived prior to their arrest and that Hor would

13:34:59   4   live there with the children or with the children

13:35:02   5   part-time, depending on how we could work that out.

13:35:06   6   And that we would then have to come up with custodians

13:35:09   7   as well to cover Hor's release during that period of

13:35:14   8   time as well, but we could physically keep them apart

13:35:17   9   that way if that's what the Court desires and the Court

13:35:19  10   feels that that would be helpful.   Obviously my request

13:35:22  11   was going to be that the family be reunited.   I

13:35:25  12   understand the concerns the government is articulating.

13:35:28  13          THE COURT:   I think it's a very fair

13:35:30  14   concern.   I really do.

13:35:31  15          MR. HELMICK:   Frankly, Judge --

13:35:33  16          THE COURT:   I hadn't thought about it

13:35:34  17   before, but I do.

13:35:35  18          MR. HELMICK:   I have to assert I think it's

13:35:37  19   pretty implausible for a lot of practical reasons, like

13:35:40  20   the Von Trapp family, they'd somehow in the middle of

13:35:43  21   the night, the five of them would somehow move across

13:35:46  22   the border and be able to leave the country.   But I

13:35:49  23   agree it's not necessarily impossible, but I think it's

13:35:52  24   highly unlikely.

13:35:53  25          THE COURT:   I would want to reduce that risk

13:35:55  1    to the extent possible.

13:35:57  2                MR. HELMICK:  The children, by the way, are

13:35:58  3    ages 15, 7 and 4.   Just so the Court is aware.

13:36:02  4                That may be something that we can engineer

13:36:04  5    or accomplish, Your Honor.

13:36:05  6                And the living situation I just described,

13:36:08  7    Amera going to her parents, Hor staying at the marital

13:36:12  8    home, I think we could absolutely work out or

13:36:15  9    accomplish.

13:36:16  10               THE COURT:  Let me ask you this:  How is the

13:36:18  11   family being supported?  Is there a mortgage on their

13:36:21  12   house?

13:36:21  13               MR. HELMICK:  Yes, Judge.   They are being

13:36:23  14   supported by his and Amera's family.   Judge, they are

13:36:27  15   second cousins; husband and wife and second cousins.

13:36:31  16   So he actually does have a blood relationship with some

13:36:34  17   of the people that are here.   Although the government

13:36:36  18   is correct; his siblings and his mother live in Lebanon.

13:36:40  19   That much is true.   But yes, Judge, I think that is

13:36:42  20   something we could accomplish if that would be

13:36:44  21   acceptable to the Court.

13:36:46  22               MR. HERDMAN:  Your Honor, if I may briefly

13:36:48  23   reply on that.   I wouldn't altogether discount the

13:36:50  24   possibility that Hor Akl would flee on his own.  I think

13:36:54  25   that possibility is real.  Although I would tell you I'm

13:36:57  1   more concerned about them -- as I think Mr. Helmick

13:37:00  2   tried to put it, them fleeing together as a family unit.

13:37:03  3            And there's one -- I'm not going to make any

13:37:06  4   representations about the status of the marital

13:37:08  5   relationship between Hor and Amera.   I did want to

13:37:11  6   point out, though, I think Mr. Helmick is aware of this,

13:37:14  7   that there was a divorce petition that had been filed

13:37:17  8   about four or five years ago.   At some point in time it

13:37:20  9   was withdrawn.   And I just want to point that out to

13:37:22 10   the Court.

13:37:22 11            THE COURT:  By whom?  Do you know?

13:37:24 12            MR. HERDMAN:  I don't know the specifics of

13:37:26 13   it.   I could try to get those.   And I don't know that

13:37:28 14   it says a whole lot about what the current status of the

13:37:31 15   relationship is.  But I do think it's a factor that, to

13:37:33 16   the extent that the possibility of Hor Akl fleeing on

13:37:36 17   his own exists, I do think it's an important factor that

13:37:39 18   the Court should take into account.

13:37:50 19            THE COURT:  I'm inclined to approve the

13:37:56 20   request that he be released under various conditions.

13:37:59 21   I obviously would stay any such order giving the

13:38:03 22   government the opportunity to appeal, as I assume it

13:38:06 23   would want to.   Certainly there is a significant risk

13:38:11 24   of flight whenever any defendant is faced with a

13:38:16 25   potential sentence of upwards of 30 years or even

13:38:23  1   something significantly less.  And do you know the

13:38:27  2   guideline range, Mr. Herdman?

13:38:29  3               MR. HERDMAN:  With the application of the

13:38:31  4   terrorism enhancement, Your Honor?

13:38:33  5               THE COURT:  Yes.  What's the worst case

13:38:35  6   scenario in terms of the guidelines?

13:38:38  7               MR. HERDMAN:  It would be at the 240-month

13:38:41  8   level.

13:38:41  9               THE COURT:  So were I to remain within the

13:38:42  10  guidelines but impose the maximum, it would be 240

13:38:46  11  months?  Is there a lower end to that range?

13:38:49  12              MR. HERDMAN:  There is, Your Honor.  I

13:38:51  13  didn't bring my handbook.

13:38:52  14              THE COURT:  I don't know either.  That's

13:38:54  15  why I'm asking.

13:38:55  16              MR. HERDMAN:  I think I have it

13:38:56  17  electronically.

13:39:00  18              THE COURT:  Do you have a guideline book

13:39:02  19  with you?

13:39:03  20              MR. MARTIN:  No, I don't.

13:39:05  21              MR. HERDMAN:  Mr. Brown has one.  I'll get

13:39:07  22  that information for you.

13:39:19  23              Your Honor, I believe he'd be about offense

13:39:23  24  level 37, which with application of the enhancement

13:39:27  25  would also be at Category VI for Criminal History.

13:39:30  1   That range is 360 to life.   And my understanding of the

13:39:34  2   operation of the Guidelines is that the effective

13:39:36  3   guideline sentence then would be 240 months, which would

13:39:41  4   be the maximum cap of the 20 year statutory max.

13:39:45  5          THE COURT:  And I would have some discretion

13:39:47  6   under Booker somewhere in between ten years and 20

13:39:50  7   years?

13:39:51  8          MR. HERDMAN:  Certainly.

13:39:57  9          THE COURT:  Well, perhaps not in a

13:40:01  10  particularly orderly manner, let me explain particularly

13:40:05  11  for the government so it can respond what it is that

13:40:09  12  makes me believe that the risk of flight can be

13:40:14  13  minimized, by no means eliminated, given the proposed

13:40:21  14  conditions and others that I would contemplate imposing.

13:40:30  15         The people who know this man best of any of

13:40:33  16  us, six of them if I count correctly, at least in terms

13:40:39  17  of owners of six properties -- eight properties --

13:40:47  18         MR. HELMICK:  Correct, Your Honor.

13:40:47  19         THE COURT:  -- seven of which are family

13:40:50  20  residences, are all willing to say:  We know this man;

13:40:56  21  we know what he is charged with.

13:40:59  22         I assume they know the significance of the

13:41:04  23  charge, not just in terms of the potential outcome, but

13:41:08  24  in terms of the mindset that manifests that.

13:41:18  25  Nonetheless, we are willing to post our family homes.

13:41:24  1        And before accepting that offer I would talk

13:41:28  2   with each of them who are here and see to it that the

13:41:31  3   others who are not were made fully aware that in the

13:41:37  4   event of the breach of any material condition of

13:41:42  5   release, and that wouldn't be limited just to flight,

13:41:46  6   but any material substantial condition of release, every

13:41:51  7   one of those properties would be taken by the U.S.

13:41:54  8   government and sold and lost.   And I wouldn't care what

13:41:58  9   the consequences were for any of the families whose

13:42:02  10  homes they were losing.  As I said before, accepting

13:42:10  11  that proffer, that is what would satisfy myself -- I

13:42:18  12  would be satisfied that they understood that and that

13:42:21  13  nonetheless they had enough confidence in the likelihood

13:42:26  14  of appearance and full and complete compliance with the

13:42:31  15  other conditions of release that they still are willing

13:42:34  16  to post their property and run that risk.

13:42:45  17        Among the other conditions that I would

13:42:47  18  include, and I listened to both the government both in

13:42:54  19  opposition but also in terms of alternatives, I would

13:43:01  20  require them to live in separate -- husband and wife to

13:43:04  21  live in separate residences.   I would require both to

13:43:07  22  have responsible adult custodians 24/7.   Yes, I

13:43:15  23  understand there's a sister and mother in the house all

13:43:20  24  the time, at least one of them present all the time.  It

13:43:27  25  would be, in effect, house arrest.  There would be no

13:43:30 1   departure from the premises without prior notice to and

13:43:33 2   approval of the Pretrial Services and Probation Officer.

13:43:38 3   In any event, any such absence would be limited solely

13:43:42 4   to coming to court, consulting with counsel, securing

13:43:49 5   medical treatment, and attending religious services.

13:43:55 6   All of that would have to require it be with the prior

13:43:59 7   approval of the Pretrial Services Officer and/or, if

13:44:01 8   that officer were in doubt, me.

13:44:05 9           I also think it would be appropriate for the

13:44:07 10  government to be notified in advance so if it had any

13:44:11 11  concern or objection, it could be heard in that regard.

13:44:21 12          There would be -- use of a telephone would

13:44:28 13  be strictly limited to any land line phone.  I would

13:44:32 14  not permit them to have any cell phones or access to any

13:44:36 15  cell phones.  And I would authorize the government --

13:44:40 16  or conditioned upon their consenting or at least the

13:44:45 17  person, the subscriber, so the land line phone's being

13:44:49 18  monitored by the government as and if the government so

13:44:52 19  desires.  I would deem that to be adequate consent for

13:44:57 20  the government to comply with Title III so that

13:44:59 21  everybody involved understands that the likelihood that

13:45:02 22  the telephones were being monitored was very

13:45:07 23  substantial.  The same would be true with regard to any

13:45:10 24  and all computers in the household that could be used to

13:45:14 25  access the internet or engage in e-mail traffic, the

owners of those computers would be required to consent

to the government monitoring their computer lines.   In

any event, there would be absolutely no use of a

telephone or computer by either Mrs. Akl or Mr. Akl.

And I would make very clear to the persons posting the

property if it came to my attention that that condition

was breached, that property would be taken.   End of

discussion.   That would be, in my view, a material

breach of the conditions of release.

          Both defendants will be required to make a

full and complete disclosure of any and all financial

assets and resources and, if the government so desires,

through Pretrial Services an accounting for expenditures

on a periodic basis, whatever the government would want

to have.  That condition would be without prejudice to

either defendant's right to contend that there might be

Fifth Amendment implications to that kind of disclosure,

in which case I would probably permit that to be -- I

would require that to be made, but to be made under seal

for the review of the Pretrial Services Officer, and

only in the event that the Pretrial Services Officer had

any concern about that report will it be provided to me;

and then if I thought it was appropriate to take action,

I would do so; and/or if I thought the government should

be aware of it, I'd give notice to the defendants before

13:46:59  1   making that disclosure and give them an opportunity to

13:47:03  2   be heard.

13:47:05  3           Obviously any passports or travel documents,

13:47:08  4   including driver's licenses, if not already in the

13:47:11  5   possession of the government, would have to be provided.

13:47:21  6           The government would be -- any such release

13:47:25  7   would be conditioned upon anybody who had a cell phone

13:47:30  8   in his or her possession in those residences would have

13:47:34  9   to consent to the government monitoring that cell phone

13:47:43  10  as well.  Alternatively, if the government thought it

13:47:47  11  was proper and necessary, I would simply prohibit any

13:47:49  12  cell phone usage by anybody in the residence.  We can

13:47:53  13  discuss that.

13:47:57  14          And, of course, I would have to -- the

13:47:59  15  government would have to have an opportunity to

13:48:03  16  investigate the background of any proposed third party

13:48:06  17  custodian, any additional third party custodian and be

13:48:09  18  heard before the conditions would take effect and

13:48:14  19  release could occur.

13:48:21  20          I think that that set and sort of conditions

13:48:29  21  suffice to insure the reasonable likelihood of

13:48:33  22  appearance at trial on the part of both defendants.

13:48:39  23  I'm not unaware of the risks of flight.  But on the

13:48:43  24  other hand, as I say, I'm giving considerable attention

13:48:50  25  to the fact that many people who know Mr. Akl well are

13:48:57  1   willing to post what I assume is a significant portion

13:49:03  2   of their material possessions to secure his appearance.

13:49:15  3          Though something else occurs to me.   And

13:49:18  4   that is perhaps that premise should be confirmed by

13:49:23  5   having those individuals placed under oath and

13:49:26  6   questioned with regard to whatever financial

13:49:29  7   resources/assets that they have.   If it were to turn

13:49:33  8   out, for example, that there were substantial other

13:49:40  9   assets on hand and available which, for whatever reason,

13:49:45  10  were not being posted as security, that might well cause

13:49:49  11  me to take a different view of things.

13:49:57  12         So that's what I have in mind.   Mr.

13:49:59  13  Herdman, understanding your objection and likelihood to

13:50:03  14  appeal, nonetheless, in terms of what I'm proposing, if

13:50:09  15  you wish to be heard, by all mean.

13:50:13  16         MR. HERDMAN:  Thank you, Your Honor.  I do

13:50:14  17  have a couple of just follow-up questions.   I was

13:50:17  18  trying to listen closely, but I wasn't sure if I caught

13:50:20  19  it.   Did you actually order electronic monitoring of

13:50:23  20  the defendant?

13:50:24  21         THE COURT:  Sure.   Of course.   Didn't --

13:50:26  22         MR. HERDMAN:  When you said home arrest, I

13:50:28  23  assumed you meant that.

13:50:30  24         THE COURT:  Either GPS or electronic

13:50:34  25  monitoring, telephone, land line or whatever.

13:50:36   1           MR. HERDMAN:  I think this would be covered

13:50:38   2    under the order of computers, but in this day and age I

13:50:40   3    know there's Voice over Internet, Skype --

13:50:44   4           THE COURT:  Same thing.  Any kind of

13:50:45   5    communication modality.  I would give the government the

13:50:49   6    opportunity to draft, without prejudice to your right to

13:50:52   7    appeal; I understand that fully.  But nonetheless, to

13:50:55   8    the extent the government would desire to propose

13:50:58   9    language to be included in whatever order, also whatever

13:51:03  10    acknowledgment and consent the custodians would sign, by

13:51:07  11    all means; absolutely.  Any mode of communication.  I

13:51:11  12    want the government to have the opportunity to listen

13:51:15  13    in, read along, basically pay attention and to be aware.

13:51:19  14           MR. HERDMAN:  And similar, we had an issue

13:51:23  15    with respect to Amera Akl.  There is an order in place

13:51:26  16    that restricts her -- I'm sorry, that restricts her

13:51:30  17    ability to communicate with the Lebanese consulate, any

13:51:35  18    Lebanese consulate or any representative of the Lebanese

13:51:39  19    government is I think how broadly it's written.

13:51:41  20           THE COURT:  And I would also require the

13:51:44  21    custodians to keep a register of all persons outside the

13:51:52  22    home, outside the family with whom there's any

13:51:55  23    communications --

13:51:57  24           MR. HERDMAN:  Okay.

13:51:58  25           THE COURT:  -- of any kind whatsoever;

13:51:59    1    e-mail, in person.

13:52:03    2            MR. HERDMAN:  I do have some questions with

13:52:04    3    respect to the property that's been put up, similar

13:52:07    4    questions that were posed.  I don't know if you wanted

13:52:10    5    to hear testimony first, but there was one thing I

13:52:14    6    wanted to point out was that I'm not quite certain that

13:52:16    7    all of these properties are, in fact, the residences of

13:52:19    8    the posters.

13:52:21    9            THE COURT:  We'll find out whose they are.

13:52:24   10    And if they're not, why they won't put up their own

13:52:27   11    residences.  That's what matters to me.  If somebody's

13:52:30   12    willing to put a house up for somebody, that's a pretty

13:52:34   13    significant sign of trust, particularly when you could

13:52:38   14    check my record and I've taken property.  And I don't

13:52:41   15    care.  I don't care who's put out on the street in a

13:52:46   16    bassinet or wheelchair.  It doesn't matter to me.

13:52:50   17            MR. HERDMAN:  After that examination is

13:52:51   18    conducted by the Court I have some questions about the

13:52:53   19    practicalities or how this is going to operate with

13:52:56   20    respect to the actual lien that would be filed.  Is it

13:52:59   21    going to be a joint -- would it apply jointly,

13:53:02   22    severally?  Are there going to be two separate liens

13:53:06   23    placed on the property?

13:53:07   24            THE COURT:  I would think probably.  I

13:53:08   25    would think so.

13:53:09  1        MR. HERDMAN:  That would be the government's

13:53:11  2   preference.

13:53:12  3        THE COURT:  Yeah.  Because, you know, it

13:53:15  4   would require -- for the lien to be released it would

13:53:17  5   require compliance by both defendants.

13:53:20  6        MR. HERDMAN:  Okay.  That's all I have.

13:53:37  7        THE COURT:  Mr. Helmick, in terms of a third

13:53:39  8   party custodian, what I'm moving towards would be

13:53:43  9   accepting your suggestion that -- well, that they live

13:53:47  10  separately, and it probably makes better sense for the

13:53:57  11  wife and children to be living with her mother or family

13:54:04  12  and for him to be back in the family home.  What I want

13:54:08  13  to make sure is there is or are suitable adult

13:54:13  14  custodians 24/7.  And if you want to take a few minutes

13:54:18  15  to try to make those arrangements, or alternatively if

13:54:23  16  they cannot be made today, then we can resume probably

13:54:25  17  Friday morning; I think I have some time.  I'm leaving

13:54:28  18  this weekend for three weeks.  I'd like to get this

13:54:31  19  done before then.

13:54:33  20        MR. HELMICK:  I know, Your Honor.  My

13:54:36  21  concern is I think you have a plane to catch today.

13:54:39  22        THE COURT:  I still have a few more hours.

13:54:41  23        MR. HELMICK:  I do need a little time with

13:54:43  24  the family to discuss the logistics before we can move

13:54:45  25  forward today.  Would you like us to come back Friday,

| | | |
|---|---|---|
| 13:54:49 | 1 | and hopefully I can have my ducks in a row? |
| 13:54:52 | 2 | THE COURT:  Let me suggest this:  Why don't |
| 13:54:54 | 3 | I begin with the various -- to the extent that the |
| 13:54:58 | 4 | people who are posting property are here, let me have |
| 13:55:01 | 5 | them come forward, be sworn, questioned by me, |
| 13:55:06 | 6 | questioned by you, questioned by Mr. Herdman.  And |
| 13:55:11 | 7 | let's put it this way:  If one or more of them presents |
| 13:55:15 | 8 | a problem, then that may moot doing anything else. |
| 13:55:21 | 9 | MR. HELMICK:  Fair enough. |
| 13:55:22 | 10 | THE COURT:  Probably not.  But I think |
| 13:55:24 | 11 | that's the place to begin is to confirm the |
| 13:55:26 | 12 | understanding and willingness and consequences of |
| 13:55:30 | 13 | posting property.  And also for the government and |
| 13:55:35 | 14 | myself to find out what else they might have; and if |
| 13:55:39 | 15 | they do, why it's not being put up. |
| 13:55:44 | 16 | MR. HELMICK:  Very well.  Would you like to |
| 13:55:47 | 17 | take testimony then at this time? |
| 13:55:49 | 18 | THE COURT:  I think I should. |
| 13:55:51 | 19 | MR. HELMICK:  The defendants would first |
| 13:55:53 | 20 | call Akrum Mahmoud. |
| 13:56:03 | 21 | THE COURT:  Do you have a copy, of the list |
| 13:56:07 | 22 | for Tracy? |
| 13:56:18 | 23 | Sir, if you'll come forward and have a seat. |
| 13:56:26 | 24 | (The witness was sworn by the clerk.) |
| 13:56:34 | 25 | THE COURT:  Will you tell me your name, |

| | | |
|---|---|---|
| 13:56:36 | 1 | please. |
| 13:56:37 | 2 | THE WITNESS: Akrum Mahmoud. |
| 13:56:38 | 3 | THE COURT:  Mr. Mahmoud, where do you live? |
| 13:56:42 | 4 | THE WITNESS:  3617 Barcelona, Toledo, Ohio. |
| 13:56:53 | 5 | THE COURT:  What are those premises?  Is |
| 13:56:57 | 6 | that a family home? |
| 13:56:58 | 7 | THE WITNESS:  My residence, yes, sir. |
| 13:56:59 | 8 | THE COURT:  Pardon me? |
| 13:57:00 | 9 | THE WITNESS:  That's my residence, yes, sir. |
| 13:57:02 | 10 | THE COURT:  Who lives there with you? |
| 13:57:04 | 11 | THE WITNESS:  My family. |
| 13:57:05 | 12 | THE COURT:  How many are there?  I don't |
| 13:57:07 | 13 | need the names. |
| 13:57:08 | 14 | THE WITNESS:  My wife and my five kids. |
| 13:57:11 | 15 | THE COURT:  How long have you owned that |
| 13:57:12 | 16 | property? |
| 13:57:13 | 17 | THE WITNESS:  Fifteen years. |
| 13:57:14 | 18 | THE COURT:  And you owe about $65,000? |
| 13:57:17 | 19 | THE WITNESS:  Yes, sir. |
| 13:57:19 | 20 | THE COURT:  In today's market, but 135 |
| 13:57:22 | 21 | maybe. |
| 13:57:23 | 22 | THE WITNESS:  Something like that. |
| 13:57:24 | 23 | THE COURT:  In that neighborhood.  Okay. |
| 13:57:27 | 24 | And you're current on your mortgage? |
| 13:57:30 | 25 | THE WITNESS:  Yes. |

| | | |
|---|---|---|
| 13:57:33 | 1 | THE COURT:  Have you ever been delinquent on |
| 13:57:35 | 2 | the mortgage? |
| 13:57:36 | 3 | THE WITNESS:  No, sir. |
| 13:57:36 | 4 | THE COURT:  Are you employed? |
| 13:57:37 | 5 | THE WITNESS:  Yes, sir. |
| 13:57:38 | 6 | THE COURT:  Where do you work? |
| 13:57:40 | 7 | THE WITNESS:  Jack's Bar and Grill, 3560 |
| 13:57:44 | 8 | Dorr. |
| 13:57:44 | 9 | THE COURT:  How long have you worked there? |
| 13:57:46 | 10 | THE WITNESS:  Eighteen years. |
| 13:57:47 | 11 | THE COURT:  Does your wife work? |
| 13:57:48 | 12 | THE WITNESS:  Part-time with me, yes, sir. |
| 13:57:50 | 13 | THE COURT:  Are you an employee of that |
| 13:57:51 | 14 | establishment or do you own it? |
| 13:57:53 | 15 | THE WITNESS:  I own it and I work there. |
| 13:57:55 | 16 | THE COURT:  Both? |
| 13:57:56 | 17 | THE WITNESS:  Yes, sir. |
| 13:57:59 | 18 | THE COURT:  Where were you born? |
| 13:58:00 | 19 | THE WITNESS:  In Lebanon. |
| 13:58:01 | 20 | THE COURT:  And where are you a citizen? |
| 13:58:03 | 21 | THE WITNESS:  I have both citizenship, |
| 13:58:06 | 22 | United States and Lebanese. |
| 13:58:07 | 23 | THE COURT:  You're an American citizen? |
| 13:58:09 | 24 | THE WITNESS:  Yes, sir. |
| 13:58:09 | 25 | THE COURT:  All your children born here? |

13:58:11   1                    THE WITNESS:  Yes, sir.

13:58:11   2                    THE COURT:  You're acquainted with Mr. Hor

13:58:15   3    Akl?

13:58:16   4                    THE WITNESS:  Yes.

13:58:16   5                    THE COURT:  He is -- do you have any kind of

13:58:19   6    relationship?

13:58:20   7                    THE WITNESS:  He's my brother-in-law.

13:58:27   8                    THE COURT:  Do you have other assets, let's

13:58:30   9    say in excess of $50,000?  In other words, do you own

13:58:36   10   the place that you -- where you work, are you the owner

13:58:41   11   of that?

13:58:41   12                   THE WITNESS:  I'm owner of the business; I

13:58:43   13   rent the property.

13:58:44   14                   THE COURT:  You rent the property.  Do you

13:58:45   15   have any stocks or bonds or investments of any kind

13:58:50   16   whatsoever?

13:58:51   17                   THE JUROR:  No, sir.

13:58:52   18                   THE COURT:  I'm talking about substantial.

13:58:54   19   I'm not talking about a few thousand dollars here or

13:58:57   20   there.

13:58:59   21                   Do you own or have any interest in any other

13:59:03   22   real estate of any kind?

13:59:04   23                   THE WITNESS:  Yes, 805 East Manhattan.

13:59:07   24                   THE COURT:  What is that?

13:59:08   25                   THE WITNESS:  Rental property business,

```
13:59:10   1   mechanics shop.
13:59:12   2              MR. HELMICK:  Judge that's the third
13:59:13   3   property listed on the list.   I'm sorry.
13:59:16   4              THE COURT:  Sure.   Right here.   And you're
13:59:18   5   willing to post that as well?
13:59:20   6              THE WITNESS:  Yes, I own it.   My brother
13:59:22   7   and I will own that property.
13:59:24   8              THE COURT:  Is your brother willing?  Is he
13:59:27   9   also going to be a joint signatory?
13:59:29  10              MR. HELMICK:  Yes, Your Honor.
13:59:30  11              THE COURT:  And that's almost free and
13:59:32  12   clear, right?
13:59:34  13              THE WITNESS:  Yes, sir.
13:59:35  14              THE COURT:  Do you have any other interest
13:59:39  15   in any other real estate of any kind?
13:59:42  16              THE WITNESS:  No, sir.
13:59:43  17              THE COURT:  And you are willing to post both
13:59:46  18   of these properties to secure your brother-in-law's
13:59:51  19   appearance at all further court proceedings?
13:59:57  20              THE WITNESS:  Yes.
13:59:57  21              THE COURT:  And also that he doesn't commit
13:59:59  22   any criminal offenses while released?  You were here
14:00:05  23   when I was talking earlier, I assume?
14:00:07  24              THE WITNESS:  Yes.
14:00:07  25              THE COURT:  And do you understand that your
```

| | | |
|---|---|---|
| 14:00:11 | 1 | brother-in-law will have several things that he will |
| 14:00:15 | 2 | have to do?  Do you understand that? |
| 14:00:18 | 3 | THE DEFENDANT:  Yes. |
| 14:00:19 | 4 | THE COURT:  And also the people who are what |
| 14:00:21 | 5 | I call his third party custodians, do you understand |
| 14:00:24 | 6 | that? |
| 14:00:24 | 7 | THE DEFENDANT:  Yes. |
| 14:00:25 | 8 | THE COURT:  The same arrangement with your |
| 14:00:27 | 9 | sister and your mother; is that right?  Mrs. Akl is your |
| 14:00:30 | 10 | sister? |
| 14:00:31 | 11 | THE WITNESS:  My sister-in-law. |
| 14:00:33 | 12 | THE COURT:  You understand the arrangements |
| 14:00:34 | 13 | with her mother and her sister having to be with her, |
| 14:00:37 | 14 | one of them? |
| 14:00:39 | 15 | THE WITNESS:  Yes. |
| 14:00:39 | 16 | THE COURT:  And there will be somebody like |
| 14:00:42 | 17 | that if this works out for Mr. Akl.  And that person |
| 14:00:48 | 18 | will have certain duties and responsibilities that if |
| 14:00:54 | 19 | that person does not fulfill, I can and will take your |
| 14:00:59 | 20 | property.  Do you understand that? |
| 14:01:02 | 21 | THE WITNESS:  Yes. |
| 14:01:03 | 22 | THE COURT:  In other words, it's not just |
| 14:01:04 | 23 | trusting Mr. Akl to do the right thing, but trusting |
| 14:01:08 | 24 | whoever is responsible as his custodian to do the right |
| 14:01:11 | 25 | thing.  Do you understand that? |

14:01:12   1               THE WITNESS:  Yes.

14:01:13   2               THE COURT:  And knowing that are you still

14:01:14   3   willing to put the property up?

14:01:16   4               THE WITNESS:  Yes.

14:01:17   5               THE COURT:  And to run the risk of losing it

14:01:19   6   completely?

14:01:19   7               THE WITNESS:  Yes.

14:01:23   8               THE COURT:  Mr. Herdman or Mr. Helmick, any

14:01:26   9   further questions?

14:01:27  10               MR. HELMICK:  No, Your Honor.

14:01:27  11               THE COURT:  Mr. Herdman, any questions?

14:01:29  12               MR. HERDMAN:  I think I have three

14:01:31  13   questions, Your Honor.

14:01:31  14                         - - -

14:01:31  15            AKRUM MAHMOUD, CROSS-EXAMINATION

14:01:33  16   BY MR. HERDMAN:

14:01:33  17   Q.  How long have you known Amera Akl?

14:01:35  18   A.  Since I came to the States, 1976.

14:01:38  19   Q.  Since you came to the U.S. in 1976?

14:01:41  20   A.  '76, yes.

14:01:42  21   Q.  How long have you known Mr. Akl?

14:01:44  22   A.  Sixteen years, 17 years.  Since he came to the

14:01:48  23   States.

14:01:50  24   Q.  And Amera Akl is sisters with your wife?

14:01:56  25   A.  Yes.

14:01:56   1            THE COURT:  So you don't have any direct
14:01:57   2   relationship with Mr. Akl?
14:01:59   3            THE WITNESS:  With Mr. Akl, no.
14:02:01   4   BY MR. HERDMAN:
14:02:01   5      Q.  You do have a direct relationship with Mrs. Akl?
14:02:04   6      A.  Yes.
14:02:04   7      Q.  What is that?
14:02:05   8      A.  My first cousin.
14:02:06   9      Q.  And do you own any property overseas,
14:02:09  10   specifically in Lebanon?
14:02:10  11      A.  No.
14:02:10  12      Q.  Do you have any bank accounts, any kind of assets
14:02:13  13   at all overseas in Lebanon?
14:02:16  14      A.  No.
14:02:19  15      Q.  You understand that if Mr. Akl flees and Mrs. Akl
14:02:23  16   stays here that your property still would be forfeited?
14:02:26  17      A.  Yes.
14:02:27  18      Q.  He doesn't have to leave with her; you're relying
14:02:30  19   on him alone to this obligation.
14:02:34  20      A.  Yes.
14:02:35  21            MR. HERDMAN:  I have nothing further.
14:02:36  22            THE COURT:  Also let me say that if that
14:02:38  23   were to happen, that the conditions of release would no
14:02:44  24   longer be satisfied as to Mrs. Akl, and she would be
14:02:47  25   placed in custody -- I'm looking at Mr. Herdman.  If

14:02:53  1   that would happen in that regard --

14:02:55  2          MR. HERDMAN:  The government would certainly

14:02:56  3   make an application.

14:02:57  4          THE COURT:  It would happen.

14:03:00  5          I jumped around a little bit on you, sir.

14:03:02  6   I apologize.

14:03:03  7          If you lost your property because he fled, I

14:03:09  8   would put her in jail; do you understand that?

14:03:13  9          THE WITNESS:  Okay.  Yes.

14:03:15  10         THE COURT:  Mr. Helmick, anything?

14:03:18  11         MR. HELMICK:  I don't think so, Your Honor.

14:03:18  12                     - - -

14:03:18  13         AKRUM MAHMOUD, REDIRECT EXAMINATION

14:03:18  14  BY MR. HELMICK:

14:03:20  15  Q.   May I just ask, sir, the property at 3617

14:03:24  16  Barcelona's owned jointly between you and your wife?

14:03:27  17  A.   Yes.

14:03:27  18  Q.   She's here today?

14:03:29  19  A.   No, she's with her sister.

14:03:31  20  Q.   But she was willing, was she not, to post the

14:03:34  21  property on behalf of Amera?

14:03:36  22  A.   Yes, she was.

14:03:37  23  Q.   She is now willing as well to sign and allow your

14:03:40  24  residence to be posted as well for Hor?

14:03:42  25  A.   Yes.

| | | |
|---|---|---|
| 14:03:44 | 1 | THE COURT:  Okay. |
| 14:03:45 | 2 | MR. HERDMAN:  Your Honor, just so you're |
| 14:03:47 | 3 | aware, Attaya Mahmoud did testify at the previous bond |
| 14:03:51 | 4 | hearing.  So I'm satisfied that would be the case. |
| 14:03:56 | 5 | THE COURT:  Do you have any questions of me? |
| 14:03:58 | 6 | THE WITNESS:  No, sir. |
| 14:03:59 | 7 | THE COURT:  You may step down.  Thank you. |
| 14:04:10 | 8 | MR. HELMICK:  Your Honor, unless there's a |
| 14:04:12 | 9 | reason to do otherwise, I'll just go in order of the |
| 14:04:15 | 10 | chart.  We're on the second property.  That would be |
| 14:04:18 | 11 | Ibrahim Ismail.  I'd point out, Your Honor, that Ibrahim |
| 14:04:28 | 12 | is the second property and the fourth property. |
| 14:04:39 | 13 | (The witness was sworn by the clerk.) |
| 14:04:51 | 14 | THE COURT:  Tell me your name, please. |
| 14:04:54 | 15 | THE WITNESS:  Ibrahim Ismail. |
| 14:04:56 | 16 | THE COURT:  Where do you live, Mr. Ismail? |
| 14:04:59 | 17 | THE WITNESS:  3426 Kenwood Boulevard. |
| 14:05:04 | 18 | THE COURT:  In Toledo? |
| 14:05:05 | 19 | THE WITNESS:  Toledo. |
| 14:05:06 | 20 | THE COURT:  That's your family residence? |
| 14:05:08 | 21 | THE WITNESS:  Yes, me and my wife and my |
| 14:05:10 | 22 | kids. |
| 14:05:10 | 23 | THE COURT:  How many children do you have? |
| 14:05:12 | 24 | THE WITNESS:  I have five; four boys, one |
| 14:05:13 | 25 | girl. |

```
14:05:16   1              THE COURT:  And you have a mortgage of about
14:05:18   2   $33,000 on that property?
14:05:21   3              THE WITNESS:  Just about.  Not quite, a
14:05:22   4   little less.
14:05:26   5              THE COURT:  Your best guess, fair market
14:05:28   6   value, is about $240,000?
14:05:31   7              THE WITNESS:  It's more than that, but I
14:05:33   8   would say.
14:05:35   9              THE COURT:  Have you ever been delinquent in
14:05:37  10   the mortgage?
14:05:37  11              THE WITNESS:  No.
14:05:38  12              THE COURT:  You have only one mortgage?
14:05:40  13              THE WITNESS:  Yes.
14:05:41  14              THE COURT:  And with regard -- you also own
14:05:50  15   3243 Houghton?
14:05:53  16              THE WITNESS:  3243 Houghton Drive.
14:05:55  17              THE COURT:  That's your sister's family
14:05:57  18   residence?
14:05:57  19              THE WITNESS:  It's a duplex.  My sister
14:05:59  20   live there, and I have the upstairs rented.
14:06:01  21              THE COURT:  In any event, you have a
14:06:06  22   family member who lives in that house?
14:06:08  23              THE WITNESS:  Yes.
14:06:09  24              THE COURT:  So if I took that, she'd be
14:06:11  25   out --
```

14:06:12   1                    THE WITNESS:  Yes.

14:06:14   2                    THE COURT:  -- as well.

14:06:16   3             And you -- Mr. Helmick, is it two mortgages

14:06:22   4   on that?

14:06:23   5             MR. HELMICK:  Judge, I think the correct

14:06:25   6   numbers -- the property value is correct as listed.

14:06:29   7   The mortgage balance is only $15,000.  That $80,000 in

14:06:34   8   parentheses is listed because it's what appeared on the

14:06:38   9   official court document that was filed.  I think that's

14:06:41  10   a mortgage that's been satisfied.  So there's only

14:06:44  11   about $15,000.

14:06:45  12                    THE COURT:  How much do you owe on that

14:06:46  13   property?

14:06:49  14                    THE WITNESS:  Just what he said, about

14:06:52  15   $15,000.

14:06:52  16                    THE COURT:  So you have about $90,000 in

14:06:54  17   equity, just one mortgage?

14:06:57  18                    THE WITNESS:  Yes.

14:06:57  19                    THE COURT:  Ever been delinquent on that

14:06:58  20   mortgage?

14:06:59  21                    THE WITNESS:  No.

14:07:00  22                    THE COURT:  I should have asked Mr. Mahmoud,

14:07:03  23   but do you have any judgments against you?

14:07:05  24                    THE WITNESS:  No.

14:07:06  25                    THE COURT:  Engaged in any litigation of any

| | | |
|---|---|---|
| 14:07:08 | 1 | kind? |
| 14:07:08 | 2 | THE WITNESS:  No. |
| 14:07:09 | 3 | THE COURT:  Where were you born? |
| 14:07:10 | 4 | THE WITNESS:  I was born in Lebanon. |
| 14:07:12 | 5 | THE COURT:  And what country or countries |
| 14:07:13 | 6 | are you a citizen? |
| 14:07:15 | 7 | THE WITNESS:  United States of America. |
| 14:07:17 | 8 | THE COURT:  And are you employed? |
| 14:07:19 | 9 | THE WITNESS:  I'm retired right now.  I |
| 14:07:23 | 10 | don't work right now.  I'm retired. |
| 14:07:27 | 11 | THE COURT:  And do you own any other real |
| 14:07:33 | 12 | estate either in this country or elsewhere? |
| 14:07:37 | 13 | THE WITNESS:  I do own some other property |
| 14:07:39 | 14 | here.  My sons run the business, and I just -- that's |
| 14:07:42 | 15 | their livelihood, and I'm not going to -- and I own 903 |
| 14:07:48 | 16 | North Westwood. |
| 14:07:49 | 17 | THE COURT:  And what is that? |
| 14:07:51 | 18 | THE WITNESS:  We have a car lot over there, |
| 14:07:53 | 19 | repair and sale. |
| 14:07:55 | 20 | THE COURT:  Why won't you put that up to |
| 14:07:58 | 21 | secure your -- |
| 14:07:59 | 22 | THE WITNESS:  It's my kids', and they run |
| 14:08:01 | 23 | the business.  I'm retired, and I don't want to |
| 14:08:03 | 24 | interfere with their business.  And I promise them |
| 14:08:07 | 25 | that's theirs. |

14:08:08  1             THE COURT:  I understand that.  But you own

14:08:13  2  it, or do they own it with you?

14:08:14  3             THE WITNESS:  Well, I own the property.

14:08:16  4  It's a corporation.

14:08:19  5             THE COURT:  What's the value of that

14:08:20  6  property would you think?

14:08:26  7             THE WITNESS:  Never appraise it.  I have it

14:08:28  8  for a long time.  I bought it from a sheriff auction.

14:08:31  9  It's worth some good amount of money, maybe a couple

14:08:36  10  hundred thousand.

14:08:38  11             THE COURT:  Do you owe a mortgage on that?

14:08:40  12             THE WITNESS:  No.

14:08:46  13             THE COURT:  Do you own any other real estate

14:08:48  14  anywhere?

14:08:49  15             THE WITNESS:  I just acquire another

14:08:52  16  building, but still I'm not, you know, it's --

14:08:55  17             THE COURT:  Where is that?

14:08:56  18             THE WITNESS:  On Berdan.

14:09:00  19             THE COURT:  The address?

14:09:02  20             THE WITNESS:  I don't recall the address.

14:09:03  21             THE COURT:  Somewhere on Berdan.  What's

14:09:06  22  its value, equity value?

14:09:08  23             THE WITNESS:  I just bought it on taxes

14:09:11  24  sale.

14:09:11  25             THE COURT:  A tax foreclosure?

14:09:13   1                    THE WITNESS:  Yes.

14:09:20   2                    THE COURT:  Are you going to rent that?

14:09:22   3                    THE WITNESS:  Well, we haven't done

14:09:23   4     anything.  I'm negotiating with the city to see what

14:09:26   5     we're going to do.

14:09:29   6                    THE COURT:  Do you have investments or other

14:09:35   7     financial resources of any kind?

14:09:38   8                    THE WITNESS:  No, I lost all of it in that

14:09:41   9     little mess we have -- most of it, let's put it that

14:09:45   10    way.

14:09:48   11                   THE COURT:  Are you getting a pension?

14:09:51   12                   THE WITNESS:  Yes, I do get my pension.

14:10:00   13                   THE COURT:  Mr. Herdman or Mr. Helmick, any

14:10:03   14    questions?

14:10:03   15                   MR. HERDMAN:  I do, Your Honor.

14:10:03   16                              - - -

14:10:03   17                   IBRAHIM ISMAIL, CROSS-EXAMINATION

14:10:03   18    BY MR. HERDMAN:

14:10:08   19       Q.  Mr. Ismail, good to see you again.  How are you?

14:10:11   20       A.  Good, thank you.

14:10:11   21       Q.  How long have you known Mr. Akl for?

14:10:14   22       A.  I know him -- I used to travel to Lebanon.  I

14:10:19   23    know him when he was a little kid.  Since he be in

14:10:22   24    America and he marry my niece.  I know him since he been

14:10:26   25    here; 17, 18 years.  I don't exactly know.  But I know

| | | |
|---|---|---|
| 14:10:29 | 1 | him even when he was child. |
| 14:10:32 | 2 | Q.  And I presume you've known Amera Akl all her |
| 14:10:34 | 3 | life? |
| 14:10:34 | 4 | A.  She's my niece, yes. |
| 14:10:36 | 5 | Q.  Did you say -- I may have just misheard this, but |
| 14:10:39 | 6 | did you say that you owe $1,500 on your -- |
| 14:10:43 | 7 | THE COURT:  $15,000. |
| 14:10:46 | 8 | Q.  Okay.  And you are solely a citizen of the United |
| 14:10:50 | 9 | States? |
| 14:10:50 | 10 | A.  Yes.  Only citizenship I have.  My dad was |
| 14:10:52 | 11 | here.  We were born in Lebanon.  I don't have any other |
| 14:10:56 | 12 | citizenship but American citizenship. |
| 14:10:58 | 13 | Q.  Do you own any property in Lebanon? |
| 14:11:01 | 14 | A.  We have some inheritance from my dad.  It messed |
| 14:11:05 | 15 | up over there.  We don't get anything out of it.  It's |
| 14:11:07 | 16 | just there. |
| 14:11:08 | 17 | Q.  That's a family residence; is that what it is? |
| 14:11:10 | 18 | A.  Yes, I do have family -- |
| 14:11:13 | 19 | Q.  The property at 9037 North Westwood you said is a |
| 14:11:17 | 20 | car lot.  Do you derive any portion of your son's income |
| 14:11:20 | 21 | from that property? |
| 14:11:21 | 22 | A.  No, I don't take any money from that. |
| 14:11:23 | 23 | THE COURT:  Do you get rent from it? |
| 14:11:25 | 24 | THE WITNESS:  No. |
| 14:11:28 | 25 | BY MR. HERDMAN: |

14:11:28  1    Q.   And the new property, what kind of property is

14:11:31  2    that?  Another car lot?

14:11:32  3    A.   It's an old building, and it need a lot of

14:11:35  4    repair, and probably, yeah.

14:11:38  5    Q.   So you're not getting income from that property?

14:11:41  6    A.   No.

14:11:42  7    Q.   And the rental property at 3243, you said your

14:11:46  8    sister lives there?

14:11:47  9    A.   Yes.

14:11:48  10   Q.   Do you get some sort of income from that

14:11:50  11   property?

14:11:51  12   A.   Yes, I guess around 700, 800 bucks every month

14:11:56  13   from upstairs and downstairs.

14:12:02  14          MR. HERDMAN:  Just a moment, Your Honor, if

14:12:04  15   you don't mind.

14:12:05  16          (Discussion had off the record.)

14:12:09  17          MR. HERDMAN:  Nothing further.  Thank you.

14:12:11  18          THE COURT:  Is Mr. Mahmoud still here?

14:12:18  19          MR. MAHMOUD:  Yes, sir.

14:12:21  20          THE COURT:  Sir, are you engaged in any

14:12:23  21   lawsuits?

14:12:24  22          THE WITNESS:  No, sir.

14:12:24  23          THE COURT:  Do you have any judgments

14:12:25  24   against you?

14:12:26  25          THE WITNESS:  No, sir.

14:12:27    1              THE COURT:  Mr. Helmick, questions?

14:12:28    2              MR. HELMICK:  No, I don't think so, Your

14:12:30    3    Honor.   I'll just note for the record he's my neighbor

14:12:34    4    on Kenwood Boulevard.  I will note that.   I would hate

14:12:37    5    to lose him as my neighbor.

14:12:40    6              THE COURT:  That makes me question the fair

14:12:43    7    market value of your property.

14:12:45    8              MR. HELMICK:  Thanks, Judge.

14:12:47    9              THE COURT:  Why won't you put up -- I'm a

14:12:51   10    little troubled, quite candidly, that you won't put up

14:12:53   11    the other property.   I mean, I'm trying to --

14:12:56   12              THE WITNESS:  It's my kids' livelihood, and

14:13:00   13    they asked me to put my house and the residence, my

14:13:04   14    business.  I don't want to mess with my business.   If

14:13:06   15    my kids tomorrow want to get a loan, want to do

14:13:09   16    something, I don't want to -- that's the only reason.

14:13:12   17    They're going to get married; they might need a little

14:13:15   18    leeway, something.  I want to make sure they are able to

14:13:19   19    get out of it what they can.   I don't want -- in case

14:13:24   20    we're going to sell it tomorrow.   If they want to sell

14:13:27   21    the business, change places, you know, I don't want to

14:13:30   22    hold them.

14:13:30   23              THE COURT:  Basically, if I understand

14:13:32   24    correctly, it may be in your name over in the county

14:13:37   25    recorder's office, but as far as you're concerned,

14:13:40  1    that's the kids'?

14:13:42  2                THE WITNESS:  Exactly.   I have two sons run

14:13:44  3    the business over there.   And whatever they get out of

14:13:47  4    it, that's theirs.

14:13:48  5                THE COURT:  But if they said, Pop, we want

14:13:49  6    to sell it, would you give them the money for it?  Would

14:13:52  7    you give them the money if you sold it?

14:13:54  8                THE WITNESS:  Absolutely.   I've given my

14:13:57  9    word that's theirs.

14:13:58  10               THE COURT:  The only thing you haven't done

14:14:00  11   is actually give them the title?

14:14:02  12               THE WITNESS:  Exactly.   I'm just debating

14:14:04  13   what can I do for my other kids.   I want to be fair to

14:14:07  14   all my kids.

14:14:09  15               THE COURT:  Mr. Herdman, anything further

14:14:11  16   from Mr. Ismail?

14:14:14  17               MR. HERDMAN:  No, Your Honor.   Thank you.

14:14:18  18               THE COURT:  Okay.  You may step down, sir.

14:14:20  19   Thank you.

14:14:23  20               Oh, wait a minute.   You heard what I said

14:14:25  21   to Mr. Mahmoud about what will happen if things don't

14:14:28  22   work out?

14:14:30  23               THE WITNESS:  Yes, I did.

14:14:31  24               THE COURT:  You understand you're trusting

14:14:34  25   not only Mr. Akl to appear and comply with all the

14:14:39    1    conditions of release?

14:14:42    2                    THE WITNESS:  Yes, sir.  Yes, Your Honor.

14:14:43    3                    THE COURT:  In terms of especially what he

14:14:46    4    can't do.  And you understand that if he fails to

14:14:50    5    comply with those conditions, you'll lose the properties

14:14:55    6    that you've put up?

14:14:56    7                    THE WITNESS:  Yes, Your Honor.

14:15:00    8                    THE COURT:  And knowing that, you're willing

14:15:01    9    nonetheless to post these properties for security?

14:15:05   10                    THE WITNESS:  Yes, Your Honor.

14:15:06   11                    THE COURT:  And is your wife on the --

14:15:09   12                    THE WITNESS:  On one of them is my wife.

14:15:11   13    She's here.  Victoria.

14:15:15   14                    THE COURT:  Just stand up please, ma'am.

14:15:18   15                    MRS. ISMAIL:  Yes, Your Honor.

14:15:19   16                    THE COURT:  You have heard everything we're

14:15:20   17    talking about?

14:15:21   18                    MRS. ISMAIL:  Yes, Your Honor.  I

14:15:23   19    understand.  I have an agreement with my husband.  I'm

14:15:26   20    willing to offer our property together on Kenwood as

14:15:29   21    collateral.

14:15:29   22                    THE COURT:  If I were to ask you all the

14:15:31   23    questions I've just asked him, would your answers be the

14:15:35   24    same?

14:15:36   25                    MRS. ISMAIL:  I believe they would be.

| | | |
|---|---|---|
| 14:15:37 | 1 | THE COURT:  Any questions at all? |
| 14:15:40 | 2 | MR. HERDMAN:  No, Your Honor. |
| 14:15:42 | 3 | THE COURT:  You may step down. |
| 14:15:49 | 4 | MR. HELMICK:  Judge, going just in order, |
| 14:15:51 | 5 | there are two properties by the same owner, Ibrahim |
| 14:15:55 | 6 | Mahmoud; 5330 Pawne and 5540 Clover Lane. |
| 14:16:18 | 7 | (The witness was sworn by the clerk.) |
| 14:16:33 | 8 | THE COURT:  Good afternoon. |
| 14:16:34 | 9 | THE WITNESS:  Good afternoon. |
| 14:16:35 | 10 | THE COURT:  Tell me your name, please. |
| 14:16:36 | 11 | THE WITNESS:  Ibrahim Mahmoud. |
| 14:16:38 | 12 | THE COURT:  Mr. Mahmoud, where do you live? |
| 14:16:40 | 13 | THE WITNESS:  I live 5335 Pawne Road, |
| 14:16:44 | 14 | Toledo, Ohio. |
| 14:16:44 | 15 | THE COURT:  That's a family residence; is |
| 14:16:44 | 16 | that correct? |
| 14:16:47 | 17 | THE WITNESS:  Yes, Your Honor. |
| 14:16:48 | 18 | THE COURT:  And you have about $40,000 worth |
| 14:16:51 | 19 | of equity? |
| 14:16:53 | 20 | THE WITNESS:  On? |
| 14:16:53 | 21 | THE COURT:  On Pawne Road. |
| 14:16:55 | 22 | THE WITNESS:  Yes. |
| 14:16:57 | 23 | THE COURT:  You owe 109? |
| 14:17:00 | 24 | THE WITNESS:  Yes. |
| 14:17:04 | 25 | THE COURT:  How long have you lived there? |

14:17:06  1              THE WITNESS:  Thirteen years.

14:17:07  2              THE COURT:  Who lives with you, if anybody?

14:17:08  3              THE WITNESS:  My wife and my kids.

14:17:10  4              THE COURT:  How many children do you have?

14:17:12  5              THE WITNESS:  Six.

14:17:14  6              THE COURT:  Are you employed?

14:17:15  7              THE WITNESS:  Yes.

14:17:15  8              THE COURT:  What sort of work do you do?

14:17:17  9              THE WITNESS:  I own Georgio Pizzeria in

14:17:20  10  Sylvania.

14:17:25  11             THE COURT:  How long have you owned that?

14:17:27  12             THE WITNESS:  Since 2001.

14:17:31  13             THE COURT:  Where were you born?

14:17:32  14             THE WITNESS:  Lebanon.

14:17:33  15             THE COURT:  Citizen in this country --

14:17:37  16  citizen in this country, that country, or both?

14:17:39  17             THE WITNESS:  I have both.

14:17:40  18             THE COURT:  How long have you been in this

14:17:42  19  country?

14:17:42  20             THE WITNESS:  Since 1976.

14:17:44  21             THE COURT:  And you also own on Kenwood; is

14:17:44  22  that correct?

14:17:49  23             THE WITNESS:  No.

14:17:50  24             THE COURT:  Wait a minute.  Clover.  I'm

14:17:52  25  sorry.  My mistake.  I'd reading the wrong line.

| | | |
|---|---|---|
| 14:17:56 | 1 | What kind of property is Clover? |
| 14:17:58 | 2 | THE WITNESS:  It's a rental house. |
| 14:18:00 | 3 | THE COURT:  A single family? |
| 14:18:02 | 4 | THE WITNESS:  Single family. |
| 14:18:06 | 5 | THE COURT:  Maybe $55,000, $60,000 worth of |
| 14:18:10 | 6 | equity in that as well? |
| 14:18:13 | 7 | THE WITNESS:  Close. |
| 14:18:14 | 8 | THE COURT:  Have you been delinquent on the |
| 14:18:17 | 9 | mortgages on either of the properties? |
| 14:18:19 | 10 | THE WITNESS:  No. |
| 14:18:20 | 11 | THE COURT:  Do you have any judgments |
| 14:18:22 | 12 | against you? |
| 14:18:23 | 13 | THE WITNESS:  No. |
| 14:18:23 | 14 | THE COURT:  Are you presently engaged in any |
| 14:18:25 | 15 | litigation? |
| 14:18:26 | 16 | THE WITNESS:  No. |
| 14:18:26 | 17 | THE COURT:  Do you own any real estate |
| 14:18:28 | 18 | anywhere else, either in this country or elsewhere? |
| 14:18:31 | 19 | THE WITNESS:  I own several real estate |
| 14:18:34 | 20 | here.  And I own a house in Lebanon and property. |
| 14:18:37 | 21 | THE COURT:  What else do you own in the |
| 14:18:39 | 22 | country? |
| 14:18:39 | 23 | THE WITNESS:  I own 1808 East Manhattan.  I |
| 14:18:44 | 24 | own 606 Magnolia road.  I own 5539 Fenwick. |
| 14:18:53 | 25 | THE COURT:  F-e-n-w-i-c-k. |

```
14:18:57   1                THE WITNESS:  F-e-n-w-i-c-k.

14:18:59   2                I own 1543 Clay.  I own property on

14:19:14   3   Fredonia; 1707, I believe.  And I own the property with

14:19:25   4   my brother, 1805 East Manhattan.  I don't know if I

14:19:34   5   forgot any.

14:19:35   6                THE COURT:  Are the other properties that

14:19:38   7   you mentioned, what are those, rental properties?

14:19:43   8                THE WITNESS:  Rental property and commercial

14:19:45   9   properties.

14:19:48  10                THE COURT:  And your best estimate of how

14:19:50  11   much equity you have in those?

14:19:52  12                THE WITNESS:  I have no idea.  I don't know

14:19:57  13   which property you can ask me to -- all of them, you

14:20:00  14   mean?

14:20:00  15                THE COURT:  All of them.

14:20:01  16                THE WITNESS:  I have no -- I don't have

14:20:06  17   any --

14:20:07  18                THE COURT:  Do you know, as to each of them,

14:20:10  19   how much they might be worth if we went through them one

14:20:13  20   by one?

14:20:15  21                THE WITNESS:  Well, I have 1808 East

14:20:17  22   Manhattan, worth probably 200.

14:20:21  23                THE COURT:  606 Magnolia?

14:20:23  24                THE WITNESS:  I bought it for 35,000.

14:20:25  25   Probably worth that much.
```

| | | |
|---|---|---|
| 14:20:27 | 1 | THE COURT:  And Fenwick? |
| 14:20:31 | 2 | THE WITNESS:  Fenwick worth 70. |
| 14:20:34 | 3 | THE COURT:  Clay. |
| 14:20:35 | 4 | THE WITNESS:  Clay worth about 25. |
| 14:20:37 | 5 | THE COURT:  Fredonia? |
| 14:20:40 | 6 | THE WITNESS:  Probably was -- right now it |
| 14:20:47 | 7 | isn't worth that much.  Probably 500 bucks. |
| 14:20:51 | 8 | THE COURT:  We'll say zero.  And are any of |
| 14:20:54 | 9 | those properties mortgaged? |
| 14:20:55 | 10 | THE WITNESS:  Yes. |
| 14:20:56 | 11 | THE COURT:  And 1808 East Manhattan; is that |
| 14:21:00 | 12 | a commercial -- |
| 14:21:01 | 13 | THE WITNESS:  Huntington Bank. |
| 14:21:02 | 14 | THE COURT:  No, is 1808 East Manhattan, is |
| 14:21:07 | 15 | that a commercial property? |
| 14:21:09 | 16 | THE WITNESS:  Yes. |
| 14:21:10 | 17 | THE COURT:  What's your mortgage on that, |
| 14:21:12 | 18 | roughly? |
| 14:21:13 | 19 | THE WITNESS:  About $90,000. |
| 14:21:17 | 20 | THE COURT:  What about the other four |
| 14:21:18 | 21 | properties; do you have mortgages on those? |
| 14:21:20 | 22 | THE WITNESS:  Yes, I do. |
| 14:21:21 | 23 | THE COURT:  Magnolia? |
| 14:21:22 | 24 | THE WITNESS:  Magnolia is -- it's Metamora |
| 14:21:25 | 25 | State Bank. |

| | | |
|---|---|---|
| 14:21:26 | 1 | THE COURT:  About how much? |
| 14:21:28 | 2 | THE WITNESS:  About $20,000. |
| 14:21:29 | 3 | THE COURT:  Fenwick? |
| 14:21:30 | 4 | THE WITNESS:  Fenwick, $50,000. |
| 14:21:33 | 5 | THE COURT:  And Clay? |
| 14:21:34 | 6 | THE WITNESS:  Clay, zero. |
| 14:21:37 | 7 | THE COURT:  And Fredonia? |
| 14:21:39 | 8 | THE WITNESS:  Fredonia, I don't -- |
| 14:21:42 | 9 | THE COURT:  Why are you not willing to put |
| 14:21:44 | 10 | that property up as well? |
| 14:21:45 | 11 | THE WITNESS:  My wife, she wouldn't do it. |
| 14:21:47 | 12 | She's not here.  She's not in the country. |
| 14:21:50 | 13 | THE COURT:  Are you willing to put up your |
| 14:21:52 | 14 | interest in that property? |
| 14:21:53 | 15 | THE WITNESS:  Yes. |
| 14:21:56 | 16 | THE COURT:  And is your wife likely to be |
| 14:21:58 | 17 | returning; do you know?  Is she going to be able to? |
| 14:22:01 | 18 | THE WITNESS:  She is kind of a little |
| 14:22:03 | 19 | worried about it. |
| 14:22:05 | 20 | THE COURT:  In other words, she does not |
| 14:22:07 | 21 | want to put the property up? |
| 14:22:09 | 22 | THE WITNESS:  Correct. |
| 14:22:09 | 23 | THE COURT:  She's worried that -- |
| 14:22:11 | 24 | THE WITNESS:  She's just worried.  She's |
| 14:22:13 | 25 | not comfortable. |

14:22:15  1              THE COURT:  But you are?

14:22:17  2              THE WITNESS:  Yes, I am.

14:22:18  3              THE COURT:  You're confident that Mr. Akl

14:22:20  4    will appear if I let him out of jail?

14:22:24  5              THE WITNESS:  Yes, I am.

14:22:25  6              THE COURT:  How long have you known him?

14:22:26  7              THE WITNESS:  All my life -- all his life.

14:22:28  8              THE COURT:  Both in Lebanon and here?

14:22:30  9              THE WITNESS:  Yes.

14:22:31  10             THE COURT:  From the same town over there, I

14:22:33  11   guess?

14:22:33  12             THE WITNESS:  Yes.

14:22:40  13             THE COURT:  Okay.  Mr. Helmick, any --

14:22:43  14             THE JUROR:  Judge, maybe just a little bit

14:22:45  15   of edification.  At the time that Amera Akl had her bond

14:22:51  16   hearing, there was talk about trying to get consent from

14:22:55  17   his wife, but it was extremely difficult because she had

14:22:58  18   just -- she had had prior plans and had just travelled

14:23:02  19   overseas.  We tried to set up a Skype video conference,

14:23:06  20   and we just couldn't -- they just couldn't establish it

14:23:10  21   or connect it to get her consent on those properties.

14:23:13  22   I think ultimately what happened is the magistrate was

14:23:15  23   satisfied with the amount that was satisfied for Amera,

14:23:18  24   and we simply never got there.  But we did make an

14:23:20  25   effort, Judge.  I was sweating over my laptop, summoned

14:23:27  1   over my laptop at one point.   I'd be -- I was glad to

14:23:33  2   help out if I could, but we just couldn't pull it off.

14:23:38  3   As a result, other accommodations were made by the

14:23:41  4   magistrate.

14:23:42  5             THE COURT:  I understand.

14:23:43  6             MR. HELMICK:  I didn't want you to think --

14:23:47  7             THE COURT:  You've known your client his

14:23:49  8   entire life; he's saying my wife's not as confident.

14:23:53  9             MR. HELMICK:  There was some question about

14:23:54  10  the language barrier and getting her to understand

14:23:57  11  exactly what it was the procedure was and what she was

14:24:01  12  asked to do.   That's why it didn't go through.

14:24:03  13            THE COURT:  Is your wife likely to be

14:24:04  14  returning to this country?

14:24:06  15            THE WITNESS:  August 24.

14:24:07  16            THE COURT:  I'll leave it open to the

14:24:09  17  government.  If it wants, assuming that this gets

14:24:12  18  completed, if it wants to undertake to have the

14:24:16  19  additional properties posted, I'm more than glad to

14:24:19  20  undertake to do so once the wife is home.

14:24:25  21            Mr. Herdman?

14:24:25  22            MR. HERDMAN:  Thank you, Your Honor.

14:24:27  23                              - - -

14:24:27  24            IBRAHIM MAHMOUD, CROSS-EXAMINATION

14:24:27  25  BY MR. HERDMAN:

14:24:27  1    Q.   Mr. Mahmoud, how are you?

14:24:30  2    A.   How are you, sir?

14:24:31  3    Q.   You stated you owned Georgio Pizzeria in

14:24:35  4    Sylvania?

14:24:35  5    A.   Yes.

14:24:36  6    Q.   Is that your sole mode of income?

14:24:38  7    A.   I rent there.   I have the business.  I own the

14:24:41  8    business.

14:24:41  9    Q.   Do you have other ways of making income?  Do you

14:24:43  10   have other businesses that you own?

14:24:44  11   A.   I do have another business in Perrysburg

14:24:47  12   Township, will be open next two weeks.   It was opened,

14:24:50  13   but I moved the location from one spot to the other.

14:24:52  14   Q.   What is that business?

14:24:53  15   A.   Georgio Pizzeria.

14:24:55  16   Q.   Pizzeria.   Okay.   And I know Judge Carr asked

14:24:59  17   you this, but you do own property in Lebanon?

14:25:01  18   A.   Yes.

14:25:02  19   Q.   Can you estimate what the value of that property

14:25:05  20   is?

14:25:05  21   A.   I have my house; it's free and clear.  We don't

14:25:07  22   get no mortgage there.   And I have another piece of

14:25:10  23   property which I bought in '85.

14:25:12  24   Q.   Do either of those properties generate any income

14:25:16  25   for you?

14:25:16  1   A.   Just an olive tree that -- the house is empty.
14:25:20  2   We live in it.
14:25:21  3   Q.   I don't know how much olives go for these days,
14:25:24  4   but is that a substantial amount of income?
14:25:26  5   A.   The value of the house?
14:25:28  6   Q.   The olives.
14:25:29  7   A.   Maybe we get, like, a couple thousand dollars
14:25:31  8   every year, $1,000 every year.
14:25:33  9   Q.   The two properties that you posted here, the
14:25:39  10  Pawne and Clover properties, those are properties that
14:25:43  11  are solely in your name?  Your wife's name is not on
14:25:45  12  those properties?
14:25:46  13  A.   Yes.   Last time I remember they were in her name
14:25:49  14  and my name.
14:25:49  15  Q.   So both of you are on the deed for those
14:25:52  16  properties?
14:25:52  17  A.   I believe last time when we were here for Amera,
14:25:56  18  they show them both in her name -- her name and my name.
14:26:00  19  Q.   So all the properties that you own, including the
14:26:03  20  rental properties, your wife is also on the deed?
14:26:06  21  A.   I believe so.   But I know for sure 1805, it's
14:26:10  22  not in her name.
14:26:13  23  Q.   That's what your brother --
14:26:14  24          THE COURT:  I think he can probably encumber
14:26:17  25  the property.   It would seem to me it would not be

14:26:19  1   transferrable.   If he -- I don't know any real estate

14:26:24  2   law.   I'm saying to me, it seems to me if I were --

14:26:28  3          MR. HERDMAN:  That's certainly true.  I

14:26:30  4   guess -- well, if it were a tax lien on him, in

14:26:33  5   particular, I think he could encumber the property.   I

14:26:38  6   wanted to clarify.

14:26:39  7          THE COURT:  I hadn't thought about that.

14:26:45  8          MR. HERDMAN:  I'll just direct this to Mr.

14:26:47  9   Helmick.   I don't remember if there was a

14:26:48  10  power-of-attorney that had been executed by his wife at

14:26:51  11  some point.

14:26:51  12         MR. HELMICK:  I don't believe so.   Frankly,

14:26:55  13  I don't believe.  However, he did execute the agreement

14:27:01  14  to forfeiture, and her name does not appear for both

14:27:05  15  properties.

14:27:09  16         MR. HERDMAN:  I think that was all I had.

14:27:12  17         MR. HELMICK:  Nothing.

14:27:13  18         MR. HERDMAN:  Nothing else, Your Honor.

14:27:15  19  Thank you.

14:27:15  20         THE COURT:  Would you be willing to post the

14:27:17  21  other properties we talked about?

14:27:21  22         THE WITNESS:  If anything I could do in my

14:27:23  23  name alone.

14:27:24  24         THE COURT:  I think I'll require that.

14:27:26  25  Because I think that suffices.   I mean, the property,

14:27:29  1  if he signs a bond, I think I certainly would take it

14:27:34  2  and sell it, let somebody else worry about it.

14:27:38  3          And you understand that's what I would do if

14:27:40  4  he doesn't do everything he has to do?

14:27:43  5          THE WITNESS:  Yes, Your Honor.

14:27:44  6          THE COURT:  You may step down.

14:27:46  7          THE WITNESS:  Thank you.

14:28:14  8          THE COURT:  Mr. Helmick.

14:28:16  9          MR. HELMICK:  The last property listed

14:28:18  10  before the new property notation is 4347 Weldwood.   You

14:28:23  11  may remember from our sidebar conference that Abdul Akl

14:28:27  12  is currently in Lebanon.   However, he executed a

14:28:29  13  power-of-attorney with regard to that property.

14:28:32  14          THE COURT:  Let me say, I would ask only

14:28:35  15  that perhaps you get a transcript of what we've done

14:28:39  16  here and go over that with him and confirm then once you

14:28:42  17  have that he remains willing, despite the notification

14:28:47  18  that you have communicated with him with regard to all

14:28:51  19  of this.

14:28:51  20          MR. HELMICK:  Very good, Your Honor.   Do

14:28:53  21  you want to hear from his power-of-attorney, which is

14:28:57  22  Amera's mother, about her consent to do so on his

14:29:00  23  behalf?  The power-of-attorney empowers her to encumber

14:29:04  24  the property.

14:29:05  25          THE COURT:  That's okay.

| | |
|---|---|
| 14:29:06 | 1 |
| 14:29:08 | 2 |
| 14:29:09 | 3 |
| 14:29:11 | 4 |
| 14:29:13 | 5 |
| 14:29:15 | 6 |
| 14:29:21 | 7 |
| 14:29:26 | 8 |
| 14:29:31 | 9 |
| 14:29:37 | 10 |
| 14:29:38 | 11 |
| 14:29:45 | 12 |
| 14:29:46 | 13 |
| 14:29:52 | 14 |
| 14:29:55 | 15 |
| 14:29:58 | 16 |
| 14:30:06 | 17 |
| 14:30:08 | 18 |
| 14:30:10 | 19 |
| 14:30:13 | 20 |
| 14:30:16 | 21 |
| 14:30:19 | 22 |
| 14:30:23 | 23 |
| 14:30:24 | 24 |
| 14:30:28 | 25 |

MR. HELMICK:  She's already a custodian.

THE COURT:  That's fine.  Unless, Mr. Herdman, do you want to?

MR. HERDMAN:  No, not with respect to that. I do have some concerns about this particular property. The only question I have for Mr. Helmick is I see Ibrahim Mahmoud is listed at 1805 Manhattan as one of the owners.  Is that Ibrahim Mahmoud that just testified?  Is it the same person?  I assume it is.

MR. MAHMOUD:  Yes.

MR. HELMICK:  I'm comfortable saying yes

MR. HERDMAN:  Your Honor, I do remember Mr. Akl -- Mr. Abdul Akl testifying at the bond hearing for Amera.  My recollection is somewhat hazy, but this Weldwood property is not his residence.  I believe he actually lives in a fairly expensive house in Fulton County, I believe.  I think his testimony was it was somewhere in excess of a million dollars, the residence that he lives in.  And the other thing I remember about Mr. Abdul Akl's testimony is that he owns Rumors, a restaurant that I think generates some substantial income for him, along with some additional property. So I am very concerned that this is the --

THE COURT:  When will he be available?

MS. JOSEPH:  He won't be back until August

14:30:30  1   15 or 20.

14:30:33  2            MR. HELMICK:  That's the best information I

14:30:35  3   have, Your Honor, from his family.

14:30:41  4            MR. HERDMAN:  This is a small fraction of.

14:30:45  5   And the power-of-attorney is limited only to this

14:30:48  6   property here; is that right?

14:30:49  7            MR. HELMICK:  That's correct, Your Honor.

14:30:51  8   He does have a residence in Berkey in Fulton County.  He

14:30:57  9   does have a residence there, Your Honor.   And that's

14:30:59  10  correct, this power-of-attorney does not authorize her

14:31:02  11  to encumber that property.

14:31:04  12           THE COURT:  With regard to Mr. Akl, was the

14:31:05  13  issue of the posting of that property raised at all?

14:31:13  14           MR. HELMICK:  It wasn't contested, Your

14:31:15  15  Honor.   I guess that's the best way to put it.

14:31:21  16           THE COURT:  Then finally --

14:31:23  17           MR. HELMICK:  Your Honor, the last piece is

14:31:28  18  Nazem Akl.   For the reasons I made known to the Court

14:31:30  19  at sidebar, he is not available today but can be

14:31:33  20  produced for the Court or Magistrate if you'd like and

14:31:36  21  has indicated a willingness to post this, which is his

14:31:39  22  family residence with his wife.

14:31:50  23           THE COURT:  What I'm going to do today is

14:31:52  24  I'm going to adjourn these proceedings.   What I would

14:31:57  25  ask counsel to do would be in light of what the

14:32:03   1    conditions that I sort of read into the record, perhaps

14:32:07   2    if you could undertake to formulate a proposed order,

14:32:13   3    and by, quote, "agreement" only insofar as the

14:32:16   4    government accepts whatever the language is, but given

14:32:22   5    what's just been said to me, I'm not going to -- at

14:32:29   6    least pending further court order, the release order

14:32:34   7    will not be implemented pending an appearance by Mr.

14:32:38   8    Abdul Akl and an examination as to -- with regard to his

14:32:42   9    willingness to post both his residence and, to the

14:32:47  10    extent he owns any commercial property, that as well.

14:32:50  11            I'll be very candid.  If he's not willing,

14:32:53  12    I'm going to have some serious reservations.  I may go

14:32:57  13    ahead and release him in any event, but as I said

14:33:00  14    before, a principal or the primary reason I'm

14:33:06  15    considering doing what I'm doing is that people who know

14:33:09  16    Mr. Akl best are willing to say, We'll put up a major

14:33:15  17    portion of what we're worth knowing that we'll lose it

14:33:19  18    permanently if he fails and the third party custodian or

14:33:23  19    custodians fail to comply with each and every material

14:33:28  20    condition of release.  And if Mr. Abdul Akl is not

14:33:35  21    willing to do that, at the very least, I want to

14:33:43  22    inquire; I want the inquiry to occur and make a

14:33:45  23    determination as to why that might be.  I can

14:33:47  24    understand with Mr. Mahmoud, the circumstance with the

14:33:57  25    wife, apprehension, particularly if there are language

14:34:02  1   problems and so forth and so on.   But what I've just
14:34:07  2   been told about Mr. Abdul Akl, it appears he's a capable
14:34:12  3   and successful businessman.   And his judgment is to put
14:34:15  4   up part but not a significant portion of what he's
14:34:22  5   worth.   And I think that's something for me to take into
14:34:27  6   consideration.   That's not to say I would preclude
14:34:30  7   entirely accepting the proposed conditions, but I would
14:34:34  8   want to have -- I would want the parties to be heard,
14:34:38  9   and I'd want to give careful attention to whatever Mr.
14:34:41  10  Akl had to say about why it was he wasn't willing to do
14:34:44  11  so.

14:34:47  12           He's not going to return until mid August?
14:34:49  13           MR. HELMICK:  Apparently so, Your Honor.
14:35:09  14           THE COURT:  Let me say this.   Is he in
14:35:11  15  Lebanon?
14:35:12  16           MR. HELMICK:  Yes, Your Honor, he is.
14:35:13  17           THE COURT:  If you can arrange a video
14:35:17  18  conference, that's fine with me.
14:35:20  19           MR. HELMICK:  I might be able to do that,
14:35:22  20  Your Honor.  I will work on that right away.
14:35:24  21           THE COURT:  And Amy, does it still look like
14:35:28  22  Friday morning's gone out?
14:35:39  23           (Discussion had off the record.)
14:35:40  24           THE COURT:  I've got to leave in a couple
14:35:42  25  hours.  Why don't you guys talk to each other.   If it

14:35:47  1  looks as though you can set something like that up, if

14:35:50  2  we can do it at 8:00 on Friday morning.   Will you be

14:35:53  3  available then or by person or by video?

14:35:56  4             MR. HERDMAN:  I will not, Your Honor.   My

14:35:57  5  sister's getting married this weekend, so I will be out

14:36:01  6  of town.   I could try to -- I could either arrange for

14:36:05  7  coverage with another one of the prosecutors.   I guess

14:36:08  8  I could try to call in.   I haven't had much luck doing

14:36:13  9  that in the past, calling into the Court.   I tend to

14:36:15  10  lose a lot.

14:36:16  11             THE COURT:  Let's wait and see.   The

14:36:18  12  problem is I'm leaving.   I mean, I suppose we could set

14:36:23  13  something up by telephone while I'm away.   Let's do

14:36:27  14  that.   If we can set something up before, I would also

14:36:32  15  be available this Friday afternoon.   I realize, Mr.

14:36:35  16  Herdman, you wouldn't be.   I'm just trying to figure

14:36:42  17  out some way, rather than if I conclude that whatever

14:36:46  18  the circumstances may be with regard to Mr. Akl that

14:36:50  19  release -- conditions are appropriate, I'd just as soon

14:36:56  20  not wait until I get back from vacation on the 23rd of

14:37:00  21  August.   I don't want to inconvenience you.   If

14:37:03  22  necessary we can do it by phone.   In the meantime you

14:37:06  23  can be inquiring and seeing what the situation is.

14:37:09  24             MR. HELMICK:  Obviously I'll keep

14:37:11  25  communication open with the government and the Court,

14:37:14  1    the Court's deputy as well.

14:37:16  2              THE COURT:  In the meantime if you could be

14:37:19  3    preparing a proposed order, as I indicated, it would be

14:37:24  4    very helpful.

14:37:25  5              MR. HERDMAN:  I'm sorry, Your Honor?

14:37:26  6              THE COURT:  In light of the conditions that

14:37:27  7    I was enumerating.

14:37:30  8              MR. HERDMAN:  Yes, Your Honor.

14:37:31  9              THE COURT:  If you can either jointly or

14:37:35  10   severally cast those into the form of a proposed order.

14:37:39  11   And perhaps if you can get that to me by Friday to look

14:37:43  12   at.

14:37:43  13             MR. HERDMAN:  I'll leave it up to Mr.

14:37:45  14   Helmick.

14:37:46  15             MR. HELMICK:  We'll work together.  I'll

14:37:49  16   draft something.

14:37:50  17             Judge, might the Court consider a simple

14:37:52  18   exception to the telephone usage rule so that he can

14:37:56  19   call his lawyer?

14:37:57  20             THE COURT:  Of course.  That's exactly the

14:38:00  21   kind of thing -- I kind of was making it up as I was

14:38:07  22   going along.  It needs to be cast into a suitable form.

14:38:11  23   And also there may be other things, in particular from

14:38:14  24   the government, that come to mind.  But I do want the

14:38:17  25   government to have the opportunity, if it chooses to do

14:38:22  1   so, to intercept any and all formal communications

14:38:25  2   without notice to anybody; because candidly, I think

14:38:28  3   that is an important condition, and I would hope the

14:38:32  4   government would implement it, if not 24/7, at least on

14:38:37  5   a random basis so people understand.  And certainly if

14:38:40  6   there were any deviation from the restrictions on

14:38:45  7   communications and the use and modes of communication,

14:38:53  8   every property would be taken.  And the person, the

14:38:57  9   custodian present at the time would be before me on a

14:39:01  10  show cause order why they should not be sanctioned,

14:39:04  11  including imprisoned, for the failure to comply.

14:39:09  12            That's the other thing I want -- are her

14:39:13  13  custodians here today?

14:39:14  14            MR. HELMICK:  One of them is here today.

14:39:23  15            This is Naja Joseph, Amera's mother, and one

14:39:26  16  of two custodians.

14:39:36  17            (The witness was sworn by the clerk.)

14:39:47  18            THE COURT:  Good afternoon.

14:39:48  19            THE WITNESS:  Good afternoon.

14:39:49  20            THE COURT:  Your name is?

14:39:50  21            THE WITNESS:  Naja Joseph.

14:39:51  22            THE COURT:  Mrs. Joseph, you're Mrs. Akl's

14:39:54  23  mom; is that correct?

14:39:55  24            THE WITNESS:  Yes.

14:39:55  25            THE COURT:  One thing, I don't know whether

14:39:57  1   the magistrate advised you, as I was simply reciting

14:40:02  2   with regard to any custodian or custodians that might be

14:40:06  3   proposed for Mr. Akl that the obligations that you have

14:40:11  4   accepted as a third party custodian are an order of the

14:40:17  5   Court.   You understand that?

14:40:19  6              THE WITNESS:  Yes.

14:40:19  7              THE COURT:  That if you were to breach any

14:40:21  8   of those obligations, you would be in contempt of court.

14:40:25  9   Do you understand that?

14:40:26  10             THE WITNESS:  Yes.

14:40:26  11             THE COURT:  Do you understand what I mean by

14:40:28  12  that?

14:40:28  13             THE WITNESS:  Yes.

14:40:29  14             THE COURT:  You would have something that I

14:40:31  15  don't think anybody would want to have, and that would

14:40:33  16  be a very angry federal judge.

14:40:35  17             THE WITNESS:  Yes.

14:40:35  18             THE COURT:  Do you understand that?

14:40:37  19             THE WITNESS:  Yes, I do.

14:40:38  20             THE COURT:  I would undertake to do whatever

14:40:41  21  I could to punish you.

14:40:42  22             THE WITNESS:  Yes.

14:40:42  23             THE COURT:  That would include not just a

14:40:44  24  failure to appear, but with regard to the current

14:40:47  25  conditions and any additional conditions that I might

14:40:51   1   impose upon your daughter and yourself, that would

14:40:54   2   include those conditions as well.   You understand that?

14:40:57   3                    THE WITNESS:  Yes.

14:40:58   4                    THE COURT:  And one of the things that Mr.

14:40:59   5   Herdman called to my attention, and I think is a very

14:41:03   6   legitimate concern, is to try to make it as difficult,

14:41:13   7   if not impossible, but as difficult as possible that

14:41:17   8   there could be no joint effort made on the part of the

14:41:21   9   entire family to flee.   Do you understand that?

14:41:24  10                    THE WITNESS:  Yes, I do.

14:41:26  11                    THE COURT:  And to that end I anticipate

14:41:28  12   whatever order I would enter may also include an

14:41:30  13   amendment to the order with regard to your daughter with

14:41:34  14   regard to use of any communication devices:  telephones,

14:41:39  15   cell phones, computers, Voice over, whatever.

14:41:44  16                    THE WITNESS:  Yes.

14:41:45  17                    THE COURT:  And part of your job as a

14:41:47  18   custodian would be to notify Pretrial Services and my

14:41:51  19   office immediately --

14:41:53  20                    THE WITNESS:  Yes.

14:41:53  21                    THE COURT:  -- if there were any violation

14:41:56  22   of that.

14:41:56  23                    THE WITNESS:  Yes.

14:41:57  24                    THE COURT:  You walk in the room; there she

14:41:59  25   is on the telephone, and she shouldn't be on the

| | | |
|---|---|---|
| 14:42:00 | 1 | telephone.   Do you understand? |
| 14:42:03 | 2 | THE WITNESS:  I understand all that.  Yes, |
| 14:42:04 | 3 | I do. |
| 14:42:05 | 4 | THE COURT:  Knowing that, you're willing to |
| 14:42:06 | 5 | continue as your daughter's custodian? |
| 14:42:09 | 6 | THE WITNESS:  Yes, I am. |
| 14:42:10 | 7 | THE COURT:  I gather there's been no |
| 14:42:11 | 8 | problem? |
| 14:42:12 | 9 | THE WITNESS:  No, thank God, so far. |
| 14:42:15 | 10 | THE COURT:  Very good.   You may step down. |
| 14:42:24 | 11 | The other thing I might suggest, a couple |
| 14:42:27 | 12 | things in light of what I was just saying, to the extent |
| 14:42:30 | 13 | that the conditions of release for both would be |
| 14:42:35 | 14 | coordinated so I would have an amended order of |
| 14:42:38 | 15 | conditions of release for Mrs. Akl and as well in terms |
| 14:42:42 | 16 | of putting together something that is an acknowledgment |
| 14:42:45 | 17 | signed by the custodians in terms of familiarity with |
| 14:42:49 | 18 | the conditions of release and acceptance and the |
| 14:42:54 | 19 | consequences of a violation and that they understand and |
| 14:42:58 | 20 | accept the responsibilities and are aware of the |
| 14:43:04 | 21 | consequences of their failure to comply.  And, Mr. |
| 14:43:09 | 22 | Herdman, if you and your colleagues think of other |
| 14:43:11 | 23 | conditions that you -- |
| 14:43:14 | 24 | MR. HERDMAN:  Ms. Poteat will speak to, I |
| 14:43:16 | 25 | think, the consent issue.   It might take a couple days. |

14:43:20  1          MS. POTEAT:  With respect to the Title III

14:43:21  2   or any consent that might occur, we're going to have to

14:43:25  3   get that in writing from those individuals, so we'll

14:43:28  4   prepare a consent form.

14:43:29  5          THE COURT:  Anything of that sort, by all

14:43:31  6   means.   I would rather leave it to you folks to try to

14:43:35  7   work that out hopefully where you have some concurrence

14:43:40  8   as to the language so that you're both satisfied with

14:43:43  9   it.

14:43:43  10         MS. POTEAT:  It would include -- in that

14:43:45  11  consent form we would include hopefully an inventory of

14:43:47  12  what facilities we're addressing.

14:43:50  13         THE COURT:  Absolutely.   And obviously

14:43:53  14  production of any toll records, any billing statement,

14:43:56  15  anything of that sort.

14:43:57  16         MS. POTEAT:  Yes, Your Honor.  We'll itemize

14:44:00  17  all of that.

14:44:00  18         THE COURT:  And anything else you can think

14:44:02  19  of.

14:44:02  20         Mr. Herdman?

14:44:04  21         MR. HERDMAN:  Two more things, Your Honor.

14:44:06  22  I don't know that we've had any discussion about the

14:44:08  23  potential custodians for Mr. Akl.

14:44:10  24         THE COURT:  We haven't.   At least I haven't

14:44:12  25  heard yet.

14:44:13   1          MR. HERDMAN:  I don't know if we want to

14:44:15   2   address that later on.

14:44:17   3          THE COURT:  My sense is -- have you had a

14:44:19   4   chance to talk to anybody?  Do you have anybody in mind?

14:44:22   5          MR. HELMICK:  We did have some names.  We

14:44:23   6   shared some with Mr. Martin as well.   In light of the

14:44:27   7   Court's decision, though, with regard to residence, I

14:44:29   8   would like an opportunity to revise that with the

14:44:31   9   family.

14:44:32  10          THE COURT:  My thought, as soon as you have

14:44:34  11   people lined up, let them know.   I think it's fair for

14:44:39  12   them to do a mini background check to make sure there

14:44:42  13   aren't reasons for concern.

14:44:44  14          MR. HELMICK:  I will, Your Honor.

14:44:45  15          THE COURT:  It's customary.

14:44:47  16          MR. HELMICK:  I'll let Mr. Martin know as

14:44:50  17   well, of course.

14:44:51  18          MR. HERDMAN:  And there was also the

14:44:52  19   outstanding issue of Mr. Nazem Akl.   I know that's a

14:44:56  20   minor issue, but I know he's willing to come back in to

14:44:59  21   offer some testimony as well.

14:45:01  22          MR. HELMICK:  That's correct.

14:45:01  23          THE COURT:  I can't remember.  You told me.

14:45:03  24   He's out of the country as well?

14:45:04  25          MR. HELMICK:  No, Your Honor, it's a

14:45:06  1   family --

14:45:07  2              THE COURT:  Sure.

14:45:11  3              MR. HELMICK:  So I will confer with him as

14:45:13  4   well, and perhaps that's something we can do on Friday

14:45:16  5   if the Court has a little time and he could be

14:45:18  6   available.

14:45:20  7              MR. HERDMAN:  It's possible.

14:45:21  8              THE COURT:  Well, could somebody, if we --

14:45:24  9   if Mr. Helmick, Mr. Akl, and I were all here, could

14:45:28  10  somebody from your office be by phone?  It would be the

14:45:31  11  same drill I did here.

14:45:32  12             MR. HERDMAN:  I think we could accommodate

14:45:34  13  that.

14:45:35  14             THE COURT:  I don't want your sister or her

14:45:36  15  mother mad at me.  I have four brides; I know what the

14:45:41  16  day of the wedding is like.  I just told Mrs. Joseph

14:45:44  17  she doesn't want a federal judge mad at her.  I don't

14:45:48  18  want the mother of a bride mad at me.

14:45:51  19             As I say, we'll be in adjournment, and then

14:45:54  20  pending further proceedings and further court order.

14:45:56  21             MR. HELMICK:  Thank you, Your Honor.

14:45:57  22             THE COURT:  If in the meantime something of

14:46:00  23  concern arises, please feel free to do so.

          24                              - - -

          25

1           **C E R T I F I C A T E**

2

3      I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled

5   matter.

6

7   /s Tracy L. Spore_____              _____

8   Tracy L. Spore, RMR, CRR                  Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25