```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
 2                       WESTERN DIVISION

 3   UNITED STATES OF AMERICA,    )  Docket No. 3:10CR251

 4            Plaintiffs,         )  Toledo, Ohio

 5            v.                  )  September 2, 2010

 6   HOR I. AKL,                  )

 7            Defendant.          )

 8   -----------------------------

 9           EXCERPT OF TRANSCRIPT OF BOND HEARING
             BEFORE THE HONORABLE JAMES G. CARR
10               UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the Plaintiffs:    Justin E. Herdman
                            Duncan T. Brown
14                          Office of the U.S. Attorney
                            801 Superior Avenue, W
15                          Suite 400
                            (216) 622-3965
16
     For the Defendant:     Jeffrey J. Helmick
17                          Helmick & Hoolahan
                            1119 Adams Street
18                          2nd Floor
                            Toledo, Ohio 43604
19                            (419) 243-3800
     For the Defendant, Amera Akl:
20                          Sanford A. Schulman
                            500 Griswold Street, Suite 2340
21                          Detroit, Michigan 48226
                            (313) 963-4740
22
     Court Reporter:        Angela D. Nixon, RPR, CRR
23                          1716 Spielbusch Avenue
                            Toledo, Ohio 43624
24                          (419) 260-5259

25
```

1    Proceedings recorded by mechanical stenography, transcript
2    produced by notereading.

1              COURTROOM DEPUTY:  Case number 3:10CR251, United

2    States of America versus Hor Akl, matter called for bond

3    hearing.

4              THE COURT:  Mr. Herdman.

5              MR. HERDMAN:  Good afternoon, Your Honor.

6              THE COURT:  Government prepared to proceed?

7              MR. HERDMAN:  Yes, we are.

8              THE COURT:  Mr. Helmick?

9              MR. HELMICK:  Yes, Your Honor, we're ready to

10   proceed.  Thank you.

11             THE COURT:  And the defendant's present?

12             MR. HELMICK:  Yes, Judge.  And for the record,

13   Mr. Schulman is here as well on behalf of Amera Akl because

14   our request affects the terms and conditions of her bond as

15   well.

16             THE COURT:  Right.  The pretrial service officer,

17   Mr. Martin, told me that.

18             Mr. Herdman, your response to the report?

19             MR. HERDMAN:  Well, we continue to have concerns,

20   Your Honor, with respect to the property.  I did want to

21   point The Court to -- I did a little bit of legal research,

22   I didn't find any persuasive authority to this, but

23   property that was provided that assured for a bond that's

24   actually in 3142, 18 U.S.C., I thought it was important to

25   point out that it actually references sufficient value of

1   unencumbered property, and obviously the government's

2   position here is that this property is encumbered twice.  I

3   actually flagged the page for you.  And just for counsel

4   that's 18 U.S.C. 3142 little (a)1B(II).  And our position,

5   Your Honor, is that the property that's been proposed is

6   encumbered two ways, one is conventional mortgages --

7               THE COURT:  They are of varying amounts.

8               MR. HERDMAN:  The second is this property's

9   already encumbered by the liens placed on it by The Court

10  with respect to Amera Akl's bond.  And the statute

11  obviously is not clear on this, there's no persuasive legal

12  authority, but I felt like I wanted the record to be clear

13  with respect to the language of the statute, and at least

14  the sense or the spirit of it seems to be that this

15  property be unencumbered, which I think lends some support

16  for the government's position.

17              THE COURT:  I would read it the other way,

18  perhaps not surprisingly that at least under the spirit of

19  bill format that directs those to determine whether there

20  are conditions sufficient reasonably to ensure the

21  defendant's appearance and avoid danger to the community.

22  In other words, I think that the statute ultimately favors

23  release rather than detention.  I think the Constitution

24  would require that the statute ought to be interpreted in

25  light of that as the value of property absent any

1   encumbrances, but your point that it would be doing double
2   duty is well taken.  Are these the exact same properties or
3   lower properties or what's --
4           MR. HELMICK:  Judge, it's the same as proposed
5   before.  You might remember --
6           THE COURT:  I meant, as are related to the wife?
7   In other words, is this the same property that's being
8   posted twice, or do you have additional property?
9           MR. HELMICK:  Judge, there's one piece of
10  property, the proposed property, 8703 Garden Road, by Nazem
11  Akl is not -- has not been put up for Amera, and that has
12  equity of about $235,000 the way I read the numbers.  That
13  would be in addition to the other property that's posted
14  for Amera.
15          THE COURT:  And if I count correctly, and tell me
16  if I don't, the property that's being posted as equity of
17  about a million dollars.
18          MR. HELMICK:  Judge, I think that's a fair net if
19  we take out mortgages.
20          THE COURT:  Right.
21          MR. HELMICK:  That's correct, Judge, just over a
22  million dollars.
23          THE COURT:  Okay.  And if I recall correctly,
24  there's pretty common understanding about two things,
25  number one, that we're talking about the risk of flight

```
 1   rather than risk of danger to the community from either of
 2   these defendants.  And number two, or at least substantial
 3   risk of danger with an issue of substantial risk of flight
 4   being greater concern and consideration.  And then I think
 5   that the defendant has not disagreed with my presuming,
 6   solely for purposes of this proceeding, solely for these
 7   purposes without requiring the government to go into a
 8   lengthy presentation of the weight and sufficiency of its
 9   evidence which, of course, is an extremely important
10   factor, but without recalling upon the government to do so,
11   presuming that there's a substantial likelihood of
12   conviction solely for purposes of these proceedings.  And
13   anything further at all, Mr. Herdman?
14         MR. HERDMAN:  One point of clarification with
15   respect to the property.  The issue that arose on, I
16   believe it was July 27th, was with respect to Abdul Akl.
17   He had posted a property in the amount of $250,000.  I
18   believe the complication was that he was in Lebanon at the
19   time, and his power of attorney ended up being proposed on
20   his behalf.  I pointed out to The Court that my
21   understanding from Mr. Abdul Akl's testimony on
22   June 8th with respect to Amera Akl's bond, is that he
23   actually has a residence that's worth approximately one and
24   a half million dollars, I don't remember exactly what the
25   figure was.  The Court had expressed some reservations with
```

1    him posting this $250,000 property as opposed to his

2    residence.  I -- subsequent to that, we did discuss that is

3    The Court, and counsel discussed leaving that property off

4    of this list, so I just want, as a point of clarification

5    determine whether, in fact, we're talking about including

6    that property in the posting or not?

7                THE COURT:  At this point no, because I don't

8    think he's come forward to offer it so, Mr. Helmick, is

9    that correct?

10               MR. HELMICK:  That's exactly right, Judge.  And

11   Najah Joseph is here with the power of attorney on behalf

12   of his property here listed $249,000.

13               THE COURT:  Are all the property owners here?

14               MR. HELMICK:  Judge, I may have lost a couple of

15   whom you inquired at the last hearing.  One had a, I think

16   an MRI or an important medical test this afternoon, so

17   there may be a couple that aren't here.  But anyone who's

18   not here you spoke with them at the last hearing about

19   their willingness to put up the property, and that

20   importance.

21               THE COURT:  Property owners who are here maybe

22   come to this side of the bar and find a seat somewhere,

23   please.

24               MR. HELMICK:  Anyone here who is going to post

25   property for Hor, please come forward now if you would,

1    please.

2              THE COURT:  Mr. Helmick, are there seats enough

3    there?

4              MR. HELMICK:  There's a couple here if it's all

5    right with the marshals, Your Honor.

6              THE COURT:  Oh, yeah, is that okay with the

7    marshals?  Okay.

8              MR. HELMICK:  Sorry, Judge, go ahead.

9              THE COURT:  I'm going to go ahead and grant

10   release on these conditions and perhaps others.  I'm

11   certainly going to hear from the government with regard to

12   any other conditions.  In addition to these, I'm going to

13   require, unless it's already happened, that both defendants

14   surrender passports and driver's licenses.  Has that

15   happened yet, do we know, Kyle?

16             MR. HERDMAN:  I believe it has, Your Honor.

17             PROBATION OFFICER:  I'm not sure.

18             MR. HERDMAN:  I know there was at least one

19   passport that was turned over to --

20             PROBATION OFFICER:  That was hers.

21             THE COURT:  But also the driver's licenses?

22             MR. HERDMAN:  I don't know.

23             MR. HELMICK:  For Mr. Akl I believe they have

24   both passports, U.S. and Lebanese and his driver's license

25   as well.

1          MR. HERDMAN:  And just to clarify, those -- with

2    the exception all those documents, with the exception of

3    Amera Akl's passport are with the FBI.

4          THE COURT:  Well, as long as they're not in

5    possession of them, okay, as long as either pretrial

6    services or -- not yet government agent's custody, then

7    pretrial service to be kept pending final disposition of

8    these proceedings.  I've been made aware of -- with regard

9    to I think one of the custodians regarding a couple of the

10   people, in any event, some prior contact with the law.  I

11   don't find that reason to disqualify their involvement,

12   relatively minor.  And as I say, if I count correctly

13   roughly a million dollars or more is being posted to secure

14   the appearance of this defendant.  And I think the fact

15   that it's also being posted, or at least most of it, to

16   secure the appearance of the co-defendant really doesn't

17   matter.  These are the people who know these individuals

18   better than probably anybody else, at least anybody else

19   involved in the case, and they're willing to accept the

20   risk and the consequences.  And let me ask you, sir, if you

21   can just tell me your name and -- Mr. Helmick, why don't

22   you introduce them?

23         MR. HELMICK:  I will, Judge, I'd be glad to.

24   Your Honor, standing right now is Nazem N-A-Z-E-M Akl,

25   A-K-L, and he is the defendant Hor Akl's first cousin.

```
 1   Resides 8703 Garden Road in Monclova and is willing to put
 2   up that property at this time.  Would you like to inquire,
 3   Judge?
 4           THE COURT:  Why don't you introduce to me the
 5   other individual.
 6           MR. HELMICK:  Sitting next to him, Your Honor,
 7   Akrum Mahmoud, he's the third down on the chart I
 8   originally proposed to The Court.  If The Court needs a
 9   copy -- he resides 1805 Manhattan in Toledo, and he is
10   Amera's brother in law.  So she would be residing at his
11   home with her sister Attaya and him -- I'm sorry,
12   Barcelona, Judge, I gave you the wrong address 3617
13   Barcelona.  I apologize.
14           THE COURT:  Amy, can you --
15           MR. HERDMAN:  I was just going to inquire simply
16   that they be sworn, Your Honor.
17           THE COURT:  If you hadn't interrupted me, we were
18   getting to that point.
19           MR. HERDMAN:  I'm sorry, I thought you were
20   leaning that way.
21           THE COURT:  Amy, if you'll ask them to swear or
22   affirm the statements.
23               (The above-mentioned individuals were sworn
24                at this time on the record.)
25           THE COURT:  And let me start first with
```

```
 1    Mr. Mahmoud.  You've heard what Mr. Helmick said?

 2              MR. MAHMOUD:  Yes.

 3              THE COURT:  And you are willing to post property

 4    that you own at 3617 Barcelona here in Toledo; is that

 5    correct --

 6              MR. MAHMOUD:  Yes.

 7              THE COURT:  -- to secure the appearance of both

 8    the defendants in this case; is that correct?

 9              MR. MAHMOUD:  Yes.

10              THE COURT:  You understand that you don't have to

11    do this?

12              MR. MAHMOUD:  Yes.

13              THE COURT:  Okay.  And this is your family

14    residence; is that correct?

15              MR. MAHMOUD:  Yes.

16              THE COURT:  And do you own any other real estate?

17              MR. MAHMOUD:  Yes, my brother and I own 1805 East

18    Manhattan.

19              THE COURT:  But that's also being posted,

20    correct?

21              MR. MAHMOUD:  Yes.

22              THE COURT:  Do you understand that this is a very

23    serious obligation that you are undertaking, and that if

24    either of the defendants fails to appear for each and every

25    court appearance, and I declare a forfeiture which would
```

```
 1    happen, property will be sold by the United States

 2    marshals, and the proceeds of it given to the United States

 3    government, you understand that?

 4              MR. MAHMOUD:  Yes.

 5              THE COURT:  You understand that you would still

 6    remain obligated for the mortgage in that property?

 7              MR. MAHMOUD:  Yes.

 8              THE COURT:  And you understand also I wouldn't

 9    care, you understand that?

10              MR. MAHMOUD:  Yes.

11              THE COURT:  And you are also willing to assume

12    the responsibility of being the what we call the third

13    party custodian --

14              MR. MAHMOUD:  Yes.

15              THE COURT:  -- for Mrs. Akl.  And again, what's

16    your relationship?

17              MR. MAHMOUD:  My sister-in-law.

18              THE COURT:  Your sister?

19              MR. HELMICK:  Judge, we also request that The

20    Court would consider that he be third party custodian, if

21    needed, for Hor Akl as well.

22              THE COURT:  In terms of?

23              MR. HELMICK:  Coverage at the other house, Judge.

24              THE COURT:  That's fine with me.  Do you have any

25    questions of me?
```

1              MR. MAHMOUD:  No, sir.

2              THE COURT:  Have you had a chance to talk to

3    Mr. Helmick and get some sense also of what all this

4    involves and the risk that you're running?

5              MR. MAHMOUD:  Yes.

6              THE COURT:  And knowing all that, you're willing

7    to do what you're offering to do?

8              MR. MAHMOUD:  Yes.

9              THE COURT:  Do you understand that if any time

10   you get concerned for any reason whatsoever, all you have

11   to do is to call either the U.S. attorney's office, my

12   office or pretrial services and say, time out, folks.  I --

13   no more, and your -- your obligations will be released

14   immediately?

15             MR. MAHMOUD:  Yes.

16             THE COURT:  And the other thing, you understand

17   that as a third-party custodian, your primary

18   responsibility is to The Court and not to your sister or

19   brother-in-law, do you understand that?

20             MR. MAHMOUD:  Yes.

21             THE COURT:  And indeed, it's in your interest

22   that you understand that, and my point simply is you'll

23   be -- you'll be made aware of all the conditions that each

24   has to follow?

25             MR. MAHMOUD:  Yes.

```
 1              THE COURT:  And if you have any reason to believe

 2    they've broken one of those conditions or are about to

 3    break one or even thinking about breaking one, you

 4    absolutely must notify the authorities, do you understand

 5    that?

 6              MR. MAHMOUD:  Yes.

 7              THE COURT:  Of course I'm talking principally

 8    about the risk of flight, but any of these other

 9    conditions.

10              MR. MAHMOUD:  Yes.

11              THE COURT:  If they fail to appear or some other

12    condition is violated, that you will be required to show

13    cause, you will be required to tell me why you didn't tell

14    us, you understand that?

15              MR. MAHMOUD:  Yes.

16              THE COURT:  And if I don't accept what you say,

17    you can be held in contempt of court.

18              MR. MAHMOUD:  Yes.

19              THE COURT:  You understand that?

20              MR. MAHMOUD:  Yes.

21              THE COURT:  Mr. Herdman, Mr. Helmick, anything

22    further that you would want to ask?

23              MR. HELMICK:  Not at this time.

24              THE COURT:  Mr. Herdman, anything you want to ask

25    this witness?
```

```
 1              MR. HERDMAN:  Just briefly, Your Honor.  He did

 2   testify as custodian, I believe, for or at least the

 3   property owner on behalf of Amera Akl, so he's already

 4   testified under oath.  So I think this is -- this can be

 5   relatively brief.  One thing I did not inquire about last

 6   time, sir, you have a concealed weapon permit?

 7              MR. MAHMOUD:  Yes.

 8              MR. HERDMAN:  You have no firearms anymore?

 9              MR. MAHMOUD:  Just I have one hunting gun, I can

10   get rid of it.

11              MR. HERDMAN:  It says here that you no longer

12   have a firearm, your brother took possession of it?

13              MR. MAHMOUD:  Yes, it was 9-millimeter.

14              THE COURT:  I couldn't hear what you said, sir.

15              MR. MAHMOUD:  Hunting, one shot and then done.  I

16   just remember I had it in the attic, I never used it.

17              MR. HELMICK:  He had a 9-millimeter pistol, he

18   gave that to another family member, so it's outside the

19   house.  He just remembers he has an old single shot hunting

20   rifle.  He's willing to get rid of that as well.  Did I get

21   that right?

22              MR. MAHMOUD:  Yes.

23              THE COURT:  Mr. Herdman, go ahead.

24              MR. HERDMAN:  I may have asked you this last

25   time, you are familiar with the allegations that the
```

```
 1   indictment --
 2              MR. MAHMOUD:  Yes.
 3              MR. HERDMAN:  Specifically with respect to
 4   Mr. Akl, you're familiar with he traveled to -- are you
 5   familiar with the allegations in the indictment that
 6   Mr. Akl traveled over to Lebanon and met with
 7   representatives of a foreign terrorist organization
 8   Hezbollah.
 9              MR. MAHMOUD:  Yes, I understand.  I don't know if
10   he did or not.
11              MR. HERDMAN:  That's not what I'm asking.  You're
12   aware of the allegations?
13              MR. MAHMOUD:  Yes.
14              MR. HERDMAN:  Have you read the indictment?
15              MR. MAHMOUD:  No, just heard details that's it.
16              MR. HERDMAN:  And despite all that you know about
17   the charges that Mr. and Mrs. Akl are facing, are you still
18   willing to serve as custodian for both of them?
19              MR. MAHMOUD:  Yes.
20              MR. HELMICK:  Judge, I'll just represent to The
21   Court that I believe Akrum has been present at every
22   meeting with the family discussing the nature of the
23   charges and proceedings, so he may not have read the
24   indictment, he's well versed as to what the charges are in
25   this case.
```

```
 1              THE COURT:  Is that correct?

 2              MR. MAHMOUD:  Yes, sir.

 3              THE COURT:  Okay.  That's -- that's fine.  I find

 4    that to be acceptable, and that you're willing to take on

 5    those responsibilities.  And Mr. Nazem Akl?

 6              MR. NAZEM AKL:  Yes, sir.

 7              THE COURT:  You heard the conversation I had so

 8    far?

 9              MR. NAZEM AKL:  Pardon me?

10              THE COURT:  You heard --

11              MR. NAZEM AKL:  Yes, I had heard.

12              THE COURT:  What I said, Mr. Herdman said, what

13    Mr. Helmick said?

14              MR. NAZEM AKL:  Yes, I heard.

15              THE COURT:  And you're willing to post the

16    premises at in Monclova; is that correct?

17              MR. NAZEM AKL:  8703 Garden Road.

18              THE COURT:  Is that your home?

19              MR. NAZEM AKL:  My home.

20              THE COURT:  You live there with your family?

21              MR. NAZEM AKL:  Yes, I do.

22              THE COURT:  You heard what I was saying earlier,

23    if they don't show up or if they violate an important

24    condition of release, even if they've shown up, I will take

25    the home, you understand that?
```

```
 1          MR. NAZEM AKL:  I understand that.
 2          THE COURT:  You'll also everything, you'll still
 3   be responsible on the mortgage?
 4          MR. NAZEM AKL:  Yes, Your Honor.
 5          THE COURT:  And knowing that, you are still
 6   willing to put the property up?
 7          MR. NAZEM AKL:  Yes.
 8          THE COURT:  And I have in the past, I mean, one
 9   time I took $850,000 --
10          MR. NAZEM AKL:  Yes.
11          THE COURT:  -- some years ago.  You also heard
12   what I said, you don't have to do this, it's up to you.
13          MR. NAZEM AKL:  Yes, I do.
14          THE COURT:  And if you get cold feet at any time,
15   become apprehensive or just say, hey, wait a minute, I
16   don't want to run this risk, all you have to do is notify
17   us, do you understand that?
18          MR. NAZEM AKL:  Yes, Your Honor.
19          THE COURT:  You can back out at any time.
20          MR. NAZEM AKL:  Yes.
21          THE COURT:  And likewise, do you understand that
22   in your own self interest, if you have any reason to
23   believe that either Mrs. Akl or Mr. Akl is about to or may
24   or is even thinking about or considering fleeing, you
25   absolutely must notify The Court and pretrial services and
```

1    the U.S. government, the U.S. attorney's office, you

2    understand that?

3              MR. NAZEM AKL:  Yes, Your Honor.

4              THE COURT:  Okay.  Mr. Helmick, other questions?

5              MR. HELMICK:  No, Your Honor, I think that's

6    sufficient.  Thank you.

7              THE COURT:  Mr. Herdman?

8              MR. HERDMAN:  Briefly.  Mr. Akl, do you own any

9    other properties?

10             MR. NAZEM AKL:  Yes, I do.

11             MR. HERDMAN:  Can you list those?

12             MR. NAZEM AKL:  Nick's Family Cafe.

13             THE COURT:  I couldn't understand that.

14             MR. HELMICK:  Nick's Family Cafe.

15             MR. NAZEM AKL:  It's a restaurant.

16             MR. HERDMAN:  What's the address of that property

17   sir.

18             MR. NAZEM AKL:  2516 South Reynolds, Toledo,

19   Ohio.

20             MR. HERDMAN:  Do you know the proximate value of

21   that property is?

22             MR. NAZEM AKL:  Pardon me?

23             MR. HERDMAN:  The proximate value of that

24   property?

25             MR. NAZEM AKL:  I can't recall.  It's around

```
 1    300 something.
 2              MR. HERDMAN:  Do you have a mortgage on that
 3    property?
 4              MR. NAZEM AKL:  No, I don't.
 5              MR. HERDMAN:  Is that your place of business?
 6              MR. NAZEM AKL:  That's my business.
 7              MR. HERDMAN:  And do you own any other
 8    properties.
 9              MR. NAZEM AKL:  No.
10              MR. HERDMAN:  Do you own any properties overseas.
11              MR. NAZEM AKL:  No.
12              MR. HERDMAN:  Have you ever had a business
13    relationship with either Mr. or Mrs. Akl?
14              MR. NAZEM AKL:  No.
15              MR. HERDMAN:  Just related to them?
16              MR. NAZEM AKL:  First cousin.
17              MR. HERDMAN:  I don't -- that's all.
18              THE COURT:  Okay.  Thank you.  You may be seated.
19    In terms of the computer usage, it's my understanding that
20    the children may need that for purposes of school and so
21    forth.  I'm going to restrict use by Mr. Akl of the
22    computer, not to use a computer, do you understand that?
23    And the custodian should understand that as well,
24    Mr. Helmick, if you'll explain that.
25              MR. HELMICK:  Very good, Your Honor.
```

1          THE COURT:  Please make clear to the custodians,

2     to the extent that they don't understand this now, that if

3     they learn that Mr. Akl is using the computer, that is a

4     material breach of the conditions of release.  And if I

5     learn that they learned about it and did not report that,

6     they will be subject to contempt of court citation and show

7     cause.  I assume that the government will want me to impose

8     that condition?

9          MR. HERDMAN:  I would, Your Honor.  The other

10    thing I would ask is these custodians have not previously

11    testified with respect to Mr. Akl.  They've not -- I

12    believe Najah Joseph testified on behalf of Amera Akl, but

13    this is an expansion of her custodial situation.  I think

14    the same is true of Attaya Akl.

15         THE COURT:  And they're here?

16         MR. HELMICK:  Yes, they are.  I just assumed -- I

17    was going to get to our request to expand the custodian, so

18    whatever order you want to do this, Judge.

19         THE COURT:  Don't let me adjourn without doing

20    that.

21         MR. HELMICK:  I will not do that, Your Honor.

22         THE COURT:  Now, I will also grant leave to the

23    government, if it desires, it will be a condition that the

24    defendant's consent and the custodians, that the government

25    may monitor either telephonic or electronic communications

```
 1    without prior notice to the defendants or the custodians if

 2    the government desires.  That's entirely up to the

 3    government.  It occurs to me that probably if the

 4    government does do so, I should be at least informed ex

 5    parte, and obviously if the government does so, I assume

 6    that the monitors will be instructed about attorney, client

 7    communications, because obviously that those may occur, but

 8    I'll believe that's up to the government to do that.

 9              MR. HERDMAN:  Just so it's on the record, I think

10    we would have to oppose as a concept -- signed consent

11    form.

12              THE COURT:  That will be a condition.

13              MR. HERDMAN:  Custodians.

14              THE COURT:  The custodians and the defendants --

15    actually I think any -- anybody in the household 18 years

16    old or -- of age or older, I think parents can waive on the

17    behalf of the children.

18              MR. HERDMAN:  You may be getting to this, Your

19    Honor, but you discussed the restriction of cell phone

20    usage in the residences where Mr. and Mrs. Akl would be

21    staying.

22              THE COURT:  And what would you -- how would you

23    want me to formulate that?

24              MR. HERDMAN:  I would -- it would have to be

25    incumbent on the custodians to enforce that part of the
```

 1   order.  And the way you proposed it was because of the

 2   fungible nature of a cell phone, it would be too hard to

 3   monitor.

 4          THE COURT:  I agree.  There is to be no cell

 5   phone usage by the defendant, and likewise the

 6   custodians -- I'm not going to take the custodian cell

 7   phones or children or whatever or spouses, but on the other

 8   hand the custodian should understand that if either of the

 9   defendants is observed in possession of or use of a cell

10   phone, that is a material breach of the condition of

11   release, and I am to be notified, along with the government

12   and pretrial services.  Failure to do so will place at risk

13   both property which such custodian may have posted, plus it

14   be held to answer show cause order contempt of court

15   citation.

16          Mr. Herdman, other conditions that the government

17   would desire without waiving its objection to the fact of

18   release on these conditions?

19          MR. HERDMAN:  We previously discussed a no

20   contact order between the defendants, and obviously

21   that's -- I know that that goes into The Court's decision

22   to maintain separate residences, but I'd also expressed a

23   concern about the ability because these are all family

24   members, the ability of them to go back and forth

25   potentially relaying messages between defendants.

1          THE COURT:  Well, I'm a little concerned.  It

2    occurs to me both from the parental standpoint and also the

3    ability to talk about the case and so forth, because at

4    least one of the parents is not going to be with the

5    children, and again, given the fact that you can, if you

6    choose without monitoring their communications, I think

7    it's probably sufficient for now if there's some specific

8    reason or cause.  I know we talked about this before, but

9    think it through a little bit more.  I'll be very candid

10   with you, a million dollars is an awful lot to take from

11   people who have stood up here in court and said, Judge, I

12   know these people, I trust them, I know that you have said

13   that the likelihood of conviction for purposes of this

14   hearing only may be substantial, nonetheless, I'm willing

15   to put this up.  That, for me, is the best security we

16   have.  So for now anyway, I'm not going to impose that, but

17   you can always apply ex parte if you want for

18   reconsideration.

19          MR. HERDMAN:  I wasn't clear on this from the

20   pretrial report, the children will reside at 3911

21   Brookfield, I assume they would be able to go see their

22   mother at the other residence?

23          THE COURT:  Sure, they're not under restraint.

24          MR. HERDMAN:  It just was left unsaid what the

25   custodial arrangement was going to be.

```
 1              THE COURT:  Of course.  Thank you.
 2              MR. HERDMAN:  And I believe you might have hit
 3    this, but the electronic monitoring was going to be 24/7,
 4    and restrictions on travel out of state I thought was
 5    something else we had discussed.
 6              THE COURT:  Well, if they're basically to remain
 7    at home --
 8              MR. HERDMAN:  Right.
 9              THE COURT:  So I think that's implicit that
10    there's no travel outside the residence which they're
11    living.
12              MR. HERDMAN:  We'd also discussed a condition of
13    no contact with Lebanese consulate or embassy of the United
14    States.
15              THE COURT:  That's correct.
16              MR. HERDMAN:  Or any consulate officials.
17              THE COURT:  No contacts with any representative
18    of any foreign government, not just Lebanese, but anybody
19    else.
20              Anything else that the government would want me
21    to consider?
22              MR. HERDMAN:  I think these are -- that covers a
23    list of conditions we have previously discussed.
24              THE COURT:  Kyle, anything?
25              PROBATION OFFICER:  May I approach?
```

```
 1            THE COURT:  Sure.  Yeah, obviously each of the
 2   defendants can leave the premises for purposes of
 3   consulting with counsel and coming to court, of course.
 4   That's the whole purpose of this.  But again, the custodian
 5   has to be with them.  In other words, they can't simply go
 6   by themselves.
 7            MR. HELMICK:  Judge, may I ask -- this is what we
 8   did with Mr. Mazloum in the past, if they travel and bring
 9   them to my office I assume they don't have to be present
10   the entire time I'm with my client?
11            THE COURT:  No, they shouldn't be because that
12   would intrude upon their attorney, client representative.
13            MR. HELMICK:  But I mean physically within the
14   suite if they have something to do.
15            THE COURT:  No, that's fine.  They can make
16   arrangements, I trust you're not going to say, okay, see
17   you later.
18            MR. HELMICK:  Exactly.
19            THE COURT:  Now, the -- there are two things we
20   have -- I have to explain to the prior custodians
21   situation, right?
22            MR. HELMICK:  Yes, Judge.  We do have -- we do
23   have Najah Joseph, and then we have a couple of new
24   proposed people as custodians as well.
25            THE COURT:  Why don't we play musical chairs and
```

```
 1    have them come forward and the two gentleman can step back.
 2              MR. HELMICK:  Judge, just by way of introduction,
 3    to my immediate right we have Najah, N-A-J-A-H, Joseph.
 4    She is Amera's mother; and therefore, Hor's mother-in-law
 5    and she's currently a custodian for Amera.  And next to her
 6    we have Attaya Mahmoud, and she is Amera's sister.
 7              THE COURT:  And can you spell that for Angela?
 8              MR. HELMICK:  Attaya, A-T-T-A-Y-A, and Mahmoud is
 9    M-A-H-M-O-U-D.
10              THE COURT:  Okay.
11              MR. HELMICK:  And Najah is already a custodian
12    for Amera, as is Attaya, and we're asking if we can expand
13    to Hor, if needed, so that we've got family switched off
14    coverage, even though it's in another --
15              THE COURT:  I understand.  Do you understand what
16    Mr. Helmick's been saying?
17              MS. MAHMOUD:  Yes.
18              MS. JOSEPH:  Yes.
19              THE COURT:  I assume you were previously sworn
20    earlier?
21              MR. HELMICK:  Yes, they were.  They both were.
22              THE COURT:  That's fine.  And that's agreeable to
23    you?
24              MS. MAHMOUD:  I'm sorry?
25              MR. HELMICK:  It's okay with you?
```

```
 1              MS. MAHMOUD:  Yes.

 2              THE COURT:  Okay.  And you heard about the

 3    consequences of failing to do all that you reasonably can

 4    see to it that your sister and brother-in-law appear in

 5    court and otherwise, and very importantly comply with the

 6    other conditions of release?

 7              MS. MAHMOUD:  Yes.

 8              THE COURT:  And you know that if you fail to do

 9    so, and I find that you have failed to do so, you will be

10    cited for contempt of court and can be punished

11    accordingly, do you understand that?

12              MS. MAHMOUD:  Yes.

13              MS. JOSEPH:  Yes.

14              THE COURT:  Obviously the chance to be heard and

15    all that, but otherwise it's a very serious obligation.

16    You also understand that you don't have to do this, you

17    wouldn't be the first person to say, Judge, I thought about

18    this, and it's either too inconvenient or it's too risky

19    or, Judge, I don't even want to tell you why, but I just

20    want to be out, and you can be relieved without any further

21    questions or an do.  You understand that?

22              MS. MAHMOUD:  Yes.

23              MS. JOSEPH:  Yes.

24              THE COURT:  And knowing that, you're willing to

25    assume the additional responsibilities?
```

```
 1              MS. MAHMOUD:  Yes.

 2              MS. JOSEPH:  Yes.

 3              THE COURT:  Mrs. Joseph, you heard what I just

 4    discussed?

 5              MS. JOSEPH:  Yes, I did.

 6              THE COURT:  And likewise, you're willing to

 7    assume the additional responsibilities?

 8              MS. JOSEPH:  Yes.

 9              THE COURT:  So far everything's gone well I take

10    it?

11              MS. JOSEPH:  Yes.

12              THE COURT:  And you heard what I just said about

13    the very unhappy things that can happen if something goes

14    wrong?

15              MS. JOSEPH:  Yes.

16              THE COURT:  Mr. Helmick, anything I should ask

17    either of these ladies?

18              MR. HELMICK:  I think that's good, Your Honor.

19              THE COURT:  Mr. Herdman?

20              MR. HERDMAN:  Mr. Brown's going to have --

21              THE COURT:  Go ahead.

22              MR. BROWN:  Thank you, Your Honor.

23              THE COURT:  Just for the record --

24              MR. BROWN:  For the record, Your Honor, AUSA

25    Jonathan Brown for the United States.
```

```
 1              THE COURT:  I should have acknowledged you
 2   before, Mr. Brown, I apologize.
 3              MR. BROWN:  Not at all, Your Honor.  I'll do it
 4   separately.
 5              THE COURT:  One thing.  Subject to request by the
 6   government for a stay, which candidly I would anticipate
 7   granting if it were requested for purposes of appeal, I
 8   think that I talked with Kyle, I think Mr. Akl has to
 9   probably remain in custody at least until sometime tomorrow
10   until the various arrangements can be worked out.
11              MR. HELMICK:  I understand, Your Honor.  All I
12   ask is that his release not be held up if the government's
13   contemplating consent of a waiver of Title III, that that
14   not be a basis for holding him for release.
15              THE COURT:  No, because if that condition doesn't
16   get satisfied, come on back.
17              MR. HELMICK:  Very good.  Mr. Brown, I apologize
18   for interrupting.  Go ahead.
19              MR. BROWN:  Not at all Ms. Do you have children?
20              MS. MAHMOUD:  Yes, I do.
21              MR. BROWN:  School aged children?
22              MS. MAHMOUD:  Yes.
23              MR. BROWN:  You understand the conditions, you
24   will always have to be with Mrs. Akl?
25              MS. MAHMOUD:  Yes.
```

1          MR. BROWN:  There might be times when either your

2   husband is at work, or there might be some juggling with --

3          MS. MAHMOUD:  I understand.

4          MR. BROWN:  And that won't be a problem to you?

5          MS. MAHMOUD:  No.

6          MR. BROWN:  You also understand that there is a

7   ban on cell phones and the use of the phones by Mrs. Akl,

8   and you understand that you would be responsible for any

9   violations while she is in your care?

10         MS. MAHMOUD:  Yes.

11         MR. BROWN:  As you've been serving as her

12  custodian has she used a phone or used the Internet in your

13  presence?

14         MS. MAHMOUD:  Yes.

15         MR. BROWN:  And you understand you won't be able

16  to let her do that?

17         THE COURT:  She can use the land line phone to

18  talk to her husband or talk to her family or whatever.

19         MR. BROWN:  Does she use a cell phone?

20         THE COURT:  Candidly I don't want to interfere, I

21  don't want to pose an unreasonable restraint in her ability

22  to maintain some sort of family life.

23         MR. BROWN:  But there is going to be a

24  significant constriction of rights.  And would that

25  constriction bother you for -- if you were responsible?

1           MS. MAHMOUD:  I understand.

2           MR. BROWN:  And you also -- have you read the

3    indictment?

4           MS. MAHMOUD:  Yes.

5           MR. BROWN:  And you understand that part of the

6    allegations are that Mr. Akl had contact with senior

7    members of Hezbollah, correct?

8           MS. MAHMOUD:  From my understanding.

9           MR. BROWN:  Do you have any idea who these

10   individuals might have been?

11          MS. MAHMOUD:  I'm sorry?

12          MR. BROWN:  Do you have any idea of who those

13   people might have been?

14          MR. HELMICK:  I'm going to object.

15          THE COURT:  I'm going to sustain.  I'm not sure

16   it's relevant.  She's not charged with anything.

17          MR. BROWN:  I would like to inquire of a couple

18   questions based of an idea of risk of flight because the

19   defendants have been in contact with this group overseas.

20   That group might have the means to provide means or provide

21   assistance to move them out of the country, so I will just

22   like to establish that --

23          THE COURT:  Why don't you rephrase the question.

24   There was a certain -- unintentionally I think there was a

25   certain accusatory finger overtone to it, and that's -- I

```
 1    think that's all my concern was.
 2              MR. BROWN:  I apologize for that.  Do you know of
 3    anybody who has contact or would have the same contacts
 4    Mr. Akl has overseas?
 5              MS. MAHMOUD:  No.
 6              MR. BROWN:  Do you have the types of contacts
 7    that the indictment alleges with those individuals
 8    overseas?
 9              MS. MAHMOUD:  No.
10              MR. BROWN:  And you don't know anybody that would
11    have those types of contacts?
12              MS. MAHMOUD:  No.
13              MR. BROWN:  Those are all the questions I have
14    for you.
15              THE COURT:  Okay.  Any questions of Mrs. Joseph?
16              MR. BROWN:  Again, just in terms of the
17    constriction of types of communication, you understand that
18    cell phones, Internet usage would be not just limited, but
19    completely cut out?
20              MS. JOSEPH:  Yes.
21              MR. BROWN:  And you understand that you would be
22    responsible --
23              MS. JOSEPH:  Yes.
24              MR. BROWN:  -- for any violation of that?
25              MS. JOSEPH:  Yes, I do.
```

```
 1              MR. BROWN:  Likewise, do you have any contacts
 2    with the groups or individuals alluded to in the
 3    indictment?
 4              MS. JOSEPH:  No, I don't.
 5              MR. BROWN:  Likewise, do you know of anybody that
 6    has contacts with those individuals or that group overseas?
 7              MS. JOSEPH:  No, I don't.
 8              MR. BROWN:  So you know of nobody who has the
 9    mean to contact these defendants?
10              MS. JOSEPH:  No.
11              THE COURT:  Okay.  Mr. Helmick, anything further?
12              MR. HELMICK:  No, Your Honor.  Thank you.  I've
13    got a couple more potential --
14              MR. SCHULMAN:  I don't want to -- I came here to
15    make sure if there was any additional additions of bond
16    she's been using that that's not a condition of her bond.
17    The government never objected to that and the pretrial
18    services never posed that at the time of The Court order.
19    We certainly aren't going to stand in the way of the
20    additional change of conditions, but she's been
21    communicating with me almost daily on a cell phone and
22    through e-mail, and I just want to make sure -- she also
23    communicates with the children coming to school, making
24    sure things are okay.  I don't know if it's the intent of
25    The Court to relinquish that, prevent the use of those
```

```
 1   communication devices, if it's the intent, obviously flight
 2   risk for the government, they have never expressed any
 3   concern to me or pretrial services, but she wants to comply
 4   and she wants to facilitate his release, obviously, but she
 5   has been e-mailing me and cell phone usage with me, and she
 6   has actually visited with me all prior to the contact with
 7   pre-trial services.  For example, she has a driver's
 8   license, she's never had to surrender that.  I just want to
 9   make sure while she's here that any conditions of her bail
10   be addressed to her.
11             THE COURT:  Let me ask Mr. Brown and Mr. Herdman,
12   at this point do you think in regards to counsel talking
13   about any needs or necessity to change the conditions?  I
14   would be most willing to restrict any such usage to
15   computer, to purposes of communicating with him by e-mail
16   and cell phone and solely for purposes of communicating
17   with the children and with counsel, realizing it's
18   difficult to enforce because obviously cell phone
19   monitoring can be more difficult.
20             MR. HERDMAN:  I think part of what I would
21   envision here is if there is a designated cell phone that
22   we can identify that is used.
23             THE COURT:  Yes, fine.
24             MR. HERDMAN:  That would certainly go most of the
25   way towards --
```

1          THE COURT:  Computer?

2          MR. HERDMAN:  But I had always presumed that

3   Mrs. Akl be allowed to speak to Mr. Schulman on the phone.

4   So if that's the phone that she has, then as long as we're

5   made aware of it -- the only concern I have is additional

6   cell phones be brought to her or using additional cell

7   phone and try to evade surveillance.

8          MR. HELMICK:  We'll include that in the order,

9   the specific ESN number and phone number and so forth and

10  exclude any other usage of any other cell phones.

11         MR. HERDMAN:  Mr. Schulman, Mrs. Akl does not

12  communicate with you using a land line?

13         MR. SCHULMAN:  It's both, Judge, cell phone and

14  land line, but it's always while she's in the residence.

15  But I never instructed her not to use a cell phone.

16         THE COURT:  What's the deal with the land line

17  usage with the monitoring?

18         PROBATION OFFICER:  It can be done.

19         MR. BROWN:  That designated cell phone be her

20  cell phone, so it's not one that other people would take

21  out in the community but one that resides within the four

22  walls of the apartment.

23         THE COURT:  What I'll do is I'll have -- mark off

24  the conditions so that they are satisfactory to you and --

25  okay.  The other --

```
 1            MR. HERDMAN:  Just to preview, I don't know if --
 2   is there any intention to have Mr. Akl have access to a
 3   cell phone?  We might as well address that now to the kids.
 4            MR. HELMICK:  I had contemplated if a land line's
 5   available --
 6            THE COURT:  Let's leave it at the land line.
 7            MR. HELMICK:  He can make contact that way.
 8            THE COURT:  Okay.
 9            MR. HELMICK:  Judge, two new people sitting
10   before you judge.  First, Judge, this is Mr. Ali Joseph,
11   and he is Amera's father; and therefore Hor's
12   father-in-law, obviously.  And we propose him to be a
13   custodian for both defendants during their release.  He has
14   not been sworn before.  The Court may want to swear him.
15            THE COURT:  Also with him is?
16            MR. HELMICK:  With him is Mohammed Joseph.  And
17   that's his brother.  And we are asking, also proposing him
18   for a custodian as well for Hor Akl, if it pleases The
19   Court, but I think they both probably need to be sworn.
20                 (Mr. Mohammed Joseph and Mr. Ali Joseph
21                  sworn by courtroom deputy.)
22            THE COURT:  You've been here this afternoon, this
23   noon time, correct, have you Mr. Joseph?  I'm sorry, I
24   didn't hear you.  You've been here since we started this
25   hearing today is that correct?
```

```
 1          MR. ALI JOSEPH:  Yes.

 2          THE COURT:  And did you hear the things that I

 3   talked about?

 4          MR. ALI JOSEPH:  Yes.

 5          THE COURT:  Did you understand what I was talking

 6   about?

 7          MR. ALI JOSEPH:  Yes.

 8          THE COURT:  And did you hear the things that the

 9   lawyers, Mr. Helmick, Mr. Brown and Mr. Herdman talked

10   about?

11          MR. ALI JOSEPH:  Yes.

12          THE COURT:  Did you understand what they were

13   saying?

14          MR. ALI JOSEPH:  Yes.

15          THE COURT:  And you understand that when you are

16   acting as a custodian, when you're in the company of your

17   daughter or son in law, you are responsible for them

18   obeying everything that they're supposed to obey in my

19   court order, do you understand that?

20          MR. ALI JOSEPH:  Yes.

21          THE COURT:  And that if they don't obey it, and

22   if I have reason to believe that you didn't try to prevent

23   it, you can be subject to contempt of court, do you

24   understand that?

25          MR. ALI JOSEPH:  Yes.
```

```
 1              THE COURT:  Mr. Helmick, I assume you'll answer
 2   any other questions there may be and will make all that
 3   clear to the extent it may not?
 4              MR. HELMICK:  I certainly will, Your Honor.
 5   Thank you.
 6              THE COURT:  And knowing that, you're willing to
 7   assume these responsibilities?
 8              MR. ALI JOSEPH:  Yes.
 9              THE COURT:  And you understand you can back out
10   at any time you want to?
11              MR. ALI JOSEPH:  Yes.
12              THE COURT:  If you'll give the microphone to your
13   brother, please.  And Mr. Joseph you've heard what I just
14   talked about with your brother?
15              MR. MOHAMMED JOSEPH:  Yes, I do.
16              THE COURT:  And what I've been talking about with
17   everybody else this noon time?
18              MR. MOHAMMED JOSEPH:  Yes, I do.
19              THE COURT:  And you understand that you have to
20   do all that you reasonably can to make sure that each and
21   every condition of release must be obeyed?
22              MR. MOHAMMED JOSEPH:  Yes, I do.
23              THE COURT:  And will be obeyed, and that you'll
24   do all you can to see to it that it is obeyed, am I
25   correct?
```

```
1              MR. MOHAMMED JOSEPH:  Yes.
2              THE COURT:  If you have any reason to believe
3    it's not being obeyed or not to be obeyed, you must notify
4    me, the U.S. attorney and pretrial services, do you
5    understand that?
6              MR. MOHAMMED JOSEPH:  Yes, I do.
7              THE COURT:  You understand the consequences if
8    you don't do so?
9              MR. MOHAMMED JOSEPH:  Yes.
10             THE COURT:  Finally, you understand you can back
11   out at any time?
12             MR. MOHAMMED JOSEPH:  Yes.
13             THE COURT:  Mr. Helmick, any questions at all?
14             MR. HELMICK:  Not at this time, thank you, Judge.
15             THE COURT:  Mr. Brown, Mr. Herdman, any
16   questions?
17             MR. HERDMAN:  I do, Your Honor.  Mr. Mohammed
18   Joseph --
19             MR. MOHAMMED JOSEPH:  Yes, I do.
20             MR. HERDMAN:  -- how long have you known Mr. Akl?
21             MR. MOHAMMED JOSEPH:  Since practically -- since
22   he came to this country.
23             MR. HERDMAN:  So early 1990?
24             MR. MOHAMMED JOSEPH:  I don't know the date, but
25   I know when he came here.
```

```
1              MR. HERDMAN:  And he's married to your niece?

2              MR. MOHAMMED JOSEPH:  Yes.

3              MR. HERDMAN:  Sir, have you read the indictment

4    in this case?

5              MR. MOHAMMED JOSEPH:  Part of it, yes.

6              MR. HERDMAN:  Are you aware of the allegations in

7    the indictment?  I'm not asking you to say -- I'm sorry,

8    I'm not asking you to say whether you believe they're true

9    or not, but are you at least aware of the allegations that

10   Mr. Akl met with representatives of Hezbollah.

11             MR. MOHAMMED JOSEPH:  Yes, I do.

12             MR. HERDMAN:  And he met with those individuals

13   to convey money, significant amounts of money to Hezbollah.

14             MR. MOHAMMED JOSEPH:  Yes.

15             MR. HERDMAN:  With all that in mind, you're still

16   willing to serve as custodian?

17             MR. MOHAMMED JOSEPH:  Yes.

18             MR. HERDMAN:  Do you, Mr. Mohammed Joseph, do you

19   have any contact with anyone in Hezbollah foreign terrorist

20   organization?

21             MR. MOHAMMED JOSEPH:  No.

22             MR. HERDMAN:  Do you know of anybody who has any

23   contacts?

24             MR. MOHAMMED JOSEPH:  No.

25             MR. HERDMAN:  And Mr. Ali Joseph --
```

```
 1              MR. ALI JOSEPH:  Yes.

 2              MR. HERDMAN:  -- you're Mr. Akl's father-in-law?

 3              MR. ALI JOSEPH:  Yes.

 4              MR. HERDMAN:  How long have you known Mr. Akl?

 5              MR. ALI JOSEPH:  I know him before he married my

 6     daughter.

 7              MR. HERDMAN:  Proximate number of years?

 8              MR. ALI JOSEPH:  20 years.

 9              MR. HERDMAN:  And sir, are you familiar with the

10     allegations that are in the indictment?

11              MR. ALI JOSEPH:  Yes, I do.

12              MR. HERDMAN:  Have you read the indictment?

13              MR. ALI JOSEPH:  No, just what I hear.

14              MR. HERDMAN:  Are you aware of the fact that in

15     certain paragraphs, it's alleged that Mr. Akl met with

16     representatives of Hezbollah in Lebanon?

17              MR. ALI JOSEPH:  Yes.

18              MR. HERDMAN:  And do you, sir, do you have any

19     contacts in Hezbollah?

20              MR. ALI JOSEPH:  No.

21              MR. HERDMAN:  Do you know anyone in Hezbollah?

22              MR. ALI JOSEPH:  No.

23              MR. HERDMAN:  Do you know a person by the name of

24     Naim Kassam.

25              MR. ALI JOSEPH:  No.
```

```
 1              MR. HERDMAN:  You don't know anyone named Naim

 2     Kassam?

 3              MR. ALI JOSEPH:  No.

 4              MR. HERDMAN:  Sir, when you -- when you came back

 5     to the country on June 12th, 2010 --

 6              MR. ALI JOSEPH:  Yes.

 7              MR. HERDMAN:  -- did you have an address book

 8     with you when you came back to the country?

 9              MR. ALI JOSEPH:  I have address book.

10              MR. HERDMAN:  Did you have an address book with

11     you?

12              MR. ALI JOSEPH:  Just a --

13              MR. HERDMAN:  Was one of those address books

14     yours?

15              MR. ALI JOSEPH:  Yeah, when they search me at the

16     airport what I have, I give it to them.

17              MR. HERDMAN:  And they were your address books?

18              MR. ALI JOSEPH:  Yes.

19              MR. HERDMAN:  Sir, isn't it true that in one of

20     those address books, you had the name Naim Kassam, who is

21     deputy secretary general of Hezbollah and telephone

22     numbers?

23              MR. ALI JOSEPH:  No.

24              MR. HERDMAN:  It's not true?

25              MR. ALI JOSEPH:  No, not true.
```

```
 1            MR. MOHAMMED JOSEPH:  Not true.  I think my
 2   brother misunderstand because his cousin in the village
 3   where we came from will be my uncle's son, his name Naim
 4   Kassam, maybe he misunderstood.
 5            MR. HERDMAN:  Your Honor, if you don't mind, I'm
 6   going to take a moment and just present Mr. Joseph with
 7   something and ask him to translate.
 8            THE COURT:  Why don't you have it marked.
 9            MR. HERDMAN:  And this is a roughly 100 page set
10   of photocopied documents that was obtained by immigration,
11   customs and border patrol on June 12th, 2010.
12   Mr. Joseph --
13            MR. ALI JOSEPH:  Yes.
14            MR. HERDMAN:  -- I'm showing you, do you
15   recognize this?
16            MR. ALI JOSEPH:  Yes, this is my cousin -- my
17   mother's sister's son, and this is my mother, brother's
18   son.  He's -- he is engineer for the electric company in
19   Lebanon.  I have his number when I was in Lebanon, and this
20   is a cab driver.
21            MR. HERDMAN:  So can you --
22            MR. ALI JOSEPH:  Still I call him professor Naim
23   Kassam.
24            MR. HERDMAN:  And he's an engineering professor?
25            MR. ALI JOSEPH:  He was bigger area, he was in
```

```
 1    electricity.
 2            MR. HERDMAN:  But there's a title in front of his
 3    name.
 4            THE COURT:  Time out.  I can't hear, and the
 5    court reporter can't hear, so if we can --
 6            MR. ALI JOSEPH:  This is Naim Kassam.
 7            THE COURT:  You'll spell that at some point for
 8    the court reporter?
 9            MR. HELMICK:  I won't, but --
10            MR. ALI JOSEPH:  My mother's sister son, he
11    drives a cab.  Usually when we go overseas he pick us up
12    from the airport.  It's his home number and his cell
13    number.  Next one my mother, brother's son his name Naim
14    Kassam.  I put his name in a book I had with me instead,
15    Naim Kassam is a Professor Naim Kassam, and this is his
16    office number and his cell number.
17            MR. HERDMAN:  And those are Lebanese numbers,
18    sir, numbers in Lebanese?
19            MR. ALI JOSEPH:  I wrote them in English.
20            MR. HERDMAN:  This is your address book, though,
21    correct?
22            MR. ALI JOSEPH:  Yes, that's my writing.
23            MR. HERDMAN:  Okay.  Your testimony is that that
24    Naim Kassam is a different Naim Kassam than the one who's
25    the deputy secretary general of Hezbollah?
```

```
 1              MR. ALI JOSEPH:  I don't know anybody from
 2    Hezbollah.
 3              MR. HERDMAN:  Okay.  I have nothing further, Your
 4    Honor.
 5              THE COURT:  Mr. Brown, anything?
 6              MR. BROWN:  No, Your Honor.
 7              THE COURT:  Mr. Helmick, anything further?
 8              MR. HELMICK:  No, Your Honor.
 9              THE COURT:  So what we're talking about,
10    apparently, Mr. Herdman, is a same names --
11              MR. HERDMAN:  Well, Your Honor --
12              THE COURT:  I understand what you mean at least
13    based upon the testimony today, that the names appear to be
14    the same.
15              MR. HERDMAN:  The name is the same.  I actually
16    have a printout, Naim Kassam is the deputy secretary
17    general of Hezbollah.
18              THE COURT:  And let me ask you this, do you have
19    any other reason to believe that the individual there, is
20    that the same individual presently?
21              MR. HERDMAN:  No, I do not, Your Honor.
22              THE COURT:  Okay.  That's fine.
23              MR. HELMICK:  May I just ask, did the government
24    check the telephone number?
25              THE COURT:  No, that's okay -- no, no --
```

```
 1              MR. HELMICK:  No, I'm -- it's a genuine question.
 2     I'm not -- I'm just inquiring, do we know anything about
 3     the telephone numbers?
 4              THE COURT:  My point is, I asked Mr. Herdman --
 5     let's put it this way, I'm willing to infer that if it had
 6     and if it had, quote, a hit, closed quote, we would have
 7     heard about it.
 8              In any event, I think that the line of inquiry
 9     was appropriate, and I think Mr. Herdman's questions have
10     been answered.
11              MR. HELMICK:  Very good, Your Honor.
12              THE COURT:  I think it was entirely appropriate
13     for the government to say, oops, time out, folks, wait a
14     minute.  What's this, and what's this has been answered.
15     It's the wife's brother's son who happens to have the same
16     name, whether it's as common as mine or Tom Smith, who
17     knows.
18              MR. HERDMAN:  I have one --
19              THE COURT:  Also, Mr. Herdman, if reason develops
20     along the course as a result of further inquiry to believe
21     that the inference I'm drawing about two separate people
22     isn't so, I trust we'll go from there.
23              MR. HERDMAN:  There's just one more nuance to
24     point out.  I have no further questions for the witnesses.
25              With respect to the title that was in front of
```

```
 1    the name, the Ustat, I can't pronounce it, in Arabic

 2    directly, but it's been spelled U-S-T-A-T or something

 3    along those lines, my understanding is that that is a --

 4    may be translated as Mr, but it's more sort of --

 5            THE COURT:  An honorific --

 6            MR. HERDMAN:  Correct.  However, I have been told

 7    for teachers it may be an appropriate terminology, but it's

 8    also the only time that that ever appears in any of his

 9    address books, so I need to make the record clear on that

10    respect too.

11            THE COURT:  Okay.  Anything further for anybody?

12            MR. HELMICK:  Not from us, Your Honor.

13            THE COURT:  Mr. Herdman, anything further?

14            MR. HERDMAN:  I realize Mr. Joseph has an

15    alternative explanation for the address book, I'm a little

16    concerned about his -- I don't know if it was a memory laps

17    or if it was a deliberate bought of forgetfulness in front

18    of The Court, but I did credit the fact that there may be

19    an alternative explanation for Naim Kassam in that address

20    book.  One would think that the name -- maybe I

21    mispronounced it, perhaps, but that name alone is certainly

22    well known in Lebanon, is my understanding, and I thought

23    if there was an alternative question, a do you know anyone

24    by that name, and I tried do it in a way that was

25    non-accusatory, but I do have some concerns based on his
```

```
 1    lack of candor with respect to that.  I mean, that -- these
 2    are his address books.  If this is his family, if someone
 3    asked me who Sam Herdman is, I would certainly know the
 4    name, and I would certainly answer appropriately and say
 5    that was my cousin or my cousin's son or whatever the
 6    situation may be, so I do have some serious concerns about
 7    Mr. Joseph as a custodian.  And I know The Court has seen
 8    the fact that he has a criminal record, I know these all
 9    appear to be minor misdemeanors, there are few of them.
10    There's more than one.  And I am just uncomfortable with
11    the thought of Mr. Joseph serving solely as a custodian
12    really in the express sense of Mr. Kassam, I do have some
13    serious concerns about him, and not for the other -- not
14    for the other custodians I have to say.
15              THE COURT:  I didn't hear --
16              MR. HERDMAN:  Not for the other custodians.  I
17    think the other custodians have testified truthfully,
18    candidly and fully with The Court.  And to the extent that
19    Mr. Akl's going to be released, I suppose I don't have any
20    objection to those particular custodians.
21              MR. HELMICK:  Judge, if I may, I guess a couple
22    of things, my recollection is, and I understand, I
23    appreciate Mr. Herdman's attempt that an open-ended
24    question with regard to the name, but the context so far in
25    terms of questions from The Government that related to
```

```
1    Hezbollah, the terrorist organization which may have been

2    Ali Joseph's frame of reference in terms of what he heard.

3              THE COURT:  Why don't you ask him how he can --

4    if he can explain that.

5              MR. HELMICK:  Mr. Joseph, I'll just ask you then,

6    did you recognize the name at all when Mr. Herdman first

7    asked you about that name?  Did you understand what name it

8    was?

9              MR. ALI JOSEPH:  My brother called it to my

10   attention, I forgot about my cousin -- my cousin Naim

11   Kassam.  My brother -- I misunderstand him.  He just

12   brought it to my attention.

13             MR. HELMICK:  And he brought it to your attention

14   right here when you were standing here?

15             MR. ALI JOSEPH:  Right here.  If I had it any

16   other intention I wouldn't put it in my book, I would not

17   carry it.

18             MR. HELMICK:  When you looked at the book and

19   Mr. Herdman drew your attention to that page, did you then

20   recognize that writing that appeared there?

21             MR. ALI JOSEPH:  Yes, it's my writing.

22             MR. HELMICK:  And you also recognize the other

23   name on that page?

24             MR. ALI JOSEPH:  Yes, my cousin on my aunt's side

25   Naim, on my uncle's side.
```

1          MR. HELMICK:  Okay.  Can you proximate for The

2     Court, based on that document you were shown, about how

3     many entries are there in your address book, how many names

4     do you think you have?

5          MR. ALI JOSEPH:  I have a full book.

6          MR. HELMICK:  Hundreds, tens, do you know how

7     many appear in that book?

8          MR. ALI JOSEPH:  More than that.

9          MR. HELMICK:  So there are a good number of names

10    that appear in here?

11         MR. ALI JOSEPH:  Yeah.

12         MR. HELMICK:  And you don't know exactly how

13    many?

14         MR. ALI JOSEPH:  To count them, no.  To be honest

15    with you, no.

16         MR. HELMICK:  And sir, your failure to recognize

17    here today, was that deliberate in any way, you're trying

18    to mislead The Court in any way?

19         MR. ALI JOSEPH:  No.  I never thought -- I never

20    think about that.

21         MR. HELMICK:  All right.  And with regard to your

22    criminal history, you have not had the opportunity to see

23    this, but the last criminal charge reflects against you was

24    regarding sales in possession of liquor in 1992?

25         MR. ALI JOSEPH:  Yes.

1              MR. HELMICK:  Is that the last time you've been

2    convicted of a crime at any time?

3              MR. ALI JOSEPH:  Yes.

4              MR. HELMICK:  Was that related to ownership

5    running in Mug Shots Bar?

6              MR. ALI JOSEPH:  Yes.

7              MR. HELMICK:  You are no longer --

8              MR. ALI JOSEPH:  36 years two violations and --

9              MR. HELMICK:  Currently you're not involved in

10   the operation of that bar?

11             MR. ALI JOSEPH:  Now?  No.

12             MR. HELMICK:  That's all I have.

13             MR. HERDMAN:  Nothing further.

14             THE COURT:  I will accept Mr. Joseph as a

15   custodian.  I think under all the circumstances, I think

16   he'll perform his obligations.  And obviously, Mr. Joseph,

17   the government has a concern, and I simply want to remind

18   you that in addition to the obligations that you have to

19   The Court, if the government's concerns are well founded

20   and either of the defendants or both of them flee or

21   attempt to flee, the government may well focus on you and

22   undertake to ascertain any involvement or misconduct on

23   your part.  Do you understand that?

24             MR. ALI JOSEPH:  Yeah, I understand that.

25             THE COURT:  Which potentially could lead to very

1    serious criminal charges against you, you understand that?

2              MR. ALI JOSEPH:  Yes.

3              THE COURT:  Mr. Brown, Mr. Herdman, anything

4    further?

5              MR. HERDMAN:  No, Your Honor, not at this time.

6              THE COURT:  Let me suggest this, that counsel

7    work -- is there any issues about exact terminology of the

8    conditions?

9              MR. HERDMAN:  Well, I haven't seen anything on

10   paper yet, but I think the way they spelled it out so far

11   there's no word --

12             THE COURT:  Pardon me.

13             MR. HERDMAN:  There's no wording I would change

14   at this point, although I haven't seen --

15             THE COURT:  That's what I thought.  Look at it,

16   and if there's other change or whatever, talk it over

17   and -- the main thing I don't want you -- either of you

18   leaving here today and then, you know, getting the order

19   and say, oops, wait a minute.  That's not what The Judge, I

20   heard The Judge say or whatever.  I don't think there will

21   be a problem in that regard, but as a matter of caution.

22   Are you prepared now to say whether you are likely for

23   appeal, or would you like a bit of time to consult and

24   determine that?

25             MR. HERDMAN:  As with everything in this realm,

```
 1    Your Honor, I would like to consult with my superiors.

 2              THE COURT:  Let's --

 3              MR. SCHULMAN:  Judge, I think I have one more

 4    proposed custodian just for Amera.

 5              THE COURT:  Okay.  Fine.

 6              MR. SCHULMAN:  Do you just have a few moments so

 7    I can take care of her quickly?

 8              THE COURT:  No, that's fine.  I misunderstood.

 9    Mr. Herdman, do you think you could notify me and counsel

10    by maybe noon tomorrow?

11              MR. HERDMAN:  Absolutely, yes.

12              THE COURT:  And if you'll introduce the lady for

13    me, please.

14              MR. SCHULMAN:  I will, Your Honor, M-A-H-A, last

15    name Mahmoud, M-A-H-M-O-U-D, like the other spelling, and

16    she is proposed custodian for Amera Akl only.  And I

17    believe she needs to be sworn.  She has not testified

18    previously.

19                   (Maha Mahmoud sworn by courtroom deputy.)

20              THE COURT:  And you've been present -- have you

21    been here this entire time?

22              MS. MAHA MAHMOUD:  19 years.

23              THE COURT:  No, I mean here in the courtroom?

24              MS. MAHA MAHMOUD:  Yes.

25              THE COURT:  You've heard everything that's gone
```

1    on?

2              MS. MAHA MAHMOUD:  Yeah.

3              THE COURT:  Did you understand everything that's

4    gone on?

5              MS. MAHA MAHMOUD:  Yeah.

6              THE COURT:  And how do you -- how do you know

7    Mrs. Akl?

8              MS. MAHA MAHMOUD:  She's my sister-in-law's

9    sister.

10             MR. HELMICK:  Sister-in-law's sister?

11             THE COURT:  Okay.  How long have you known her?

12             MS. MAHA MAHMOUD:  17 years.

13             THE COURT:  And you're willing to, on occasion,

14   to be in her company and her custodian?

15             MS. MAHA MAHMOUD:  Yes.

16             THE COURT:  And you know you don't have to do

17   that?

18             MS. MAHA MAHMOUD:  Yes.

19             THE COURT:  Do you know that while you are with

20   her, you must do everything that you reasonably can to see

21   to it that she complies with my court order?

22             MS. MAHA MAHMOUD:  Yes.

23             THE COURT:  And if you don't, you can be in

24   trouble, you understand that?

25             MS. MAHA MAHMOUD:  Yes.

1          THE COURT:  And you can change your mind at any

2    time.

3          MS. MAHA MAHMOUD:  Yes.

4          THE COURT:  Do you understand that you can say,

5    oops, wait a minute, I don't want to do this anymore?

6          MS. MAHA MAHMOUD:  Yes.

7          THE COURT:  Okay.  Mr. Helmick, have you spoken

8    with her and described the responsibilities?

9          MR. HELMICK:  Only briefly this afternoon, Judge,

10   but I would certainly meet with the custodians after

11   today's hearing and answer any questions that they have,

12   answer any questions that they have about the

13   responsibilities they've taken on.

14         THE COURT:  One thing occurs to me, talk this

15   over with the government and custodians, I think it would

16   be appropriate if it's possible, reasonably possible to

17   have sort of a line up so that Kyle particularly knows

18   who's going to be since we have a number of people, some of

19   them on different occasions responsible for either one.

20         MR. HELMICK:  So maybe a proposed schedule of

21   custodians for coverage, Judge, we'll work on that as well.

22         THE COURT:  And then the other thing, perhaps

23   have the contact information, particularly cell phone

24   information --

25         MR. HELMICK:  Very good.

```
 1              THE COURT:  -- of the custodians and so forth.

 2              MR. HELMICK:  We'll provide Mr. Herdman with that

 3    as well and the government.

 4              THE COURT:  Mr. Herdman, any questions?

 5              MR. HERDMAN:  Just briefly.  Ms. Mahmoud, are you

 6    Akrum Mahmoud's sister?

 7              MS. MAHA MAHMOUD:  No, I'm Akrum's sister-in-law.

 8              MR. HERDMAN:  So your husband is who?

 9              MS. MAHA MAHMOUD:  Akl's brother.

10              MR. HERDMAN:  What's his last name?

11              MS. MAHMOUD:  K-A-R-E-E-M.

12              MR. HELMICK:  Kareem?

13              MR. HERDMAN:  And he's not one of the

14    individuals -- you haven't posted any property?

15              MS. MAHA MAHMOUD:  No.

16              THE COURT:  And are you familiar with the

17    indictment in this case?

18              MS. MAHA MAHMOUD:  Yes.

19              MR. HERDMAN:  Have you read the indictment?

20              MS. MAHA MAHMOUD:  Yes.

21              MR. HERDMAN:  You have read the indictment?

22              MS. MAHA MAHMOUD:  Yes.

23              MR. HERDMAN:  You're familiar with respect to

24    both Mr. and Mrs. Akl?

25              MS. MAHA MAHMOUD:  Yes.
```

```
 1            MR. HERDMAN:  You're familiar with the

 2    allegations that Mr. Akl traveled over to Lebanon and met

 3    with representatives of a foreign terrorist organization,

 4    Hezbollah?

 5            MS. MAHA MAHMOUD:  Yes.

 6            MR. HERDMAN:  Despite that, you're still willing

 7    to serve as a custodian for Mrs. Akl?

 8            MS. MAHA MAHMOUD:  Yes.

 9            MR. HELMICK:  Nothing here, Judge.

10            THE COURT:  Anything else to be presented this

11    afternoon?

12            MR. HELMICK:  May I have one moment, Judge?

13    Judge, we have nothing further at this time.

14            THE COURT:  Okay.  One thing should be clear, and

15    that is all of the property owners will have to sign the

16    bond before release can occur, and also that custodians, I

17    want them -- I won't hold that part up, but the consents

18    with regard to the monitoring will have to be signed by the

19    end of next week at the latest, just given the holiday

20    weekend coming up I'd make it a little bit sooner.

21            Is there anything else that the government would

22    ask presently.

23            MR. HERDMAN:  Not with respect to conditions,

24    Your Honor.  I will have an answer for The Court and

25    counsel by noon tomorrow with respect to possibility of an
```

1    appeal.

2            MR. HELMICK:  And Judge, having -- having

3    reviewed the transcript in detail from our last proceeding,

4    I think between you and the government you covered all the

5    conditions that were discussed the last time, I have the

6    checklist and I think you covered all of them.

7            THE COURT:  Okay.  Let me -- give me one minute,

8    please.

9            Just for the record, my understanding is that the

10   legal standard is that defendant is entitled to be released

11   under the law, provided that The Court can be reasonably

12   assured that the defendant will appear and not be a danger

13   to the safety of any other person in the community.  As

14   previously indicated, I think that that's a substantially

15   lesser concern than is the concern about risk of flight and

16   failure to appear.  I am persuaded that the conditions that

17   I have imposed, particularly the third party custodial

18   relationships, and the posting of substantial property

19   bonds, as I say around or in excess of a million dollars, I

20   will conclude that those conditions and the others being

21   imposed are sufficient reasonably to ensure that both

22   defendants will appear as ordered.  There can never be any

23   absolute certainty in that regard or really with regard to

24   just about everything else.  But I am persuaded that each

25   of the custodians is entering upon his or her

1    responsibilities knowingly, intelligently and voluntarily

2    and fully aware of the very serious consequences that will

3    result in the event any of the custodians is determined to

4    have known or have had cause to apprehend that a violation

5    of a material condition of release was occurring, was --

6    might be occurring, or even was being contemplated.  And

7    they will, in the event of the violation, they will be held

8    to answer those apparently responsible will be held to

9    answer upon a contempt of court citation and an order to

10   show cause why they should not be held in contempt of

11   court.

12            I also believe that each of the individuals who

13   is posting property understands fully and completely that

14   in the event of a failure to appear or a violation of any

15   other substantial material condition of release imposed to

16   them here that that property will be gone, all of it will

17   be gone.  And the equity will be, once the property is

18   sold, will be property of the United States government, and

19   whatever encumbrances, mortgages and so forth, whatever

20   exists on the property, the owners will be liable for those

21   amounts.  And therefore, I am ordering -- or granting the

22   request that this defendant be released subject to those

23   conditions.  Mr. Akl, you understand --

24            THE DEFENDANT:  Yes.

25            THE COURT:  -- a number of people will have

```
1    expressed their confidence that you will appear and
2    otherwise comply with each and every condition of release,
3    do you understand that?
4              THE DEFENDANT:  Yes.
5              THE COURT:  They have put their trust and faith
6    in you that you will do so, do you understand that?
7              THE DEFENDANT:  Yes, Your Honor.
8              THE COURT:  And do you understand that these
9    relatives and friends of yours, whether they are custodians
10   or have posted property, will lose the property if you fail
11   to appear?
12             THE DEFENDANT:  Yes, Your Honor.
13             THE COURT:  Otherwise violates a material
14   condition of release, and that includes Internet usage and
15   use of the telephone for any other reason other than that
16   which I allow.  Do you understand that?
17             THE DEFENDANT:  Yes, Your Honor.
18             THE COURT:  That in addition to that, if you fail
19   to appear or violate any of the other substantial material
20   condition of release, these friends of yours, these family
21   members, will be held to answer to a contempt of court
22   citation?
23             THE DEFENDANT:  Yes, Your Honor.
24             THE COURT:  And if I find that they have violated
25   my court order and failed to discharge in every respect,
```

1    the obligations that they have assumed as third-party

2    custodians, they will be punished?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  You may be running around somewhere

5    but they won't be.  Did you do you understand that?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  Anything further for The Government?

8              MR. HERDMAN:  No, Your Honor.

9              THE COURT:  Mr. Helmick?

10             MR. HELMICK:  No, Your Honor, not at this time.

11   Thank you.

12             THE COURT:  I will sign the order upon its

13   submission to me.  That will conclude these proceedings.

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    s:/Angela D. Nixon

7    --------------------------                  -----------

8    Angela D. Nixon, RPR, CRR                   Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25