GOVERNMENT
EXHIBIT
A

FILED

2011 MAY 23  AM 11: 20

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
TOLEDO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:10-CR-251 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES G. CARR |
| v. | ) | |
| | ) | |
| HOR I. AKL, | ) | |
| | ) | PLEA AGREEMENT |
| Defendant. | ) | |

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and in

consideration of the mutual promises set forth below, the United States Attorney's Office for the

Northern District of Ohio (hereinafter "USAO") and the United States Department of Justice

National Security Division (hereinafter "NSD"), by and through its undersigned attorney(s), and

the defendant, **HOR I. AKL** (hereinafter "Defendant"), agree as follows:

## MAXIMUM PENALTIES AND OTHER
## CONSEQUENCES OF PLEADING GUILTY

1.      **Waiver of Constitutional Trial Rights.** Defendant understands that Defendant

has the right to plead not guilty and go to trial. At trial, Defendant would be presumed innocent,

have the right to trial by jury or, with the consent of the United States, to trial by the Court, the

right to the assistance of counsel, the right to confront and cross-examine adverse witnesses and

Plea Agreement of HOR I. AKL

subpoena witnesses to testify for the defense, and the right to be protected from compelled self-incrimination.  Defendant understands that Defendant has the right to an attorney at every stage of the proceedings and, if necessary, one will be appointed to represent Defendant.  Defendant understands that by pleading guilty, Defendant specifically and voluntarily waives each of these trial rights, except the right to counsel.  Defendant understands that a guilty plea is a complete admission of guilt and if the Court accepts the guilty plea, the Court will find Defendant guilty without a trial.

2.    **Statutory Penalties.**  Defendant understands that the statutory maximum penalties, and minimum penalties if applicable, for the count(s) to which Defendant agrees to plead guilty is/are as follows:

| <u>Count</u> | **Statute and <u>Description of Offense</u>** | <u>**Statutory Sentence Per Count**</u> |
|---|---|---|
| One | 18 U.S.C. § 2339B (Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization) | Maximum imprisonment:  15 years<br>Statutory fine: $250,000<br>Maximum period of supervised release: Life<br>Special assessment: $ 100 |
| Two | 18 U.S.C. § 1956(h) (Conspiracy to Violate Money Laundering Statutes) | Maximum imprisonment: 20 years<br>Statutory fine: $500,000<br>Maximum period of supervised release: 3 years<br>Special assessment: $ 100 |
| Three | 18 U.S.C. § 157(1) (Bankruptcy Fraud) | Maximum imprisonment: 5 years<br>Statutory fine: $250,000<br>Maximum period of supervised release: 3 years<br>Special assessment: $ 100 |
| Four | 18 U.S.C. § 1621(1) (Perjury) | Maximum imprisonment: 5 years<br>Statutory fine: $250,000<br>Maximum period of supervised release: 3 years<br>Special assessment: $ 100 |

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

| Count | Statute and Description of Offense | Statutory Sentence Per Count |
|-------|-----------------------------------|------------------------------|
| Five | 18 U.S.C. § 152(7) (Bankruptcy Fraud) | Maximum imprisonment: 5 years<br>Statutory fine: $250,000<br>Maximum period of supervised release: 3 years<br>Special assessment: $ 100 |

3.      **Minimum sentence must include imprisonment.** The sentence for the offenses charged in count, One, Two, Three, Four, and Five may not be satisfied by a term of probation and must include some period of imprisonment. [18 U.S.C. § 3561(a)(3) and U.S.S.G. § 5B1.1].

4.      **Special Assessment.** In addition to the penalty listed above, Defendant will be required to pay a mandatory special assessment of $100 for each count of conviction, for a total of $500, due immediately upon sentencing.

5.      **Forfeiture.**

a.      By agreeing, *inter alia*, to plead guilty to Count One of the Indictment in this case (Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B), and pursuant to 18 U.S.C. § 981(a)(1)(G)(i) and 28 U.S.C. § 2461, Defendant agrees to the forfeiture of the following properties to the United States:

1)      2004 Chevrolet Trailblazer LS 2 Wheel Drive, VIN: 1GNDS13SX42392596;

2)      $6,629.40 in U.S. currency;

3)      $511.00 in U.S. currency;

b.      Defendant further agrees:

1)      The 2004 Chevrolet Trailblazer LS 2 Wheel Drive, VIN: 1GNDS13SX42392596, was titled to Defendant's wife, co-defendant

Page 3 of 28

H. A.

Defendant's Initials

Plea Agreement of HOR I. AKL

Amera A. Akl, and is currently titled in the name of Excellerate Auto
Sales;

2)      The $6,629.40 in U.S. currency is the property of Defendant and
his wife, co-defendant Amera A. Akl. A total of $6,629.40 was recovered
by law enforcement authorities during the execution of a search warrant at
the residence (3911 Brookfield Drive, Toledo, Ohio) of Defendant and
Amera Akl on June 3, 2010.

3)      The $511.00 in U.S. currency is the property of Defendant and his
wife, co-defendant Amera A. Akl. The $511.00 was recovered by law
enforcement authorities during the execution of a search warrant at the
residence (3911 Brookfield Drive, Toledo, Ohio) of Defendant and Amera
Akl on June 3, 2010. Particularly, the $511.00 was recovered from a
vehicle located on the premises.

c.      Defendant waives any rule and statute, including Rule 32.2(a) of the
Federal Rules of Criminal Procedure, which require the government to
provide notice, in the indictment, that forfeiture will be sought.

6.      **Costs.** The Court may order Defendant to pay the costs of prosecution and
sentence, including but not limited to imprisonment, community confinement, home detention,
probation, and supervised release.

7.      **Restitution.** The Court may order Defendant to pay restitution as a condition of
the sentence, probation, and/or supervised release.

8.      **Violation of Probation/Supervised Release.** If Defendant violates any term or
condition of probation or supervised release, such violation could result in a period of

H I A.
Defendant's Initials

Plea Agreement of HOR I. AKL

incarceration or other additional penalty as imposed by the Court. In some circumstances, the combined term of imprisonment under the initial sentence and additional period of incarceration could exceed the maximum statutory term.

## PLEA(S) AND OTHER CHARGE(S)

9.     **Agreement to Plead Guilty.** Defendant agrees to plead guilty to Counts One, Two, Three, Four and Five of the Indictment in this case.

10.    **Dismissal of Counts.**   Upon sentencing, the USAO will move to dismiss the charges against Defendant in Count Six of the Indictment in this case.

11.    **Agreement Contingent Upon Plea of Co-Defendant.** Defendant understands that this agreement is contingent upon entry of a plea of guilty by his co-defendant, Amera A. Akl, and that the USAO and NSD may withdraw from the terms of this agreement should Amera A. Akl fail or refuse to enter into a plea agreement in this case, fail or refuse to plead guilty under the terms of any plea agreement in this case, seek to withdraw any plea of guilty entered under the terms of any plea agreement in this case, or otherwise violate the terms of any plea agreement in this case.

12.    **Agreement Not to Bring Certain Other Charges.** The USAO and NSD will not bring any other criminal charges against Defendant

-     for violations known to the USAO and NSD on the date of the execution of this agreement as it relates to this investigation.

-     for conduct disclosed to the USAO and NSD by Defendant during proffers, if any.

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

--     relating to conduct charged in the Indictment and/or described in the Factual Basis

section of this agreement based on facts currently within the knowledge of the

USAO and NSD.

### ELEMENTS OF THE OFFENSE

13.     The elements of the offense(s) to which Defendant will plead guilty are:

| Count One:  18 U.S.C. § 2339B, Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization | |
| --- | --- |
| One: | The Defendant unlawfully and knowingly agreed with other persons, known and unknown, to provide material support and resources, including, but not limited to, currency and monetary instruments, tangible property, personnel (including the Defendant himself), and services to Hizballah; |
| Two: | That the Defendant did so knowing that Hizballah was a designated terrorist organization and engaged or engages in terrorist activity. |
| Count Two:  18 U.S.C. § 1956(h), Conspiracy to Violate Money Laundering Statutes | |
| One: | The Defendant unlawfully and knowingly with other persons, known and unknown, to conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce; |
| Two: | That the property involved in the financial transaction was represented to be property used to conduct and facilitate a specified unlawful activity, to wit, providing material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B; |
| Three: | That the Defendant intended to promote the carrying on of specified unlawful activity and intended to avoid a transaction reporting requirement under state and federal law. |
| Count Three:  18 U.S.C. § 157(1), Bankruptcy Fraud | |
| One: | The Defendant devised a scheme and artifice to defraud; |
| Two: | That for the purpose of executing the scheme, the Defendant filed a petition under Title 11 of the United States Code, to wit, a fraudulent petition for personal bankruptcy. |
| Count Four:  18 U.S.C. § 1621(1), Perjury | |
| One: | The Defendant testified under oath at the meeting of creditors held under Section 341 of Title 11, United States Code, regarding the defendant's bankruptcy petition; |
| Two: | That the testimony was false; |

H. A.
Defendant's Initials

| Three: | That at the time he testified, the Defendant knew the testimony was false; |
|---|---|
| Four: | That the Defendant voluntarily and intentionally gave the false testimony; |
| Five: | That the false testimony was material. |
| **Count Five:  18 U.S.C. § 152(7), Bankruptcy Fraud** | |
| One: | A bankruptcy proceeding existed under Title 11, United States Code; |
| Two: | That with the intent to defeat the provisions of Title 11, United States Code, the Defendant transferred and concealed property which would have belonged to the bankrupt estate; |
| Three: | That the Defendant transferred and concealed the property knowingly and fraudulently. |

## SENTENCING STIPULATIONS AND AGREEMENTS

14.  **Sentencing Guidelines.** Defendant understands that sentencing rests within the discretion of the Court; that federal sentencing law requires the Court to impose a sentence which is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a), and that the Court must consider among other factors the advisory United States Sentencing Guidelines in effect at the time of sentencing.

15.  **Presentence Report.** Defendant understands that the advisory guideline range will be determined by the Court at the time of sentencing, after a presentence report has been prepared by the U.S. Probation Office and reviewed by the parties.  Defendant further understands that it is the obligation of the government to provide to the U.S. Probation Office all known information regarding Defendant's conduct subject to its limited use under U.S.S.G. §1B1.8 and not protected under the proffer agreement if any.

16.  **Joint Recommendation to Use the Advisory Sentencing Guidelines Computation.**  After considering the factors in 18 U.S.C. §3553(a), the parties agree to recommend that the Court impose a sentence within the range and of the kind specified pursuant

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

to the advisory Sentencing Guidelines in accordance with the computations and stipulations set forth below. Neither party will recommend or suggest in any way that a departure or variance is appropriate, either regarding the sentencing range or regarding the kind of sentence.

17.    **Right of Allocution.** Defendant understands and agrees that the USAO reserves the opportunity to speak at Defendant's sentencing. The USAO agrees that Defendant reserves the right of allocution at sentencing.

18.    **Stipulated Guideline Computation.** The parties agree that the following calculation, using the current advisory Sentencing Guidelines Manual (dated November 1, 2010), represents the correct computation of the applicable offense level.

**Count One: 18 U.S.C. § 2339B (Material Support to Foreign Terrorist Organization)**

Based upon the evidence currently known to the Government and the Defendant, the parties to this Plea Agreement stipulate and agree that Section 2M5.3 of the United States Sentencing Guidelines applies to Count One of the Indictment. Under U.S.S.G. § 2M5.3, the base offense level for Count One is 26.

**Count Two: 18 U.S.C. § 1956(h) (Conspiracy to Violate U.S. Money Laundering Statutes )**

Based upon the evidence currently known to the Government and the Defendant, the parties to this Plea Agreement stipulate and agree that Section 2S1.1(a)(1) of the United States Sentencing Guidelines applies to Count Two of the Indictment. Under the operation of U.S.S.G. § 2S1.1(a)(1), the base offense level for Count One (U.S.S.G. § 2M5.3) is incorporated; as a result, the base offense level is 26. Under U.S.S.G. § 2S1.1(b)(2)(B), an enhancement of 2 levels applies, as the defendant will be convicted under 18 U.S.C. § 1956. Accordingly, the total offense level for Count Two is 28.

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

Grouping of Closely Related Counts: Counts One and Two

Pursuant to Section 3D1.2 of the United States Sentencing Guidelines, all counts involving substantially the same harm or transaction shall be grouped together into a single Group. Accordingly, the Guidelines provision for multiple counts provide that the combined offense level for Counts One and Two is 28, pursuant to U.S.S.G. § 3D1.3(a).

Aggravating Role

Pursuant to U.S.S.G. § 3B1.1(c), the defendant was an organizer, leader, manager and supervisor in the criminal activity in Counts One and Two. According, the combined offense level for Counts One and Two is 30.

**Count Three and Count Five: 18 U.S.C. § 157(1) and 152(7) (Bankruptcy Fraud)**

Based upon the evidence currently known to the Government and the Defendant, the parties to this Plea Agreement stipulate and agree that Section 2B1.1(a)(2) of the United States Sentencing Guidelines applies to Counts Three and Five of the Indictment. Under the operation of U.S.S.G. §2B1.1(a)(2), the base offense level for Counts Three and Five is 6. Under U.S.S.G. § 2B1.1(b)(8), an enhancement of 2 levels applies, as the offense involved a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding, resulting in an adjusted offense level of 8. As the resulting offense level is less than level 10, the offense level is increased to level 10, pursuant to § 2B1.1(b)(8). Accordingly, the total adjusted offense level for Count Three is 10, and the total adjusted offense level for Count Five is 10.

**Count Four: 18 U.S.C. 1621(1) (Perjury)**

Based upon the evidence currently known to the Government and the Defendant, the parties to this Plea Agreement stipulate and agree that Section 2J1.3(a) of the United States Sentencing Guidelines applies to Count Four of the Indictment. Under the operation of

Defendant's Initials

Plea Agreement of HOR I. AKL

U.S.S.G. § 2J1.3(a), the base offense level for Count Four is 14.

Grouping of Closely Related Counts: Counts Three, Four and Five

Pursuant to Section 3D1.2 of the United States Sentencing Guidelines, all counts involving substantially the same harm or transaction shall be grouped together into a single Group. Accordingly, the Guidelines provision for multiple counts provide that the combined offense level for Counts Three, Four and Five is 14, pursuant to U.S.S.G. § 3D1.3(a).

**Determining the Combined Offense Level**

Pursuant to U.S.S.G. § 3D1.4, the combined offense level is determined by taking the offense level applicable to the Group with the highest offense level, and increasing that offense level by pre-determined amounts relating to the seriousness of the other Groups. The parties to this Plea Agreement stipulate and agree that the highest offense level is 30.

Pursuant to U.S.S.G. § 3D1.4(c), any Group that is 9 or more levels less serious than the Group with the highest offense level is disregarded.[1] Accordingly, the combined offense level for Counts One, Two, Three, Four and Five is 30.

The parties agree that no other Guideline adjustments apply.

19. **Acceptance of Responsibility.** The USAO has no reason to believe at this time that Defendant has not clearly and affirmatively accepted personal responsibility for Defendant's criminal conduct. The USAO agrees to recommend a three (3) level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b), provided Defendant's conduct continues to reflect Defendant's acceptance of responsibility. Defendant understands it will be up to the

---

[1] While such Groups will not increase the offense level, they may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level. *See* U.S.S.G. § 3D1.4(c).

H i A,
Defendant's Initials

Plea Agreement of HOR I. AKL

Court at the time of sentencing to determine whether a reduction for acceptance of responsibility is appropriate.

20. **Criminal History Category.** The parties have no agreement about the Criminal History Category applicable in this case. Defendant understands that the Criminal History Category will be determined by the Court after the completion of a Pre-Sentence Investigation by the U.S. Probation Office.

## WAIVER OF APPEAL AND POST-CONVICTION ATTACK

21. **Waiver of Appellate Rights.** Defendant acknowledges having been advised by counsel of Defendant's rights, in limited circumstances, to appeal the conviction or sentence in this case, including the appeal right conferred by 18 U.S.C. § 3742, and to challenge the conviction or sentence collaterally through a post-conviction proceeding, including a proceeding under 28 U.S.C. § 2255. Defendant expressly and voluntarily waives those rights, except as specifically reserved below. Defendant reserves the right to appeal: (a) any punishment in excess of the statutory maximum; (b) any sentence to the extent it exceeds the greater of any mandatory minimum sentence or the maximum of the sentencing range determined under the advisory Sentencing Guidelines in accordance with the sentencing stipulations and computations in this agreement, using the Criminal History Category found applicable by the Court; or (c) the Court's determination of Defendant's Criminal History Category. Nothing in this paragraph shall act as a bar to Defendant perfecting any legal remedies Defendant may otherwise have on appeal or collateral attack with respect to claims of ineffective assistance of counsel or prosecutorial misconduct.

22. **Waiver of Statute of Limitations.** Defendant waives all defenses based on the statute of limitations with respect to any prosecution that is not already time-barred by the

Defendant's Initials

Plea Agreement of HOR I. AKL

applicable statute of limitation on the date of Defendant's signing of this agreement and that is

commenced within *one year* after any of the following events: (1) Defendant fails to plead guilty

at the plea proceeding or the Court refuses to accept a guilty plea by Defendant pursuant to this

agreement; (2) the Court permits Defendant to withdraw a guilty plea entered pursuant to this

agreement or otherwise vacates such a guilty plea; or (3) the conviction obtained pursuant to this

agreement is vacated, overturned, or otherwise set aside.  Defendant understands the waiver of

the statute of limitations is effective immediately upon Defendant's signing of this agreement

and is not conditioned upon the approval of this agreement by the Court.

### FACTUAL BASIS AND RELEVANT CONDUCT

23.      Defendant agrees that the following summary fairly and accurately sets forth

Defendant's offense conduct and a factual basis for the guilty plea.  Defendant further agrees that

the facts set forth in the summary are true and could be established beyond a reasonable doubt if

the case were to proceed to trial:

    a.      Defendant and his wife, Amera Akl, were residents of Toledo, Ohio from
    as early as 1994 and continuing through the present.  Defendant was a dual citizen
    of the United States and Lebanon during this same time period; Amera Akl was a
    citizen of the United States during this same time period.  Defendant's brother
    (hereinafter "brother") lived in Lebanon between January 2009 and June 2010.
    Defendant's brother-in-law, who is the brother of Amera Akl (hereinafter
    "brother-in-law"), was a resident of Ohio between January 2009 and July 2010.
    Between approximately January 2009 and June 2010, both Defendant and Amera
    Akl were acquainted with a person working on behalf of the Federal Bureau of
    Investigation (hereinafter "FBI") as a confidential human source of information
    (hereinafter "CHS").

    b.      Hizballah was designated by the Secretary of State as a Foreign Terrorist
    Organization, pursuant to Section 219 of the Immigration and Nationality Act, on
    or about October 8, 1997, and has remained so designated since that time.
    Accordingly, donations of money or other forms of material support to Hizballah
    were and are prohibited.

    c.      Federal law establishes a $10,000 reporting requirement related to the
    transportation of monetary instruments into, or out of, the United States as set

Page 12 of 28

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

forth in Title 31, United States Code, Section 5316 and Title 31, Code of Federal Regulations, Section 103.23;

d.      Federal law establishes a $3,000 reporting requirement related to verification of the identity of persons purchasing monetary instruments for currency (e.g. wire transfers, money orders, etc.) as set forth in Title 31, Code of Federal Regulations, Section 103.29;

e.      On August 30, 2009, Amera Akl met with the CHS in Toledo, Ohio and stated that she was willing to transport funds to Hizballah in Lebanon on behalf of the CHS. Amera Akl asked what was "in it" for her. Amera Akl also asked the CHS to which part of Hizballah the funds should go – the army or the families. Amera Akl then stated, in sum and substance, that she could personally transport $20,000 per trip to Lebanon and suggested methods by which Hizballah could provide a receipt for the funds. Amera Akl offered to approach Defendant in order to secure his assistance in transporting the funds to Hizballah. With respect to the transfer of funds to Hizballah, Amera Akl stated, "I can lead the way." On this date, Amera Akl also stated that she dreamed of dressing like Hizballah, carrying a gun, and dying as a martyr. Following this conversation with the CHS, Amera Akl relayed the nature of the discussion to Defendant.

f.      On September 2, 2009, Defendant met with the CHS in Toledo, Ohio. Defendant stated to CHS that he had spoken to Amera Akl about the August 30, 2009 conversation outlined in Paragraph 23e. Defendant further stated that he had previously transported funds from the United States to Lebanon on his own behalf and on behalf of others. Defendant offered to personally transport funds on behalf of CHS. Defendant further stated that he was "well-connected" in Lebanon. Defendant asked whether the total amount to be transferred was more than $1 million or approximately $500,000. Defendant also asked what percentage of the total amount to be transferred he would receive as a fee, stating that if his fee was approximately $300,000 to $400,000, then he would probably not return from Lebanon after transporting the funds. Defendant also proposed transporting funds by purchasing vehicles in the United States, then selling the vehicles in Lebanon for a profit. Amera Akl was not present during this discussion between Defendant and the CHS.

g.      On September 3, 2009, Defendant met with the CHS in Toledo, Ohio. Defendant stated that there were many options for transporting the funds to Lebanon, including through the purchase and sale of vehicles and electric generators. Defendant stated that in order to transport the funds, he would first need to travel to Lebanon. Defendant also stated that sending the money to Lebanon would have a "cost." Defendant also stated that he knew individuals in Lebanon who were associated with, or members of, Hizballah and that his brother was an important person in Lebanon. In Defendant's presence, Amera Akl stated that everyone would get their "cut" for participating and that "you do it the right way or you don't do it." Amera Akl also stated that they could have transferred

Page 13 of 28

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

$500,000 if they had been asked earlier in 2009, such as at the beginning of summer, when the travel to Lebanon would have coincided with well-established travel patterns.

h.     On September 10, 2009, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant, in the presence of Amera Akl, stated that he understood the funds were being transported to the "terrorists." Defendant also stated that he understood the funds would be sent to a designated terrorist organization and used to target Israel. Defendant also detailed methods of transporting the funds to Lebanon, including purchasing and re-selling vehicles, and using individuals to carry the funds on their persons. Defendant stated that any individuals who carried funds on their persons would carry less than $10,000 in order to avoid a reporting requirement. Defendant stated that he was also familiar with the $3,000 reporting requirement related to money orders and Western Union wire transfers. Defendant also suggested methods by which Hizballah could provide a receipt for the funds. Defendant also stated that he would charge a fee of thirty percent on a transfer of one million dollars. Amera Akl stated, in the presence of Defendant, that she and Defendant had transported cash from the United States to Lebanon on prior occasions by concealing the cash on their persons and in magazines.

i.     On October 20, 2009, Defendant met with the CHS in Toledo, Ohio. Defendant stated to CHS that transporting funds to Hizballah would result in him making money and "gaining some merits" at the same time. Defendant also suggested methods by which Hizballah could provide a receipt for the funds. Defendant also stated that he knew individuals in the military branch of Hizballah and that he could arrange a meeting with a named Hizballah official. Defendant stated that his brother operated a recreation club in Lebanon that was used frequently by Hizballah in order to conduct meetings. Defendant stated that Amera Akl knew that Hizballah used the recreation club in order to conduct meetings. Defendant also stated that he would need to travel to Lebanon and return with names, information, and a plan for transporting the funds. Defendant also stated that he had well-established connections with Hizballah, in that Hizballah had stored artillery, firearms, and rockets in the family home of Defendant in Lebanon. Amera Akl was not present during this discussion between Defendant and the CHS.

j.     On November 3, 2009, Defendant met with the CHS in Toledo, Ohio. Defendant stated that he would travel to Lebanon and return with contact information for individuals within Hizballah. Defendant again stated that he could meet with a named Hizballah official during a trip to Lebanon. Defendant also detailed various methods for transporting funds to Lebanon, including the use of post office boxes and offshore accounts in order to deposit money orders in amounts less than the $3,000 reporting requirement. Defendant also proposed using wealthy individuals in the United States who owned property in Lebanon to operate as unlicensed money transmittal services. Defendant also stated that his

Page 14 of 28

H. A.
Defendant's Initials

objective was to make money and to perform good deeds. Amera Akl was not
present during this discussion between Defendant and the CHS.

k.      On December 7, 2009, Defendant met with the CHS in Toledo, Ohio.
Defendant stated that he was ready to move forward with the plan to transport
funds to Hizballah. Defendant discussed the timing of his departure to Lebanon
and explained that he was going to Lebanon in order to personally meet with a
named Hizballah official, or Hizballah representatives, in order to ensure that the
funds would be received by Hizballah. Defendant also proposed using a business
owned and operated by Amera Akl's family (hereinafter, "Business #1") in order
to over-report cash income received, which would then be taxed and therefore
"legitimate," as these funds could subsequently be declared, as required by federal
law, during transport to Lebanon and forwarded on to Hizballah. Defendant
stated that he and his brother were "well-connected" in Lebanon. Amera Akl was
not present during this discussion between Defendant and the CHS.

l.      On December 16, 2009, Defendant met with the CHS in Toledo, Ohio.
Defendant discussed taking a trip to Lebanon and reviewed at least two methods
of transporting funds to Lebanon, including shipping vehicles and using an
offshore account in another country. Defendant stated that he had discussed these
methods of transporting funds with Defendant's brother-in-law and that they were
the brother-in-law's ideas. Defendant also discussed how he would communicate
with persons in the United States while he was in Lebanon. Defendant further
stated that he could be reached at certain telephone numbers in Lebanon. Amera
Akl was not present during this discussion between Defendant and the CHS.

m.      On December 22, 2009, Defendant met with the CHS in Toledo, Ohio.
Defendant stated that he was willing to travel to Lebanon anytime after the New
Year. Defendant also discussed how he would communicate with persons in the
United States while he was in Lebanon. Defendant further stated that telephone
coverage in Lebanon was good and that there were telephone numbers in Lebanon
where he could be reached. Amera Akl was not present during this discussion
between Defendant and the CHS.

n.      On January 12, 2010, Defendant met with the CHS in Toledo, Ohio.
Defendant stated that he had consulted on several occasions with Defendant's
brother-in-law about transferring funds to Lebanon. Defendant further stated that
his brother-in-law had devised numerous methods to transfer funds to Lebanon.
Defendant agreed to arrange a meeting with the CHS and Defendant's brother-in-
law the next day in order to discuss the transfer of funds to Hizballah. Amera Akl
was not present during this discussion between Defendant and the CHS.

o.      On January 13, 2010, Defendant, his brother-in-law, and the CHS met in
Toledo, Ohio. On this date, Defendant's brother-in-law stated that he understood
that the point was to move money from the United States to Lebanon without
anyone knowing about it. When told that the funds would be transferred to

Defendant's Initials

Plea Agreement of HOR I. AKL

Hizballah, Defendant's brother-in-law stated, "I support Hizballah." Defendant's brother-in-law further stated that he had no problem with the fact that the funds would go to support Hizballah's military activities. Defendant and his brother-in-law proposed using couriers to carry cash, in amounts less than the $10,000 reporting requirement, to Lebanon. Defendant's brother-in-law asked whether the funds were currently "clean," meaning not derived from criminal activity, held in a bank account, and on which taxes had been paid. Defendant's brother-in-law also asked whether the funds were derived from criminal activity and held in cash. Defendant also proposed purchasing 15 to 20 pickup trucks to be resold in Lebanon as a method of transferring funds. Defendant and his brother-in-law stated that a receipt signaling that the money had been received would be important. Defendant's brother-in-law again stated that Hizballah as the ultimate destination of funds was acceptable to him. Amera Akl was not present during this discussion.

p.      On January 22, 2010, Defendant met with the CHS in Toledo, Ohio. Defendant confirmed that his brother-in-law was an additional participant in the money transfer operation. On this date, the CHS told Defendant that the money was "clean" and existed in a bank account, to which Defendant responded that this might mean he could transfer funds electronically to Lebanon. Defendant then produced a deposit receipt for a bank account in Lebanon in the name of Defendant's brother. Defendant stated the importance of his trip to Lebanon was to make connections. Defendant also stated that Hizballah trusts Defendant's brother because they are already doing business together. As a result of this relationship, Defendant stated that he too would be trusted by Hizballah. Amera Akl was not present during this discussion between Defendant and the CHS.

q.      On January 28, 2010, Defendant, his brother-in-law, and the CHS met in Toledo, Ohio. On this date, Defendant and Defendant's brother-in-law were told that the funds existed in a bank account and totaled almost one million dollars. Defendant then stated that it was a "done deal" that he was going to Lebanon. Defendant also proposed transferring the funds using other individuals to wire transfer amounts less than the $3,000 reporting requirement. Defendant stated that the first step was for him to go to Lebanon in order to arrange a meeting with Hizballah representatives. Defendant's brother-in-law stated that an easy method of transferring funds was to send five couriers with cash to a third country, where the funds would be deposited into an offshore bank account and sent to Lebanon via wire transfer. Defendant and Defendant's brother-in-law discussed how they would communicate while Defendant was in Lebanon in order to evade government surveillance, agreeing that Defendant would only call from a number in Lebanon with which Defendant's brother-in-law had an already-established call pattern, such as with a relative. Defendant and Defendant's brother-in-law also agreed to use code words involving work and business travel in order to conceal the true subject matter of their conversations. Defendant also stated that Hizballah needed trucks to carry rockets. Defendant stated that he would not tell anyone about travelling to Lebanon. Defendant stated that he would use his

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

brother in order to arrange meetings with Hizballah representatives in Lebanon. Defendant also stated that the likelihood was "100 percent" that he would meet with a "big boss," including a named Hizballah official, during any trip to Lebanon. Defendant's brother-in-law stated that he would not accompany Defendant on the first trip to Lebanon, but that he would be available to go any other time that was necessary. Defendant then stated that he would be available to travel to Lebanon in March. Amera Akl was not present during this discussion.

r.       On February 9, 2010, Defendant, his brother-in-law, and the CHS met in Toledo, Ohio. Defendant's brother-in-law stated that they could use individuals employed at Business #1 to carry cash, in an amount less than the $10,000 reporting requirement, to a third country. Defendant's brother-in-law further stated that the employees of Business #1 would receive wire transfers, in amounts less than the $3,000 reporting requirement, while the employees were in the third country. Defendant stated that the funds could then be transferred from the third country to accounts in Lebanon opened under the name of Defendant's brother, mother and sister. Defendant stated that he would travel to Lebanon in order to withdraw the funds. Defendant's brother-in-law stated that he could travel to the third country to research the feasibility of this plan in person, as he would not research the plan over the Internet or while he was in the United States. Amera Akl was not present during this discussion.

s.       On February 13, 2010, Amera Akl met with the CHS in Toledo, Ohio. Amera Akl stated that she knew the details of the proposed transfer of funds and of Defendant's trip to Lebanon in order to arrange a meeting with Hizballah representatives. Amera Akl stated that Defendant and Defendant's brother-in-law could accomplish this part of the plan with no problem. Following this meeting, Amera Akl telephoned Defendant and relayed details of this discussion to the Defendant.

t.       On February 17, 2010, Defendant met with the CHS in Toledo, Ohio. Defendant agreed to travel to Lebanon in early March, 2010. Defendant identified the travel agent that he would use in order to make the travel arrangements. Defendant also stated that he would fly via Air France and would purchase the ticket in cash one week before his travel date. Defendant proposed an additional method of transferring funds to Lebanon, using appliances to hide cash and then shipping these appliances to Lebanon, where Defendant would then retrieve the cash. Defendant stated that he had assisted an individual with smuggling approximately $100,000 using this method and that the same individual had previously smuggled over two million dollars and weapons to Lebanon using this same method. Defendant also proposed sending three refrigerators, each concealing approximately $200,000 in cash, to Lebanon where Defendant would meet each shipment in order to retrieve the cash. Defendant stated that his brother-in-law would be useful in transferring the funds to Hizballah because of his good credit, personal wealth, salaried job, and fluent English. Defendant also discussed the connections he planned to make in

Page 17 of 28

Defendant's Initials

Plea Agreement of HOR I. AKL

Lebanon with Hizballah and stated that his brother would take Defendant to meet a named Hizballah official. Defendant also stated that he believed it would be possible to meet "the boss" while in Lebanon, referring to a named Hizballah official. Amera Akl was not present during this discussion.

u.      On February 18, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Amera Akl stated, in the presence of Defendant, that she made the reservation for Defendant's trip to Lebanon. Defendant stated that he intended to meet representatives of Hizballah upon arrival in Lebanon and might be able to return early to the United States. Defendant also described his desire to have the funds available upon his return from Lebanon. Defendant once again proposed using appliances in order to conceal cash and stated that Defendant's brother-in-law would purchase the appliances and make the shipping arrangements. Defendant stated that while he was in Lebanon, he would communicate only with Amera Akl or Defendant's brother-in-law by telephoning them from a relative's home in Lebanon.

v.      On February 23, 2010, Defendant and Amera Akl drove with the CHS to an identified travel agency in Michigan where they purchased a round-trip ticket from Detroit to Beirut, Lebanon for approximately $1,060 in cash, a portion of which was paid for by Defendant and Amera Akl. On this date, Defendant again explained his plan to conceal the funds in appliances purchased and shipped to Lebanon by Defendant's brother-in-law. Amera Akl stated, in the presence of Defendant, that Defendant would telephone Amera Akl directly while he was in Lebanon and that Amera Akl could then relay any messages from Defendant.

w.      On February 27, 2010, Defendant met with the CHS in Toledo, Ohio. Defendant stated that he had spoken with his brother via telephone. Defendant further stated that he had instructed his brother to keep the fact of Defendant's travel to Lebanon a secret.

x.      On March 1, 2010, Defendant boarded an Air France flight at Detroit Metro Airport and departed for Beirut via Paris, France.

y.      Between March 1, 2010, and March 3, 2010, Defendant and Amera Akl spoke via telephone and confirmed that Defendant had arrived safely in Lebanon. Between March 1, 2010, and March 5, 2010, Defendant told Amera Akl, in coded language, that he would be meeting with a highly-placed person in Hizballah.

z.      On March 10, 2010, Defendant arrived at Detroit Metro Airport on an Air France flight from Beirut via Paris, France. Upon arrival in the United States, Defendant made false statements to officials of the United States Customs and Border Patrol regarding the nature of his trip to Lebanon and the source of the funds used to pay for his travel. On this date, Defendant and Amera Akl met with the CHS. Defendant stated that after several days in Lebanon, he and his brother met with representatives of Hizballah, including a named Hizballah official.

Page 18 of 28

Defendant's Initials

Plea Agreement of HOR I. AKL

Defendant further stated that Hizballah was willing to receive funds from the CHS and would provide receipt of the funds by posting a pre-arranged message in a named, Hizballah-controlled publication. Defendant further stated that the plan was still to conceal the funds inside appliances and that "we are ready" to send all the funds in one shipment.

aa.    On March 12, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant again stated, in the presence of Amera Akl, that he had arranged for a specific message to appear in a named, Hizballah-controlled publication upon receipt of the funds from the CHS. Defendant also stated that he would meet with his brother-in-law on this same date in order to update him on the details of the Lebanon trip and the plan to transfer funds.

bb.    On March 18, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that he was still willing to transfer the funds to Hizballah, but that he was waiting for the funds to arrive. Defendant then explained, in the presence of Amera Akl, that the situation was very dangerous and that he would like to deliver the funds by May 8, 2010. Defendant further stated that if the funds were not delivered by that date, then both Defendant and his brother would be questioned due to their meeting with Hizballah leaders. Defendant once again stated that the funds would be transported using appliances to conceal them. Defendant further stated that his brother-in-law would purchase the appliances and make the shipping arrangements. Defendant also stated that he could acquire a signal from Hizballah before receiving the funds, but that he would only arrange this for a fee of $10,000. On this date, Amera Akl stated, in the presence of Defendant, that Hizballah would investigate Defendant's activities and would know with whom he has been in contact.

cc.    On March 26, 2011, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated, in the presence of Amera Akl, that he would arrange a signal from Hizballah before receiving the funds, but that he was reluctant to do so without providing some monetary contribution to Hizballah. Defendant proposed sending Hizballah an amount of $10,000 composed of $5,000 contributed by CHS and $5,000 that Defendant would borrow from his brother-in-law.

dd.    On March 30, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that he would conceal the funds inside the Akls' truck (the 2008 Dodge Ram) and then ship the vehicle to Lebanon. Defendant explained that his brother-in-law would make the shipping arrangements for the truck. On this date, Amera Akl met with a representative from the leasing company holding the title to the Akls' truck in order to arrange for a purchase of the vehicle and a transfer of title to Amera Akl in order to facilitate shipping the vehicle to Lebanon.

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

ee.     On April 15, 2010, Defendant and Amera Akl met with the CHS in
Toledo, Ohio. When asked what denomination of funds would be required in
order to effectuate the money transfer, Defendant stated that they would need
$100 bills. On this date, Defendant also outlined a plan to transfer the funds by
concealing them inside a Jeep Wrangler vehicle. Defendant stated that he would
purchase a Jeep Wrangler at an auto auction in Toledo, Ohio with the assistance
of a named local car dealer. Defendant then stated that the funds would be
concealed inside this Jeep Wrangler, which would then be shipped to Lebanon via
the named car dealer. Defendant also stated that depending upon the volume and
size of the cash to be transferred, they may use a vehicle owned by Amera Akl
(the 2004 Chevrolet Trailblazer) in order to conceal the cash. Defendant stated
that if two vehicles were necessary, then Defendant's brother-in-law would
provide the necessary funds to purchase a vehicle and obtain the title in order to
ship the vehicle to Lebanon. Defendant further stated that once the vehicle was
shipped, he would purchase a plane ticket to Lebanon and would receive the
vehicle with his brother, who would assist Defendant in removing the funds and
providing the cash to Hizballah. On this date, Amera Akl stated that she
supported the transfer and just wanted to get it done.

ff.     On April 18, 2010, Defendant and Amera Akl met with the CHS in
Toledo, Ohio. Defendant stated, in the presence of Amera Akl, that he had
spoken with the identified car dealer about shipping vehicles to Lebanon; the
identified car dealer had suggested sending the vehicle inside a shipping container
if they wished to limit scrutiny from customs officials. Defendant further stated
that the identified car dealer had scheduled, pre-arranged shipping containers that
depart approximately every fifteen days. Defendant further stated that his
brother-in-law would purchase a vehicle, currently registered in the name of
Amera Akl, (the 2004 Chevrolet Trailblazer) in order to allow it to be shipped to
Lebanon. Defendant further stated that he would buy side-step rails for the
vehicle, conceal the funds inside the side-step rails, and then attach the side-step
rails to the vehicle. Defendant used a stack of one dollar bills in order to
demonstrate the method that would be used to roll the funds and how the funds
would sit inside the side-step rail. Defendant further stated that he would cover
the window in his garage with wood, in order to prevent anyone from observing
him while he concealed the funds.

gg.     On April 26, 2010, Defendant and Amera Akl met with the CHS in
Toledo, Ohio. Defendant stated, in the presence of Amera Akl, that he would
purchase a Jeep Wrangler upon receipt of the funds to be transferred. Defendant
further stated that the identified car dealer could ship a vehicle every week, so the
vehicle could be shipped upon receipt of the funds. Defendant further stated that
he had recently spoken to his brother via telephone. Defendant further stated that
he was concerned about the need to complete the transfer of funds because one
does not mess with Hizballah because they are dangerous. Defendant further
stated that he had the best plan for transferring the money. Defendant further
stated that he would cover the window in his garage with wood on the next day.

Page 20 of 28

Defendant's Initials

Plea Agreement of HOR I. AKL

hh.     Between April 26, 2010, and May 5, 2010, Defendant covered a window in his garage with wood in order to prevent others from observing any activities within the garage. This action was consistent with Defendant's statements on April 18, 2010 and April 26, 2010, that he would cover a window in the garage in order to prevent individuals from observing him while he concealed the funds within a vehicle or vehicle accessories.

ii.     On May 5, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant detailed, in the presence of Amera Akl, the steps to be taken in order to transfer funds to Hizballah, including purchasing a vehicle at an auto auction, concealing the funds inside the vehicle at the Akl residence, using a shipping company to send the vehicle to Lebanon, and travelling to Lebanon in order to recover the funds from the vehicle. Defendant further stated that he would arrange to have the vehicles shipped from an identified car dealership on the same date that the vehicle would be dropped off at the dealership. Defendant estimated that it would take three to four days to conceal the cash inside the vehicle. Defendant also stated that the Akls would use their percentage of the funds to pay bills and start a business, but that this money would be left in the United States with Amera Akl.

jj.     On May 12, 2010, Defendant and Amera Akl went to an identified auto parts store in the Toledo, Ohio area, where Defendant and Amera Akl located the side-step rails that would be used to conceal cash and obtained a parts catalog.

kk.     On May 13, 2010, Amera Akl spoke to the CHS via telephone. During this conversation, Amera Akl related the trip to the auto parts store on May 12. Amera Akl spoke using code words in order to conceal the true meaning of her conversation from law enforcement, including the use of code words such as "egg" and "chicken" in order to indicate dollar amounts and the transfer of funds.

ll.     On May 14, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that he and Amera Akl would need five days in order to obtain title to the Dodge Ram pickup truck, but that the title could be obtained by paying the full amount owed on the truck. At some point prior to this date, Defendant purchased two "running boards" and two side-rails for the Dodge Ram pickup truck for approximately $700 in order to conceal the cash for transport to Lebanon. Also on this date, Defendant and Amera Akl demonstrated on their laptop computer the location of the Hizballah-controlled website where a pre-arranged phrase would be printed in order to signal receipt of the funds by Hizballah.

mm.     On May 17, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Amera Akl stated that she would arrange to pay off the remaining balance on her 2004 Chevrolet Trailblazer in order to obtain title to the vehicle, thereby enabling Defendant to conceal the cash inside this vehicle and allowing for the

Page 21 of 28

H. A.
Defendant's Initials

vehicle to be shipped to Lebanon. Defendant stated that he would purchase additional vehicle accessories in order to fit the 2004 Chevrolet Trailblazer for the concealment of cash.

nn.     On May 18, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that Amera Akl had arranged to pay the balance remaining on the 2004 Chevrolet Trailblazer and would do so the next day. Defendant stated that they would have the title to the 2004 Chevrolet Trailblazer and the accessories, including a front grill and side-step rails, for this vehicle by May 21, 2010. Defendant also used a ruler and a stack of 100 one dollar bills in order to estimate the amount of cash that could be concealed within the vehicle accessories that would be purchased for the 2004 Chevrolet Trailblazer.

oo.     On May 20, 2010, the state of Ohio re-issued a title to Amera Akl for the 2004 Chevrolet Trailblazer. This title was issued to Amera Akl after the lien attached by Fifth Third Bank was removed, indicating that full payment had been made on the outstanding balance owed on the 2004 Chevrolet Trailblazer.

pp.     On May 24, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that he was ready and that he had obtained the parts that they need. On this date, Defendant possessed the side-step rails that would be used to conceal the funds on the Chevy Trailblazer. Defendant further demonstrated that, using the side-step rails, he could conceal $60,000 in each of the two steps on one rail; $100,000 in the curved area of the side-step rail; and an additional $150,000 in the area of the side rail between the two steps. Defendant further stated that he planned to place expanding foam in the end of the side-step rail and glue the black cap back on the end of the side-step rail. Defendant further stated that he could conceal additional funds inside the back door of the Chevy Trailblazer. On this date, Defendant and Amera Akl possessed a title to the Chevy Trailblazer that had been obtained by Amera Akl after full payment had been made on the vehicle, thereby obtaining a title that was clear of any liens and, as a result, eligible to be shipped to Lebanon.

qq.     On May 30, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that he was going to purchase household items that would be shipped in a container along with the 2004 Chevy Trailblazer to Lebanon in order to avoid additional scrutiny from customs officials. Defendant further stated that he would have an identified car dealer order the shipping container for June 3, 2010. Defendant further stated that if the funds were received on June 3, then the cash would be concealed within vehicle accessories on that date, the vehicle accessories would be installed on to the vehicle the next day, and the vehicle would be in the custody of the shipping company by June 4, 2010. Defendant further expressed his intent to arrive in Lebanon two weeks prior to the delivery of the vehicle.

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

rr.     On June 1, 2010, Defendant and Amera Akl met with the CHS in Toledo, Ohio. Defendant stated that he had visited the identified car dealer on this date and provided 300 dollars to reserve a shipping container. Defendant further stated that the shipping container would be delivered on June 4, 2010, and would be picked up by the shipping company later on that date. Defendant further stated that he would meet with the identified car dealer on June 2, 2010, in order to transfer title to the car dealer to allow for shipping the 2004 Chevy Trailblazer to Lebanon. Defendant further stated that he would use latex gloves when handling the cash to be transferred. Defendant further stated that he would use coffee grounds inside the vehicle accessories in order to disguise the cash from canines used by customs officials.

ss.     On June 2, 2010, Defendant and Amera Akl made flight arrangements with an identified travel agency. Defendant was scheduled to depart Detroit on June 5, 2010 and arrive in Beirut on June 6, 2010, travelling via Paris, France. Defendant was scheduled to return from Beirut to Detroit, via Paris, on September 15, 2010.

tt.     On June 3, 2010, the CHS delivered $200,000 in cash to Defendant and Amera Akl at their residence in Toledo, Ohio. Shortly thereafter, Defendant and Amera Akl were observed inside their residence wearing latex/rubber gloves in possession of approximately $200,000 in cash. Defendant and Amera Akl were located within close proximity to various automobile accessories, plastic wrap, latex/rubber gloves, duct tape, and fragrant insect repellant sticks. Defendant had prepared a portion of the money had been prepared for concealment into the automobile accessories, as it was wrapped in plastic and taped into a bundle.

uu.     From at least as early as December 10, 2007, and continuing through the date of this Plea Agreement, Defendant devised a scheme and artifice to defraud his creditors, including Bank of America, Chase, Discover, and Fifth Third Bank, and the bankruptcy trustee in his bankruptcy case. For the purpose of executing this scheme and artifice to defraud:

    i.      On or about December 10, 2007, Defendant requested and received an increase on his line of credit in his Bank of America account (BA 1369, hereinafter) from $4,000 to $26,600;

    ii.     On or about December 12, 2007, Defendant transferred $14,000 from account BA 1369 to his Huntington Bank account (H 1967, hereinafter);

    iii.    On or about December 20, 2007, Defendant transferred $11,000 from account BA 1369 to account H 1967;

    iv.     On or about December 26, 2007, Defendant issued a check to cash, in the amount of $766, from account H 1967;

Defendant's Initials

Plea Agreement of HOR I. AKL

    v.        On or about January 4, 2008, Defendant issued a check to cash in the amount of $10,000, from account H 1967;

    vi.       On or about January 7, 2008, Defendant issued a check to cash in the amount of $3,000 from account H 1967;

    vii.      On or about January 12, 2008, Defendant transferred, in two separate transactions, $5,400 and $3,900 from his JP Morgan Chase credit card account, (JP 4293, hereinafter), to Amera Akl's Discover card account, DC 4112; and Sears credit card account (S 4461), respectively; on that same date, Defendant made two additional separate transfers from his other JP Morgan Chase credit card account, (JP 8279, hereinafter), totaling $8,250, into Amera Akl's Bank of America credit card account (BA 9982), and Sears credit card account (S 4461);

    viii.    On or about January 15, 2008, Defendant obtained a $500 cash advance from account BA 1369;

    ix.      Defendant transferred ownership interest in personal and real property to family members' names, in anticipation of filing for bankruptcy in the United States;

    x.      On or about August 28, 2008, Defendant caused the filing of a petition for personal bankruptcy under Title 11 of the United States Code, in the United States Bankruptcy Court for the Northern District of Ohio;

    xi.      Defendant verified that the information provided in the petition and attachments was true and correct, under penalty of perjury.

vv.    From August 29, 2008 and continuing to the date of this Plea Agreement, Defendant provided false material information, concealed assets, and failed to disclose transfers of assets, including funds and real property, on his bankruptcy petition and related documents, and during official bankruptcy proceedings.

ww.    On October 27, 2008, Defendant, while under oath that he would testify, declare and depose truly as a witness and petitioner at the meeting of creditors held under Section 341 of Title 11 (the U.S. Bankruptcy Code), conducted by the trustee appointed by the U.S. Trustee's office regarding the defendant's bankruptcy case, and having taken the oath before the trustee in a bankruptcy case in which United States law authorized the administration of the oath, willfully and contrary to such oath gave testimony concerning a material matter which he did not believe to be true, in that the defendant, when asked by the trustee whether he had "given away, sold or transferred any property in the past year" and whether he had "made any payments or transferred any property to friends or family members within the past four years," answered "NO" to each question, and this

Page 24 of 28

Defendant's Initials

Plea Agreement of HOR I. AKL

testimony, as the defendant then well knew and believed, was false in that the defendant had transferred his property, including but not limited to funds, to family members within a year of said testimony.

24.     Defendant acknowledges that the above summary of Defendant's conduct does not set forth each and every fact that the USAO could prove at trial, nor does it encompass all of the acts which Defendant committed in furtherance of the offense(s) to which Defendant is pleading guilty.

## OTHER PROVISIONS

25.     **Financial Statement.** Defendant agrees to submit to the USAO, prior to the date of sentencing, a complete and accurate financial statement on government form OBD-500.

26.     **Agreement Silent About Matters Not Expressly Addressed.** This agreement is silent about all aspects of the determination of sentence not expressly addressed herein, and the parties are free to advise the Court of facts and to make recommendations to the Court with respect to all aspects of sentencing not agreed to herein.

27.     **Sentencing Guidelines.** Defendant understands that sentencing rests within the discretion of the Court; that federal sentencing law requires the Court to impose a sentence which is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a), and that the Court must consider among other factors the advisory United States Sentencing Guidelines in effect at the time of sentencing.

28.     **Consequences of Breaching the Plea Agreement.** Defendant understands that if Defendant breaches any promise in this agreement or if Defendant's guilty plea is rejected by the Court or is vacated or set aside, the USAO will be released from all of its obligations under this agreement and may institute or maintain any charges and make any recommendations with respect to sentencing that otherwise would be prohibited under the terms of the agreement.

Page 25 of 28

H. A.
Defendant's Initials

Plea Agreement of HOR I. AKL

Defendant understands, however, that a breach of the agreement by Defendant will not entitle Defendant to withdraw, vacate, or set aside Defendant's guilty plea or conviction.

29.     Defendant agrees not to accept remuneration or compensation of any sort, directly or indirectly, for the dissemination through books, articles, speeches, interviews, or any other means, of information regarding the transactions alleged in the above-captioned Indictment, or the investigation or prosecution of any civil or criminal cases against Defendant (if applicable).

30.     **Agreement not Binding on other Jurisdictions and Agencies.** Defendant understands that this plea agreement is binding only on the United States Attorney's Office for the Northern District of Ohio and the National Security Division, Counterterrorism Section of the Department of Justice. It does not bind any other United States Attorney, any other federal agency, or any state or local government.

31.     **Defendant is Satisfied with Assistance of Counsel.** Defendant makes the following truthful statements: I have discussed this case and this plea agreement in detail with my attorney who has advised me of my Constitutional and other trial and appeal rights, the nature of the charges, the elements of the offenses the United States would have to prove at trial, the evidence the United States would present at such trial, possible defenses, the advisory Sentencing Guidelines and other aspects of sentencing, and other potential consequences of pleading guilty in this case. I have had sufficient time and opportunity to discuss all aspects of the case in detail with my attorney and have told my attorney everything I know about the charges, any defenses I may have to the charges, and all personal and financial circumstances in possible mitigation of sentence. I am satisfied with the legal services and advice provided to me by my attorney.

Page 26 of 28

Defendant's Initials

Plea Agreement of HOR I. AKL

32.  **Agreement Is Complete and Voluntarily Entered.**  Defendant and Defendant's undersigned attorney state that this agreement is the entire agreement between Defendant and the USAO and that no other promises or inducements have been made, directly or indirectly, by any agent or representative of the United States government concerning any plea to be entered in this case.  In particular, no promises or agreements have been made with respect to any actual or prospective civil or administrative proceedings or actions involving Defendant, except as expressly stated herein.  In addition, Defendant states that no person has threatened or coerced Defendant to do or to refrain from doing anything in connection with this case, including Defendant's decision to enter a guilty plea.  Finally, Defendant acknowledges that this agreement cannot be modified unless in writing and subject to approval by the Court.

## SIGNATURES

**Defendant:**    I have read *(or have had read to me)* this entire plea agreement and have discussed it with my attorney.  I have initialed each page of the agreement to signify that I understand and approve the provisions on that page.  I am entering this agreement voluntarily and of my own free will.  No threats have been made to me, nor am I under the influence of anything that could impair my ability to understand this agreement.

_____          05 – 23 – 20 11
Hor Ibrahim Akl                                          Date

**Defense Counsel:**  I have read this plea agreement and concur in Defendant pleading in accordance with terms of the agreement.  I have explained this plea agreement to Defendant, and to the best of my knowledge and belief, Defendant understands the agreement.

_____          May 23, 2011
Jeffrey J. Helmick                                       Date
Counsel for Defendant

Page 27 of 28

H.A.
Defendant's Initials

Plea Agreement of HOR I. AKL

_____        _____5-23-11_____
David L. Doughten                       Date
Counsel for Defendant


**United States Attorney's Office:** I accept and agree to this plea agreement on behalf of the United States Attorney for the Northern District of Ohio.

_____        _____5/23/2011_____
Justin E. Herdman                       Date
Assistant U.S. Attorney


**National Security Division, United States Department of Justice:** I accept and agree to this plea agreement on behalf of the National Security Division, United States Department of Justice.

_____        _____5/23/2011_____
S/Elisabeth Poteat                      Date
Trial Attorney, Counterterrorism Section


The within Rule 11(c)(1)(C) binding plea agreement between the United States of America and the defendant, HOR I. AKL, consisting of 28 typewritten pages, is hereby

**APPROVED AND ACCEPTED:**

_____        _____5/23/11_____
Honorable James G. Carr                 Date
UNITED STATES DISTRICT JUDGE

Defendant's Initials